1
2                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
3                          EASTERN DIVISION

4     UNITED STATES OF AMERICA,

5              Plaintiff,              Case No. 5:18CR406
                                       Akron, Ohio
6         vs.                          Wednesday, February 13, 2019
                                       1:40 p.m.
7     WILLIE R. BENTON, JR.,

8              Defendant.

9

10                 TRANSCRIPT OF SENTENCING HEARING
                 BEFORE THE HONORABLE JOHN R. ADAMS
11                  UNITED STATES DISTRICT JUDGE

12
      APPEARANCES:
13
      For the Government:   Aaron P. Howell
14                          Office of the U.S. Attorney - Akron
                            2 South Main Street, Room 208
15                          Akron, Ohio 44308
                            (330) 375-5716
16
      For the Defendant:    Lawrence J. Whitney
17                          Burdon & Merlitti
                            137 South Main Street, Suite 201
18                          Akron, Ohio 44308
                            (330) 253-7171
19
      Court Reporter:       Caroline Mahnke, RMR, CRR, CRC
20                          Federal Building & U.S. Courthouse
                            2 South Main Street, Suite 568
21                          Akron, Ohio 44308
                            (330) 252-6021
22

23

24    Proceedings recorded by mechanical stenography; transcript
      produced by computer-aided transcription.
25

1         Wednesday, February 13, 2019

2              THE COURT:  For the record, the Court has before

3    to today Case Number 5:18CR406.  The case is United States

4    of America versus Willie Benton.  We're here today for

5    purposes of sentence.

6         Counsel for the government, are you ready to proceed?

7              MR. HOWELL:  Good afternoon, Your Honor, Aaron

8    Howell on behalf of the United States.  Seated to my left is

9    Detective Gilbride of the Akron Police Department.  We are

10   ready to proceed.

11             THE COURT:  Thank you.

12        On behalf of the defendant?

13             MR. WHITNEY:  Yes, Your Honor.  We are ready to

14   proceed.

15             THE COURT:  Mr. Benton, did you go over the

16   presentence report that was prepared to assist me in

17   deciding your sentence?

18             THE DEFENDANT:  Yes.

19             THE COURT:  Did you discuss it with your

20   attorney?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Thank you.

23        Counsel, did you go over the report, review it with

24   your client?

25             MR. WHITNEY:  I did, Your Honor.

1          THE COURT:  The report does indicate that there

2     are two objections the defendant wishes the Court to

3     address.

4          Before I do that, I just want to make it clear for the

5     record the documents I have in front of me.  I have the

6     defendant's sentencing memorandum along with the

7     government's sentencing memorandum, the PSI.  I also have

8     the defendant's sentencing exhibits.  The Exhibit D makes

9     reference to an order, I think, related to the sentencing of

10    a codefendant, if I'm not mistaken.

11         MR. WHITNEY:  Correct, Your Honor.

12         THE COURT:  So if you would like, I do have

13    the -- given the fact that the defendant raised the issue, I

14    did go back and review the PSI of Mr. Merida.  We can

15    discuss that in a moment.

16         Beyond that, as to the objection, we have two

17    objections.  And one relates to the amount of drugs in

18    question.  The second is related to the enhancement for

19    possession of a firearm, as I understand it.

20         Is that correct, Mr. Whitney?

21         MR. WHITNEY:  Yes, Your Honor.

22         THE COURT:  What if any evidence do you wish to

23    present?

24         MR. WHITNEY:  Your Honor, we discussed putting

25    the case agent on.  There is a laboratory analyst from BCI

1    that we discussed putting on.  And I think Mr. Howell will

2    put those people on.

3                 THE COURT:  All right.  Counsel.

4                 MR. HOWELL:  Your Honor, yes.  That is correct.

5    I do have Keith Taggart from BCI here prepared to testify,

6    and we also intend to put Detective Gilbride on.

7          Additionally, Your Honor, we had one other witness

8    based upon something that came up, and we would like to put

9    that witness on if we could.

10                THE COURT:  All right.  We can start with that

11   witness.  And that witness is with regard to, you say,

12   something else has come up.  What is that remaining issue?

13                MR. HOWELL:  There have been some threats and

14   also the Title III affidavit in this case, which was sealed

15   by Your Honor, was unsealed for the purposes of discovery,

16   has now been posted on Facebook, trying to track down who

17   they believe the confidential sources may be.

18          And we believe that person is in the courtroom and we

19   want to call her to the stand.

20                THE COURT:  All right.  You may proceed.

21                MR. HOWELL:  The United States would call

22   Marquete Fullmore to the stand.

23                THE COURT:  Marquete Fullmore.

24                MR. HOWELL:  Did she leave?

25          She might be outside, Your Honor.  I don't know if she

1      saw the Facebook posting and maybe took off.  But maybe

2      she's outside.

3                THE COURT:  If need be, we can issue a subpoena

4      or take whatever steps are necessary.

5           Ma'am, please approach the witness stand, if you

6      would, and remain standing while I administer the oath or

7      affirmation.

8           Do we need an attorney for her?

9                MR. HOWELL:  Your Honor, I guess that would

10     depend on her answers.  At this point I don't know enough to

11     know if she's the person who posted or not.  But we intend

12     to find out.

13          Basically -- let me put on the record, Your Honor, I

14     do have the same concern that the Court issued, but the

15     purpose for us putting her on is we think that perhaps the

16     obstruction guideline should apply to Mr. Benton based upon

17     how these documents ended up on Facebook.

18          So our intent with putting her on is to find out

19     exactly how those ended up on Facebook and how they got into

20     someone's possession when they were sealed but for the

21     purposes of discovery in this particular case and should

22     have only been provided to Mr. Benton.

23                THE COURT:  Well, obviously that's a serious

24     issue.  And obviously it has some bearing on Mr. Benton's

25     sentence, too.  It could obviously add --

1          MR. HOWELL:  There is at least two levels that

2     are a potential.  I've looked at the guideline, Your Honor.

3     And that's the purpose, obviously, of why we're putting Ms.

4     Fullmore on.

5          If it gets to the point where we think she may

6     incriminate herself, maybe we can stop the proceeding.

7          THE COURT:  We'll stop at that point, but be very

8     cautious and careful with your questions.

9          Ma'am, stand up.  Please raise your right hand.

10         Do you solemnly swear or affirm that the testimony you

11    are about to give in this matter shall be the truth, the

12    whole truth, and nothing but the truth, so help you God, or

13    as you shall answer under the pains and penalties of

14    perjury?

15         THE WITNESS:  Yeah, I guess.

16         THE COURT:  Are you going to tell the truth?

17         THE WITNESS:  Yeah.

18         THE COURT:  You're under oath.

19         Have a seat.  It's important, ma'am, you understand,

20    I'm going to tell you so you understand, it's important that

21    all your answers be truthful.  If it's later shown any

22    answers that you give here are false, then you may be

23    subject to a separate prosecution for perjury or making a

24    false statement.

25         Do you understand that?

1          THE WITNESS:  Um-hum.

2          THE COURT:  Yes?

3          THE WITNESS:  Yes.

4          THE COURT:  You need to respond verbally.  Yes or

5   no.  And if it reaches a point where we're concerned about

6   whether you are in some way incriminating yourself, we'll

7   terminate the proceedings.  But at least initially I'm going

8   to allow the questions to go forward.

9          Counsel, you may inquire.

10                        MARQUETE FULLMORE,

11          of lawful age, a witness called by the Government,

12             being first duly placed under oath, was examined

13                        and testified as follows:

14              DIRECT EXAMINATION OF MARQUETE FULLMORE

15   BY MR. HOWELL:

16   Q.    Please state your name and spell your last name for

17   the record?

18   A.    Marquete Shalindia Fullmore.

19   Q.    Spell your last name, please.

20   A.    F-U-L-L-M-O-R-E.

21   Q.    Spell your first name, please.

22   A.    M-A-R-Q-U-E-T-E.

23   Q.    T-T-E?

24   A.    It's one T.

25   Q.    What is your relationship to Mr. Benton?

1    A.    My fiance.  We share two kids.

2    Q.    He's your fiance?

3    A.    Yes.

4    Q.    Did you live with him?

5    A.    Yes.

6    Q.    Where did you live?

7    A.    At my house.

8    Q.    What was your address?

9    A.    802 Orlando.

10   Q.    You're here in support of Mr. Benton today for this

11   sentencing?

12   A.    Yes.

13   Q.    Do you have a Facebook page?

14   A.    Yes.

15   Q.    Did you make some recent postings?

16   A.    Yes.

17   Q.    Did those postings consist of a Title III affidavit

18   pertaining to this case?

19            MR. WHITNEY:  Your Honor, I think she ought to be

20   instructed, Your Honor.  I have been told that there may be

21   another -- there may be some charges arising from this.

22            THE COURT:  Well, let's proceed with caution here

23   because obviously the government can obtain from Facebook

24   through the appropriate means information that would pertain

25   as to exactly who posted these items.

1          MR. WHITNEY:  Correct.

2          THE COURT:  Number one.

3     And number two -- maybe we should have this discussion

4 in private, but I'm going to be blunt with you.

5 Irrespective of the guidelines, if in fact your client has

6 in some way disseminated confidential material, then the

7 consequences could be far more than just guideline

8 computation issues.  We're talking about statutory penalties

9 here.

10     Even with the guidelines we have now, depending on

11 your argument, he's facing 235 to I'm not sure what the

12 guideline range is.

13     Now, the government has a right to get to the bottom

14 of it.  I am deeply concerned.  If we have Title III

15 information provided to your client that has in some way

16 come into the hands of some third person and being posted on

17 Facebook, then you know what the consequences are going to

18 be for your client, potentially.

19     Do you understand that?

20          MR. WHITNEY:  May I say something, Judge?

21          THE COURT:  We'll take a break and we will

22 appoint counsel for her.

23     Just so we know her information.  We now know where

24 she lives and we now know where she can be found.

25     So we're going to get to the bottom of this.

1           MR. WHITNEY:  May I indicate, Judge, I was told

2      of this yesterday afternoon.  This is not something that's

3      been lurking around for even days.  I was told about 2:00

4      yesterday afternoon that this had occurred and they were

5      investigating it.

6           THE COURT:  Well, obviously this is the first

7      time I've learned of it.

8           MR. WHITNEY:  Me too.

9           THE COURT:  There can only be two sources of the

10     material, right?

11          MR. WHITNEY:  Correct.

12          THE COURT:  The government or your client.

13          MR. WHITNEY:  Right.

14          MR. HOWELL:  Or Mr. Merida.

15          THE COURT:  Pardon?

16          MR. HOWELL:  Or Mr. Merida.

17          THE COURT:  That's possible, too, I suppose.

18     So we're going to get to the bottom of it.  So we'll

19     just set this matter over until we find out exactly what

20     transpired.  The government can do its job.

21          Ma'am, I'll appoint an attorney to represent you so

22     that you have adequate counsel to protect your rights in the

23     matter.

24          You can step down.  I'm sorry.  You're excused.

25          Make sure that we have contact information -- before

1    you leave, what is your contact -- we have your address?

2    What's your telephone number ma'am?

3                 THE WITNESS:  330-624-4708.

4                 THE COURT:  Get a call in to that lawyer.  You

5    should reach out to that lawyer because it's important that

6    you talk to him or her as the case might be.

7         We'll set the matter over until we have adequate time

8    to address -- clear that issue up because the other issues

9    are tangential.  We're not going to worry that much about

10   the other issues until we have a decision made about this

11   very serious matter.

12                MR. HOWELL:  If I may, I have Mr. Taggart here.

13   Would the Court like to use the time now if he's here?

14                THE COURT:  I suppose we can.  I'm in trial.

15   Let's clear up -- I suppose we can take testimony on these

16   other issues, and then we will not impose sentence until we

17   figure out exactly what has gone one with this Title III and

18   the posting of same.

19        You can call you witness if you have him.

20        Sir, if you'd approach the witness stand.  Please

21   remain standing.

22                          KEITH TAGGART,

23            of lawful age, a witness called by the Government,

24              being first duly placed under oath, was examined

25                        and testified as follows:

1    THE COURT:  Be seated in the witness stand if you

2    would, and use the microphone.  The chair does not move,

3    sir.  I'm sorry.

4    Counsel, you may inquire.

5    MR. HOWELL:  Thank you, Your Honor.

6    May I have one second?

7    THE COURT:  Yes.

8    DIRECT EXAMINATION OF KEITH TAGGART

9    BY MR. HOWELL:

10   Q.    Good afternoon.  Could you please state your full name

11   and spell your last name for the record?

12   A.    Keith Taggart, T-A-G-G-A-R-T.

13   Q.    What do you do for a living, sir?

14   A.    I work as a forensic chemist for the Ohio attorney

15   general's office, Bureau of Criminal Identification, in

16   Richfield, Ohio.

17   MR. HOWELL:  And I think for purposes of this

18   hearing, Judge, I did speak to Attorney Whitney, I think he

19   would stipulate to his qualifications.

20   MR. WHITNEY:  Right.  He also has a report, Your

21   Honor.  We'll stipulate to that, too.

22   THE COURT:  We will note the stipulation as to

23   his qualifications.

24   BY MR. HOWELL:

25   Q.    All right.  Mr. Taggart, we just want to talk to you

1     here specifically in regards to the lab report you did in

2     this particular case.

3          I'm going to go ahead and mark that as Government's

4     Exhibit 2.

5               MR. HOWELL:  And will the screen show it to him,

6     Chris, with the overhead?

7               THE DEPUTY CLERK:  Yes.

8     BY MR. HOWELL:

9     Q.   Do you see Government Exhibit 2 on the screen in front

10    of you, Mr. Taggart?

11    A.   Yes, I do.

12    Q.   And is this your lab report?

13    A.   Yes, it is.  I think my signature is on page 2.

14         There it is.  Yes.

15    Q.   All right.  Now, specifically, let's go right to your

16    findings here.

17         Submitted on July 9, 2018 by Detective Carmen R.

18    Ingram, you were asked to examine four separate items; is

19    that correct?

20    A.   That's correct, yes.

21    Q.   And those are listed here in your report.  And we will

22    go over your findings.

23         In regards to the first one, will you please read into

24    the record what you found in regards to Item Number 1?

25    A.   My finding were three foil wrapped packages, each with

1    a white substance, 2,968.97 grams, plus or minus 0.09 grams,

2    and that was found to contain cocaine.  And that was

3    determined using instrumental analysis.

4    Q.    And Finding Number 2?

5    A.    Was a white substance, 988.22 grams, plus or minus

6    0.09 grams, and that was found to contain cocaine also, and

7    that was determined using instrumental analysis.

8    Q.    And Item Number 3?

9    A.    Was a yellow substance, 991.29 grams, plus or minus

10   0.09 grams, found to contain cocaine base, crack cocaine,

11   determined using instrumental analysis.

12   Q.    And finally, Finding Number 4?

13   A.    Two plastic wrapped packages, each with a yellow

14   substance, 1,932.49 grams, plus or minus 0.09 grams.  And

15   that's found to contain cocaine base, crack cocaine,

16   determined using instrumental analysis.

17   Q.    All right.  Now, I want to focus specifically on your

18   findings Number 3 and Number 4?

19   A.    Correct.

20   Q.    Now, prior to testifying here today, did you have the

21   opportunity to speak to Mr. Whitney in regards to this

22   matter?

23   A.    Yes, I did.

24   Q.    All right.  And so we just want to focus on those two.

25   Can you please state for the record, on your Finding Number

1    3 and Finding Number 4, what type of procedures and testing

2    did you do to come to that opinion?

3    A.    I used -- like it said, "determined using instrumental

4    analysis."  I used what's commonly referred to as FTIR which

5    is Fourier-transform infrared spectroscopy.  And that

6    determines both the cocaine hydrochloride form and the

7    cocaine base form based on the specific molecular

8    fingerprint when an infrared beam is passed through it.

9         And I also took two separate samples and ran a gas

10   chromatograph mass spectrometer, and I also ran a gas

11   chromatograph mass spectrometer for retention time.  And all

12   those indicated cocaine or cocaine base in this case.

13   Q.    And with all four of your findings here, do you hold

14   those to a reasonable degree of scientific certainty?

15   A.    Yes, I do.

16             MR. HOWELL:  Your Honor, with that I would turn

17   over the questioning to Mr. Whitney.

18             THE COURT:  All right.  Thank you.

19        Mr. Whitney, you may inquire.

20             THE WITNESS:  It keeps on going blurry on me.  I

21   don't know if it's my glasses or me.

22             MR. WHITNEY:  I just moved it.

23             THE WITNESS:  It was off to the side.

24             MR. WHITNEY:  Can you see it now?

25             THE WITNESS:  Yeah, I can see it now.

1     MR. WHITNEY:  May I proceed, Your Honor?

2     THE COURT:  Yes.

3     MR. WHITNEY:  Thank you.

4         CROSS-EXAMINATION OF KEITH TAGGART

5  BY MR. WHITNEY:

6  Q.    Sir, just a couple questions regarding 3 and 4 that

7  you've already testified to.

8         When you run that test, that FTIR test, that is

9  specifically for cocaine or cocaine base, cocaine

10  hydrochloride or cocaine base; is that correct?

11  A.    That is correct, yes.

12  Q.    So you don't test -- I mean, that test would not

13  indicate whether or not there were other substances in 3 and

14  4 other than the cocaine base?

15  A.    It will determine if other substances are present, if

16  it's a mixture.  In this case, my initial analysis run was

17  cocaine base indicated.

18         I started out with Item Number 3.  And then I

19  extracted it and hexane dried it down and ran the sample

20  again.  And it became -- it was cocaine base at that time.

21  So nothing was done to the substance, just extract out any

22  adulterants that were in there.

23  Q.    But it wouldn't show if there were heroin, for

24  instance, in the sample?

25  A.    That's correct.

1    Q.    Okay.  And it does not do an analysis as to how much

2    cocaine base was in the substance?

3    A.    That's correct.

4    Q.    In other words, I've seen reports -- I think maybe the

5    federal government does reports indicating that the quality

6    is 50 percent or 80 percent or 90 percent.

7          The tests that you have available to you at the Bureau

8    of Criminal Identification do not perform that kind of

9    testing?

10   A.    We just do qualitative analysis to determine whether

11   something is or is not there.  Not quantitative analysis.

12   Q.    And no such analysis was done, to your knowledge, at

13   your laboratory on 3 and 4?

14   A.    That is correct.

15   Q.    And 3 or 4, then, they were three separate packages,

16   were they not, sir?

17   A.    That is correct, yes.

18   Q.    Wrapped in plastic?

19   A.    Correct, yes.

20   Q.    Okay.

21              MR. WHITNEY:  Thank you.  That's all, Judge.

22   Thank you.

23              THE COURT:  All right.  Anything else?

24              MR. HOWELL:  No, Your Honor.

25              THE COURT:  All right, sir.  You may step down.

1          THE WITNESS:  Thank you.

2          THE COURT:  Anything else related to Issue or

3     Objection Number 1?

4          On behalf of the government?

5          The allegation is that these drugs were not part of

6     the same course of conduct.  They were determined to be

7     cocaine base, not cocaine.  There appears to be no common

8     factors such as common victims, common accomplishments,

9     common purpose, or modus operandi.  That is the objection

10    raised by the defendant.

11         Counsel for the defendant, what if any other evidence

12    do you wish to present regarding your objection?

13         MR. HOWELL:  We hope to get something from the

14    case officer assigned, Your Honor.

15         THE COURT:  You would like to call him as a

16    witness?

17         MR. WHITNEY:  I think the government will call

18    him.

19         MR. HOWELL:  Yes, Your Honor.  We'll call

20    Detective Gilbride.

21         THE COURT:  Sir, if you'd approach the witness

22    stand.

23                    MICHAEL GILBRIDE,

24        of lawful age, a witness called by the Government,

25         being first duly placed under oath, was examined

1      and testified as follows:

2              THE COURT:  All right.  Be seated in the witness

3      stand, sir.

4              DIRECT EXAMINATION OF MICHAEL GILBRIDE

5      BY MR. HOWELL:

6      Q.    Please state your full name, spell your last name for

7      the record.

8      A.    Michael Gilbride, spelled G-I-L-B-R-I-D-E.

9      Q.    Where do you work?

10     A.    Akron Police Department, Akron, Ohio.

11     Q.    What are your primary duties there?

12     A.    Assigned to the narcotics unit and currently detailed

13     to the Drug Enforcement Administration in Cleveland, Ohio,

14     Enforcement Group 2.

15     Q.    How long have you been with the Akron Police

16     Department?

17     A.    It will be 20 years in April.

18     Q.    When you're assigned with the DEA, that's as a task

19     force officer?

20     A.    Yes, sir.

21     Q.    And what do you do as a member of the task force?

22     A.    I investigate drug trafficking organizations

23     responsible for bulk narcotics trafficking in Northeast

24     Ohio.

25     Q.    As part of your duties investigating drug trafficking

20

1    organizations, do you obtain Title III wiretaps?

2    A.    Yes.

3    Q.    And did you obtain one in this particular case?

4    A.    Yes.  The audio was obtained during the course of

5    investigation beginning in March of 2018.  And the first day

6    of interception was, I believe, May 18, 2018.

7    Q.    And as a result of that Title III wiretap and the

8    investigation that surrounded it, did you eventually arrest

9    Mr. Benton?

10   A.    Yes.

11   Q.    Do you see Mr. Benton in the courtroom?

12   A.    Yes.

13   Q.    Could you please just point to him and identify him

14   for the record?

15   A.    Orange jumpsuit with Larry Whitney.

16             MR. HOWELL:  Your Honor, may the record reflect

17   he has identified the defendant?

18             THE COURT:  It will so reflect.

19   BY MR. HOWELL:

20   Q.    In regards to Mr. Benton, we're here -- and I want to

21   focus specifically on some items that were found in his

22   residence the day that he was arrested, specifically the

23   items we just heard Mr. Taggart talk about.

24        Would you describe these as three kilos, close to

25   three kilo packages?

1    A.    There was four kilograms that was immediately

2    delivered to the house, and there was an additional three

3    kilograms found in a safe.

4    Q.    All right.  So the four kilograms are the subject

5    matter of the offense that he was charged with in this case

6    with Mr. Merida; is that fair?

7    A.    Correct.

8    Q.    And you also found three other kilo packages, correct?

9    A.    Correct.

10   Q.    Would you describe for the Court what those three

11   kilo-like packages, what were those like, based on what you

12   saw?

13   A.    They had been -- there was a significant amount of

14   cutting agent added to them, adulterant.  It was not

15   consistent with a typical kilogram of cocaine.

16         The best I could describe it is whatever he added to

17   it was not good.  It looked similar like Bisquick pancake

18   mix.

19         And we were aware that he had had three kilograms that

20   he was having difficulty selling because the quality of the

21   cocaine was so poor.

22   Q.    All right.  And you were aware of that through your

23   investigation including the wiretap; is that fair to say?

24   A.    Yes, sir.

25   Q.    And please describe for the Court what you mean by

1    that he was having troubling selling it.  What do you mean

2    by that?

3    A.    I recall one lady in Cleveland that he sold two ounces

4    of cocaine to, and she called back complaining that it would

5    not cook into crack cocaine.

6          She stated it looked like oatmeal, that it was very

7    milky, at which point in time Willie Benton was trying to

8    tell her how to cook it into crack, to put it in the

9    refrigerator and see if it would cool off.  And it was

10   pretty evident that nothing was working.

11   Q.    All right.  So based upon the things that you heard,

12   what about the packaging of this, anything to indicate to

13   you that it was packaged for sale or anything about the

14   amount?

15   A.    It looked like kilograms of cocaine, but it was not

16   consistent with good kilograms of cocaine that you would

17   normally intercept.

18         They had clearly been doctored up.  They were wrapped

19   in cellophane.  And the texture of it was -- I don't know

20   what he did to this cocaine, but he clearly messed it up

21   bad.

22   Q.    Was there a firearm found that day as well?

23   A.    There was.

24   Q.    And where was that firearm found?

25   A.    Inside the residence of the apartment there.

1    Q.    And do you recall the address of where that took
2    place?
3    A.    696 Carlyle Street.
4    Q.    Let's talk a little bit about your training and
5    experience with your drug investigations.
6          Do you typically come across firearms in your drug
7    investigations?
8    A.    Yes.
9    Q.    Please describe for the Court what your experience is
10   with that as far as drug trafficking and guns, if they go
11   together or not?
12   A.    They do.  Generally used as a means of securing the
13   proceeds derived from illicit drug trafficking.
14   Q.    At that time, when you seized -- let's first talk
15   about those four kilograms of the powder cocaine.  What was
16   the approximate street value in Akron at that time?
17   A.    40,000 times four, 160,000, if you did them straight
18   up, if you bought them by the kilogram.  Obviously if you
19   begin to break it down further and further and further down
20   to an ounce, say, I would need a calculator, but it
21   certainly would be more than $160,000.
22   Q.    All right.  Now, with the powder cocaine, is there
23   anything else you can do with that?  Can you turn that into
24   crack cocaine?
25   A.    Yes, you can.

1    Q.    How do you do that?

2    A.    Through cooking it over heat and water.

3    Q.    So you can stretch it out even further?

4    A.    Certainly.

5              MR. HOWELL:  Your Honor, at this time I wanted to

6    briefly touch upon and just get the exhibit put in that we

7    were going to talk about with Ms. Fullmore, that the agent

8    had discovered, if I may.

9              THE COURT:  You may.

10   BY MR. HOWELL:

11   Q.    Did you recently become aware of some Facebook

12   postings in this particular matter --

13   A.    Yes.

14   Q.    -- that drew your attention?

15   A.    Yes.

16   Q.    Can you please just describe for the Judge what you

17   found?

18   A.    Two, what I could determine to be two to three pages

19   of the Title III affidavit that I drafted for Mr. Benton's

20   phone identifying cooperating informants in the

21   investigation.

22   Q.    And were you able to determine what -- well, first of

23   all, where did you find those?

24   A.    On the Facebook page.  They were forwarded to me.  And

25   then on -- obviously on the Facebook page of Ms. Fullmore.

1    Q.    And that's Marquete Fullmore?

2    A.    Yes.

3    Q.    Had you ever met Ms. Fullmore prior to today?

4    A.    No.

5    Q.    All right.

6              MR. HOWELL:  Your Honor, permission to publish on

7    the overhead for him to identify the document.

8              THE COURT:  You may.

9    BY MR. HOWELL:

10   Q.    Government Exhibit 1, as soon as the screen pops up

11   here.

12         Do you see that?  Do you recognize that?

13   A.    I'm not getting it.

14             THE COURT:  I'm sorry.  It will need to be

15   focused better, sir.  I'm sorry.  Can't see it.

16             MR. HOWELL:  It's blurry with the print job as

17   well.  I'm just trying to get him to identify the document?

18             THE WITNESS:  My screen is all black.  I can see

19   hers.

20             MR. HOWELL:  I can just bring the physical

21   exhibit up.

22             THE WITNESS:  I got you.  I got you.

23   BY MR. HOWELL:

24   Q.    Do you recognize that?

25   A.    Yes.

1    Q.    What is this?

2    A.    Some of the paragraphs that I drafted for Mr. Benton's

3    phone regarding confidential informants utilized during the

4    investigation of Mr. Benton.

5    Q.    I know it's blurry there with the paper, but you're

6    talking about what's right in front of you there, that's

7    from the T3 affidavit?

8    A.    Yes.

9    Q.    On page 2, same thing?

10   A.    Yes.

11              THE COURT:  May I see the exhibit itself?

12              MR. HOWELL:  I did provide a copy to Mr. Whitney.

13              THE COURT:  Well, I'm going to need -- go ahead

14   and finish the examination.

15        I just want to mention here, I want to -- one thing

16   that strikes me is -- all right.  Thanks.

17        I'll wait until the examination is conducted.  We'll

18   have to have that marked and made part of the record in the

19   case.

20              MR. HOWELL:  With that, I don't have any further

21   questions for Detective Gilbride, Your Honor.

22              THE COURT:  Thank you.

23         Counsel, you may inquire.

24              MR. WHITNEY:  Yes, sir.

25               CROSS-EXAMINATION OF MICHAEL GILBRIDE

1    BY MR. WHITNEY:

2    Q.    On the last subject, could you tell me when these

3    posts came to your attention?

4    A.    Yesterday morning.

5    Q.    Okay.  So this has been a very recent thing?

6    A.    That's correct.

7    Q.    And as I understand it, they were sent to you,

8    correct?

9    A.    Correct.

10   Q.    Okay.  And had you talked to this woman who had these

11   postings?  Have you interviewed her prior to what we heard

12   from her today?

13   A.    No, sir.

14   Q.    Do you know when they were posted?

15   A.    No, sir.

16   Q.    Okay.  Is there any way for you to determine when in

17   fact these items were posted?

18   A.    Yes.

19   Q.    Okay.  And that would be part of your investigation?

20   A.    Yes, sir.

21   Q.    And will you then be able to determine whether they

22   were sent to anyone else, or the chain of custody, if you

23   will, of the postings on this website and other websites?

24   A.    Are you asking if other people are aware of the post

25   that she made?

1    Q.    Right.

2    A.    Yeah, you can tell that from the pictures.  There is a

3    fellow named Oden that re-tweeted it.

4    Q.    So that would be part of your investigation also?

5    A.    Yes.

6    Q.    Just a few questions about, you've handled a lot of

7    cocaine in your career, have you not, sir?

8    A.    Yes, sir.

9    Q.    Picked up a lot, bought a lot, professionally?

10   A.    Yes.

11   Q.    Bought a lot, picked up a lot, seized a lot, hauled it

12   to the BCI and other laboratories; is that correct?

13   A.    Yes, sir.

14   Q.    Identified it in courtrooms?

15   A.    Yes, sir.

16   Q.    This stuff that you saw, this three -- in the

17   safe -- and I'll show the Court some pictures -- didn't look

18   like normal cocaine; fair to say?

19   A.    Yes, sir.

20   Q.    Okay.  I call it junk; is that fair to say?

21   A.    That's probably the worst cocaine I've seen in 20

22   years.

23   Q.    And it's cut so much, or something has been done to

24   that cocaine to render it at least not to even appear to be

25   powder cocaine?

1    A.    Correct.

2    Q.    Anyone that knew, that dealt with powder cocaine

3    before, bought it, sold it, used it, would probably

4    recognize it as -- it was so bad, would probably recognize

5    it as junk?

6    A.    I would think so, but then again, we were intercepting

7    conversations of people actually purchasing it and then

8    complaining about it.  However, I would think so, yes.  I

9    certainly would not have purchased that cocaine.

10   Q.    You said that, okay, but we do know, if we look at the

11   laboratory, the BCI report that we just heard -- and I've

12   got it marked as G.

13              MR. HOWELL:  I have it here.

14              MR. WHITNEY:  In fact, I'll give it to you here.

15              MR. HOWELL:  Here, Larry.

16              MR. WHITNEY:  I got it here, too.

17         Thanks.

18         May I approach, Your Honor?

19              THE COURT:  You may.

20   BY MR. WHITNEY:

21   Q.    I'm going to give you a packet of exhibits.  I'm not

22   sure you need to see these right now.  I just want to -- I

23   have the same exhibits here.  I'll just ask you a few

24   questions about that.

25   A.    Okay.

1    Q.    You said there was some discussion you picked up on

2    the wire regarding the sale of junk cocaine?

3    A.    Yes, sir.

4    Q.    And, first of all, you said you had some evidence

5    there was three keys of that junk cocaine.

6    A.    Correct.

7    Q.    Do you mean there were three keys where there had been

8    some junk cocaine that was talked about on the wire?

9    A.    We were of the understanding, we believed that Mr.

10   Benton had under, guesstimating, five kilogram of cocaine

11   that was poor.

12   Q.    Okay.  But when you look -- let's look at the lab

13   report here on 3.

14         Now, I know that a kilo of cocaine is generally not

15   scientifically weighed; is that correct?

16   A.    Correct.

17   Q.    So a kilo could actually be 991 grams as it says on

18   Number 3, correct?

19   A.    Yes, sir.

20   Q.    Okay.  And the other two, the other two packages are

21   represented in Number 4, correct?

22   A.    It moved.  I can't see what you're seeing.

23   Q.    There you go.  I'm sorry.

24   A.    1,932?

25   Q.    Right.

1    A.    Yes.

2    Q.    So they are packaged separately, correct?

3    A.    Yes, sir.

4    Q.    About 1,000 kilograms -- grams per package, roughly.

5    And so we know that no one bought cocaine out of those two

6    packages?

7    A.    Correct.

8    Q.    Correct, because we're talking about two ounces.  That

9    would be how many grams?

10   A.    48.

11   Q.    48.  We're talking about the packages were closed.

12   And I'll show you pictures of them here in a minute.

13         So if there was talk about cocaine, junk cocaine,

14   complaints about junk cocaine, it doesn't appear that it

15   would have come from Items Number 3 and 4 on this list?

16   A.    That's correct.

17   Q.    Thank you.

18         Now, I'm going to show you some photos so the

19   Court -- you said that there were these three packages.

20   Three separate packages were found, were they not, sir, in a

21   locked safe?

22   A.    Correct.

23   Q.    And we got photographs of C-1.

24         MR. WHITNEY:  I think, Your Honor, I provided you

25   with these photographs, too.

1    THE COURT:  I have them.

2    MR. WHITNEY:  Thank you.

3    BY MR. WHITNEY:

4    Q.    So let's look at -- it's hard to see this.  I'm

5    zooming out.

6    Look at C-1 for a moment.  Those are the three

7    packages; is that correct?

8    A.    Yes, sir.

9    Q.    C-2, again, shows us the packages in the safe?

10   A.    Correct.

11   Q.    As you found them, sir?

12   A.    Yes.

13   Q.    And C-3 looks like you had to destroy the safe to get

14   it open?

15   A.    Correct.

16   Q.    And C-4, again, C-4 and C-5, they are three

17   independently wrapped sealed packages, correct?

18   A.    Yes, sir.

19   Q.    Okay.  Now, were you aware that another person lived

20   in that side of the apartment where you found the drugs, a

21   guy by the name of Harris?

22   A.    Devine?

23   Q.    Yes.

24   A.    At the time we conducted this investigation there was

25   no electricity in there.  I believe there was no running

1    water.  The residence was inhabitable -- unhabitable.  I

2    would find it hard to believe that Mr. Harris resided there.

3    Q.    Okay.  If we look at --

4    A.    Furthermore, we did have a pole camera on this

5    residence for approximately three months.  I never saw Mr.

6    Harris coming or going from that residence.

7    Q.    Okay.  We'll get to that in a moment.

8          If you look at Exhibit Number F, are you familiar with

9    these Notice of Seizure of Property and Initiation of

10   Administrative Forfeiture Proceedings?

11   A.    Yes, I am.

12   Q.    Okay.  These are a common practice in drug

13   enforcement; is that correct?

14   A.    Yes, sir.

15   Q.    Okay.  And that is an administrative requirement that

16   these notices be sent to basically anyone that the seizing

17   agents feel may have some interest in the property that was

18   seized?

19   A.    Correct.

20   Q.    I'm not here to say, and I'm not here to tell the

21   Court or you, that this is evidence of ownership.  But it

22   certainly is evidence that when this notice was sent, the

23   government thought that Mr. Harris may have some interest in

24   that firearm?

25   A.    That's correct.

1    Q.    And it tells him that if he does have an interest, to

2    bring in that interest or it will be forfeited?

3    A.    Correct.

4    Q.    Did you have anything at all to do with the

5    preparation of this exhibit?

6    A.    No, sir.

7    Q.    So you don't know how it came to be sent?

8    A.    Correct.

9    Q.    But you see his name at the top and his address of

10   being 1507 South Main Street?

11   A.    Yes.

12   Q.    And do you recognize that address?

13   A.    Yes, that's the address -- he is part owner of

14   that -- of the bar that Mr. Benton owned.

15   Q.    Right.

16         And it does in fact list that there is a gun, a TP9V2

17   .9 millimeter handgun?

18   A.    That's correct.

19   Q.    Seized on June 26 by DEA in Akron, Ohio?

20   A.    Correct.

21   Q.    Okay.  Is that the handgun that was found in that

22   apartment?

23   A.    Yes.

24   Q.    Do you recall where it was found?

25   A.    No.

1    Q.    Okay.

2    A.    Not off the top of my head.

3    Q.    But that was in -- and the drugs were both -- both the

4    delivered drugs, the four kilos that were delivered that

5    afternoon, were found in that side; is that correct?

6    A.    Correct.

7    Q.    And the safe containing the three other keys were in

8    that same apartment?

9    A.    Yes, sir.

10   Q.    Okay.  Now, what I would like to do is just give the

11   Court some idea about -- very quickly to go through some of

12   the Title III wiretaps.

13         You're familiar with those and reviewed those

14   throughout the course of this investigation; is that fair to

15   say?

16   A.    Yes, sir.

17   Q.    And you've probably filed at least one affidavit we

18   know to support a request for a warrant?

19   A.    Yes.

20   Q.    I think -- were you the affiant in other affidavits

21   other than the one for the documents?

22   A.    I was the affiant for the original Title III.  We did

23   re-up that Title III.  I don't recall the exact day.  I'm

24   going to say mid June.

25         I was the affiant for both search warrants at both 696

1    and 698 Carlyle.

2    Q.    Okay.  If you could go to H, H-1 in that packet.

3          And I don't represent that this is all of the

4    affidavit.  Hopefully I'll be able to go with you and take a

5    few minutes and go through some of these paragraphs so that

6    the Court can get an idea as to what led up to the seizure

7    of these four kilos on this day, okay?

8    A.    Yes, sir.

9    Q.    At the bottom in paragraph 20, it talks about -- and

10   after that -- about fixing up the pole camera.  That

11   happened apparently some time in mid March; is that correct?

12   A.    March or April we put a camera up on his house, yeah.

13   Q.    Then if we go to paragraphs -- towards of end of May,

14   in paragraph 37, you're listening to telephone calls between

15   Benton and another man talking about this Merida?

16   A.    Okay.

17   Q.    Correct?

18   A.    You're referring to paragraph 37?

19   Q.    37.

20   A.    No.  That would be Matthew Virden asking Willie Benton

21   for two kilograms of cocaine.

22   Q.    Yes.  But what I'm saying is, is Benton --

23   A.    Oh, "whenever Merida brings them," yes.

24   Q.    Benton begins talking in the end of May about this

25   delivery of four kilos in June?

1   A.   Correct.

2   Q.   Fair?

3   A.   Yes.

4   Q.   And this is the first time that I saw some specific

5   reference to this four kilos in the intercepted text, okay?

6   A.   Okay.

7   Q.   And is that fair?  Specifically about this four?

8   A.   These four?

9   Q.   Right.

10   A.   Yes.

11   Q.   Okay.  So that's fair to say that they're talking on

12   May 29 in the context of Benton receiving from Merida four

13   kilos of cocaine?

14   A.   You know, I may have misstated.  I think, and without

15   looking at it and having a timeline right in front of me,

16   there was intercepted conversations prior to this paragraph

17   37 with Merida where it was clearly evident Benton owed him

18   money, presumably from cocaine previously provided on

19   consignment.

20   Q.   Okay.

21   A.   So there was conversation of cocaine but not

22   specifically this delivery.

23   Q.   Well, I'm talking about these four.

24   A.   Okay.  This would be the first.

25   Q.   Because what I'm driving to, I'm trying to give the

1    Court some background to determine whether or not these two

2    finds here, the four and the three, should be lumped

3    together in this case, okay?

4    A.    Okay.

5    Q.    So I'm talking about the four.

6    A.    Okay.

7    Q.    So is that -- and it is fair to say then that this is

8    when the discussions are coming into play regarding the four

9    that Merida was going to deliver?

10   A.    That's correct.

11   Q.    For instance on paragraph 40, he confirmed that he was

12   going to get it.  On May 29 at about 10:07 p.m., this "Yup,"

13   and I think you indicate that that basically indicates that

14   he knows it's coming?

15   A.    That's correct.

16   Q.    And then later on, on the -- and then in June,

17   paragraph 41, we're now on June 5, correct?

18   A.    That's correct.

19   Q.    We're still talking about the four keys?

20   A.    Correct.

21   Q.    And that you intercept conversations between Benton

22   and Merida regarding that it's going to be ready at 5:30.

23   And then they want more time.  And then Benton can't meet.

24   And then they want to meet the next day, the following day

25   on June 6.

1          And Benton keeps asking him, I need this delivered,

2     correct?

3     A.    Correct.

4     Q.    And he says, "Please, man, I need you"?

5     A.    Correct.

6     Q.    Meaning that he needs to get this cocaine?

7     A.    Correct.

8     Q.    Is it fair to say that cocaine suppliers, cocaine

9     delivery people, buyers, don't like to sit on their money

10    and sit on their cocaine?

11    A.    No, they do not.

12    Q.    They want to get rid of it?

13    A.    As fast as possible.

14    Q.    That's because you're out there looking for it?

15    A.    We're looking for them, and they're needing money.

16    It's twofold.

17    Q.    Right.  And they're liable to be carrying a large

18    amount of money in a car, stopped for a traffic offense, and

19    boom, correct?

20    A.    Correct.

21    Q.    Same thing with cocaine?

22    A.    Correct.

23    Q.    You may trip on it and have it there, so their idea is

24    to get rid of it when they get it as soon they can, get it

25    quickly, get rid of it, and get rid of the money as soon as

1   they can?

2   A.   Yes, sir.

3   Q.   Okay.  And, again, June 18, now we're getting closer

4   to June 26 here on the next page.

5        There is an argument between Benton and Merida about

6   not using a certain phone and so forth.

7        And they're trying -- Benton keeps wanting to get it

8   delivered, and it doesn't seem to be coming; correct?

9   A.   That's correct.

10  Q.   Then on June 19, they're talking about

11  delivering -- he asks for three kilograms.

12       No, I'm sorry.

13       There is a discussion between Benton and another

14  individual who wants three of those four?

15  A.   Yes.

16  Q.   Okay.  So Benton has then a buyer for the three of the

17  four?

18  A.   That's correct.

19  Q.   Okay.  And that guy becomes involved, when is he

20  coming, correct?

21  A.   Correct.

22  Q.   And then on the 19th, Merida says I'll be there in ten

23  minutes, but he doesn't show up.  Then he asks for two more

24  days, correct?

25  A.   Yes.

1    Q.    And, "You been sitting here and I'm up here sweating

2    bullets man counting this -- " money, the "money, man."

3          Sweating bullets means that he's sitting on money,

4    correct?

5    A.    He was sitting right on the corner counting out

6    $100,000, and he was worried he was going to get stopped by

7    the police.

8    Q.    Right.  So that's an example of what you just said?

9    A.    Correct.

10   Q.    He's sweating bullet because he is sitting on the

11   money?

12   A.    Correct.

13   Q.    And he wants to get rid of this money that he's got,

14   correct?

15   A.    Yes.

16   Q.    And then Benton replied, yeah, "a whole bunch of

17   bullshit."

18         But anyway, so we get to the 19th.  They ask for two

19   more -- apparently Merida asks for two more days.  And

20   Benton is telling people we got to wait two more days.

21         June 19, it's getting close.  It's on the way.

22   Correct?

23   A.    That is correct.

24   Q.    That's all in these things.

25         And then on the 19th, again, they take a couple more

1    days.

2          And then -- so my point is, from May all the way to

3    June 26, is it fair to say that the conversation you're

4    hearing between Merida and Benton is about this four keys?

5    A.    Yes.

6    Q.    Okay.  The next exhibit we have is I, which is a

7    Report of Investigation about that day, okay, about the day

8    that he was arrested on June 26.

9          And I think you detail here, do you not, that you're

10   listening to the phone calls between Merida and Benton?

11   A.    Yes.

12   Q.    And you hear "ready at 6:30," "I'll be there."

13         So you knew that it was coming, that four kilos was

14   going to be delivered?

15   A.    We knew cocaine was coming.  We didn't know the

16   quantity, but yes.

17   Q.    But you knew that this was something that has been

18   anticipated for over a month, correct?

19   A.    Yes, and it's finally coming.

20   Q.    You have been watching it for a month, listening to

21   conversations for about a month?

22   A.    Yes.

23   Q.    And thinking this may be the time?

24   A.    Yes.

25   Q.    So you go and watch Benton leave his business,

1    correct?

2    A.    Correct.

3    Q.    And he drives over to the house that you searched?

4    A.    Correct.

5    Q.    And that's all detailed in this -- and you see Benton

6    arrive on the pole camera?

7    A.    Correct.

8    Q.    And at about 6:09, that's on the second -- I think

9    it's the second page of that report.  Yeah, second page of

10   that report.

11         6:09 you see Benton's truck pull up by the pole

12   camera, correct?

13   A.    Correct.

14   Q.    And then they enter the house.  And this is not that

15   important, but this 6:09, and then they enter the Carlyle

16   Street house.  And then a couple minutes later, three

17   minutes later, both Benton and Merida exit, correct?

18   A.    Correct.

19   Q.    Benton returned to his pickup truck, remained parked

20   in the driveway, Merida then drove off?

21   A.    That's correct.

22   Q.    And I think the Court knows that Merida was picked up

23   as an investigatory stop and found to have money and was

24   arrested then?

25   A.    That's correct.

1    Q.    And then shortly thereafter you put Benton in custody?

2    A.    That's correct.

3    Q.    So if we go to the -- I'm sorry.  It also -- I don't

4    think that is that important, but let's go to the last

5    exhibit is J.

6          And if you remember, I spent a great deal of time

7    trying to get text messages in this case from various

8    phones, and the Court was kind enough to help me issue

9    subpoenas.

10         But the greatest source we had was when the government

11   dumped the phones that they had seized from the defendant;

12   is that correct?  You realize that that happened in this

13   case?

14   A.    Yes.

15   Q.    Okay.  As a result of that phone dump -- and for the

16   record, what I mean by phone dump, could you tell the record

17   what I mean by phone dump?

18   A.    We extracted all the information from Mr. Benton's

19   phone and put it on a CD and gave it to you.

20   Q.    And this is, as you can see, the 26th of June.  And it

21   starts at the bottom at 18:08 which would be 6:08, right?

22   A.    Yes, sir.

23   Q.    And I just listed those because you can see he's

24   sending messages here, correct?

25   A.    Yes.

1    Q.    And he's -- "Are you ready?"  "I'm trying."  "Come if

2    you can."

3          And then all the way up to 18:19, okay, which would be

4    6:19, correct?

5    A.    Yes.

6    Q.    Okay.  He says, "I'm ready."  Correct?

7    A.    Correct.

8    Q.    And then we see that was sent.  And then we see unread

9    messages after that?

10   A.    That's correct.

11   Q.    Okay.  So that would have been approximately the time

12   that Mr. Benton was arrested?

13   A.    That's correct.

14   Q.    And it looks like the records that we have before us

15   indicate that he sent a text saying "I'm ready"?

16   A.    That's correct.

17   Q.    What would that mean to you, that the drugs were here?

18   A.    Yes, he was in possession of the drugs and ready to

19   sell them.

20   Q.    Okay.  Now, did the pole camera that was set up, that

21   was viewing Mr. Benton arriving and Merida arriving that

22   afternoon at Carlyle Street, was it evident which side of

23   the building they went in and out?

24   A.    Yes.

25   Q.    Okay.  And that was the side where the drugs were

1    contained?

2    A.    That's correct.

3    Q.    Okay.

4              MR. WHITNEY:  That's all I have, Judge.  Thanks.

5              THE COURT:  Thank you.

6         Counsel for the government.

7              MR. HOWELL:  Just briefly, Your Honor.

8              THE COURT:  Further inquiry?

9              MR. HOWELL:  Your Honor, if I may publish Exhibit

10   3.

11             THE COURT:  You may.

12             REDIRECT EXAMINATION OF MICHAEL GILBRIDE

13   BY MR. HOWELL:

14   Q.    Do you see that, Detective Gilbride?

15   A.    Yes, sir.

16   Q.    Is that your ROI that you wrote with regard to the

17   evidence that was obtained at 696 Carlyle Street?

18   A.    I believe it was drafted by Special Agent Wehrmeyer,

19   but it was the ROI from the residence, yes, the search of

20   the residence.

21   Q.    You were asked some questions by Attorney Whitney with

22   regards to where the firearm was recovered from, and you

23   said you didn't recall off the top of your head, right?

24   A.    Yes.

25   Q.    Take a look at Item Number 7 on the list there.  What

1   does that say?

2   A.    Canik TR-9V2 .9 millimeter handgun, with a magazine

3   and 17 rounds of ammunition located on the second floor

4   northeast bedroom by Detective Wallace.

5   Q.    So second floor northeast bedroom.

6         Then I want to direct your attention to Items 9 and

7   10.  That refers to those three kilograms of the yellow

8   substance which turned out to be cocaine base; is that

9   right?

10  A.    Yes, sir.

11  Q.    What bedroom were those located in?

12  A.    Item Number 9, two kilos of off-white powder located

13  in the second floor northeast bedroom in a safe by Detective

14  Wallace.

15  Q.    And Item 10, the same thing?

16  A.    Same thing, one kilo, in the safe, northeast bedroom,

17  Detective Wallace.

18  Q.    Okay.

19         MR. HOWELL:  I have nothing further, Your Honor.

20         THE COURT:  All right.  Anything else?

21         MR. WHITNEY:  Excuse me, Your Honor.  One second.

22  Just a couple more questions.

23         RECROSS-EXAMINATION OF MICHAEL GILBRIDE

24  BY MR. WHITNEY:

25  Q.    Your investigation did indicate, did it not, that

```
 1    Merida delivered four keys of cocaine to that residence on
 2    June 26?
 3    A.    That's correct.
 4    Q.    Okay.  He didn't deliver seven?
 5    A.    No, he did not.
 6    Q.    He delivered four?
 7    A.    That's correct.
 8    Q.    Okay.  And that there is a major -- and you saw both
 9    the four and the three?
10    A.    Yes.
11    Q.    Correct?
12    A.    Correct.
13    Q.    You handled both the four and the three?
14    A.    Correct.
15    Q.    The two were not comparable in terms of quality; is
16    that a good way to put it?  You know what I'm driving at?
17    A.    That's correct.
18    Q.    There were obviously two different -- the three was
19    obviously different from the four?
20    A.    100 percent different.
21    Q.    Okay.  And Merida did not bring the three that day?
22    A.    That's correct.
23              MR. WHITNEY:  One minute, Your Honor.
24              THE COURT:  Yes.
25              MR. WHITNEY:  That's all we have, Judge.  Thanks.
```

1           THE COURT:  All right.  You may step down, sir.

2           THE WITNESS:  Thank you, Your Honor.

3       (Witness excused.)

4           THE COURT:  Anything else with regard to the

5   first objection as to the three kilos that counsel has

6   argued should not be considered as relevant conduct?

7       Any additional testimony, evidence?

8           MR. HOWELL:  No, Your Honor.

9           THE COURT:  In regard to argument, Mr. Whitney,

10  what if any argument would you like to make regarding that

11  issue?

12          MR. WHITNEY:  Judge, I set forth in my brief, I

13  think, a number of -- I couldn't find a whole heck of a lot

14  of cases on it.  But I found two or three.  One from our

15  district from 2008, that's the *Hill* case, that talked about

16  it must be sufficiently connected or related to each other

17  as to warrant the conclusion that they are part of a single

18  episode, spree, or ongoing series of offenses.

19      Number one, I would only indicate that this

20  is -- number one, the quality here is different.  Number

21  two, the three are crack cocaine rather than cocaine.  There

22  is no evidence that there were common accomplices.

23      I mean, I don't know -- there is no evidence as to

24  where the three came from, common purpose or similar modis

25  operandi.  We just don't know where that three came from.

1          And in this case, it's, as you know and pointed out,

2      it's substantial in terms of its effect on the length of

3      sentence in this case.

4          But I don't know what evidence there is that there

5      was -- that there was a part of a single episode, spree, or

6      ongoing series of offenses.

7          And then I found that Seventh Circuit case that talks

8      about that relevant conduct cannot be used to sentence a

9      defendant based upon isolated unrelated events that happen

10     only to be similar in kind.

11         So I'm just asking the Court to look at its relevance,

12     and I think the Court must find that there is some

13     commonality other than it's just a drug.

14              THE COURT:  Well, isn't it commonality that the

15     defendant is a distributor of cocaine?  He has been for a

16     long period of time.  His prior record indicates that he has

17     been a distributor, possessor of cocaine for many, many

18     years, going back a substantial period of time, number one.

19         Number two, I haven't heard the government's argument,

20     but listening to the agent, it's clear that the defendant

21     had sold poor quality crack cocaine.  By virtue of the

22     wiretaps we do know that.

23         Your argument is going to be, well, it didn't appear

24     that the crack that was sold came from the two or three

25     bricks that were in the safe.  But we do know that he had

1       sold, at least on one occasion, by virtue of the wiretap,

2       the poor quality crack cocaine.

3              So he was a seller of crack cocaine as well as the

4       powder kilograms he distributed.

5              And then thirdly is that the cocaine was obviously a

6       value to him.  He kept it in a safe.  It wasn't like if it

7       was poor quality, that it wasn't valuable.  It was valuable

8       enough that he had to retain it in a safe.  For whatever

9       future use, we do not know, other than we do know that he is

10      a distributor of cocaine.

11             So that's the problem.

12             The other problem is, is that, is this activity part

13      of the same course of conduct, common scheme, as the offense

14      of conviction?

15             And the argument goes that yes, clearly it was because

16      this is an individual who has sold cocaine throughout his

17      lifetime.

18             So let me hear from the government.  Then we'll make a

19      decision.

20             Thank you very much.

21             Counsel for the government, what's your position

22      regarding how the Court should use this?

23                  MR. HOWELL:  Your Honor, we do believe that it's

24      related conduct.  It's relevant conduct under the guidelines

25      and just uncommon sense based upon the testimony of

1    Detective Gilbride, all the evidence that we did provide to

2    probation for the preparation of the presentence report.

3         Mr. Benton is a drug dealer.  That's not in dispute.

4    Just because he was having trouble selling this low quality

5    drug, either by his own doing or how he purchased it,

6    doesn't mean he didn't possess it with the intent to

7    distribute it.

8         If somebody would have paid him for it, I'm sure he

9    would have sold it.

10        We also have testimony from Detective Gilbride that he

11   did sell some of this poor quality.  He also told you that

12   he had information based on the investigation and the

13   wiretap that he had approximately five kilograms of this.

14        I would also note that this is less than three

15   kilograms.  It's approximately 70 grams less -- 68 grams

16   less than three kilograms.  So it's not full three kilograms

17   that were there as well.  Did he pinch some of it off there,

18   or did he take it from the other two kilograms that he

19   reported he had?

20        We know that Mr. Benton throughout this investigation

21   had multiple sources of supply that he relied upon.  Some

22   out of state, and also he relied upon Mr. Merida.

23        They were possessed at the exact same time, in the

24   exact same location.  The firearm in this particular case

25   was located in the bedroom next to three kilograms of

1    cocaine base in a safe.

2             THE COURT:  We'll decide the firearm issue

3    separate and apart.  So let's just focus on the drugs.

4             MR. HOWELL:  The only reason I was bringing it

5    up, Your Honor, is based upon his intent with that and how

6    it being relevant conduct, of the firearm being next to it,

7    it being in a safe, it's something of value to him.  And we

8    know that he was trying to sell it.

9             THE COURT:  I understand.

10            MR. HOWELL:  So based upon all those things, the

11   other commonality is that it's Mr. Benton.  If he had

12   different people he was selling it to or different sources

13   of supply doesn't mean it's not relevant conduct.

14        When he can't get it from Mr. Merida, he said he's

15   sitting there waiting, he has to get it from elsewhere.  He

16   gets that.  He doesn't think he can sell it.  He has to go

17   to Mr. Merida.  That's common.

18        Your Honor, we think it's certainly the same

19   scheme -- the scheme is he is a drug dealer who deals in

20   large amounts of drugs and has customers around the Northern

21   District of Ohio that he supplies.

22        So we do think it's relevant conduct, Your Honor, and

23   we would ask that you find so.

24            THE COURT:  For the record, the Court would note

25   I've carefully considered the matter, the arguments of

1    counsel, the briefing that's been submitted, and obviously

2    the testimony submitted.  The objection will be overruled.

3        United States Sentencing Guideline 1B1.3 defines

4    relevant conduct as acts committed by the defendant that

5    were part of the same course of conduct or common scheme as

6    the offense of conviction.  That's 1B1.3(a)(2).

7        The drugs in question here were clearly, although not

8    part of the most recent delivery of drugs to the defendant,

9    it's clear that the drugs that were of poor quality were of

10   value to the defendant.  They were located in the safe.  He

11   obviously secured them.

12       Obviously based on the testimony we have here today,

13   the defendant also engaged in selling not just powder but

14   also crack cocaine.  We heard from the officer, and the

15   evidence submitted on the wiretap supports that proposition

16   as well.  That is clear.

17       Additionally, the Court cannot overlook the

18   defendant's prior record and history.  He has a long record

19   of trafficking in cocaine in particular.  And so it's clear

20   to me that the evidence has more than well established that

21   the defendant's conduct and the use of these drugs were part

22   of the common scheme.

23       And just as an aside, if in each transaction or in

24   each case of this nature we had to determine the drugs were

25   of poor qualify or not of high quality -- the Court isn't

1    required to do that.  The fact that a drug dealer or drug

2    trafficker does a poor job of cooking his crack and/or of

3    mixing his drugs doesn't mean they're not relevant for

4    purposes of sentencing as they are in this case.

5         Clearly part of the course of conduct of the defendant

6    in my mind, so the objection is overruled.

7         As to the firearm, we have heard from the officer as

8    to where the firearm was located.

9         It's your objection, Mr. Whitney.  What if anything

10   would you like to put on with regard to the firearm?

11             MR. WHITNEY:  Well, I put on evidence, Your

12   Honor, that at least there was one other party the

13   government thought had an interest in that firearm.

14        There is -- I guess what I'm saying is I think the

15   Court can do what the Court feels is appropriate.  Is two

16   levels appropriate for this firearm?  Or one level?  Or no

17   levels, is what I'm --

18             THE COURT:  Why would it not be appropriate if we

19   have a trafficker of large-scale kilograms of drugs in

20   possession of a gun?

21        I mean, obviously the officer testified, and it's

22   pretty common knowledge that drug traffickers possess

23   firearms to protect both their drugs and their cash and

24   their money.

25        Mr. Benton is a large-scale drug trafficker.  He has

1    large sums of money in his possession.  He has large amounts

2    of drugs in his possession.  So it's not really too far of a

3    stretch to believe that he would possess a gun in connection

4    with this offense.

5         So the other thing that I call to your

6    attention -- and again, we can hear any argument you want or

7    any evidence you want -- is you heard the officer testify

8    there was a pole camera on that residence.  For how many

9    months?

10        You heard the officer testify he did not see the

11   person that you wish to attach the firearm to come or go in

12   the residence.  So we can re-call him and make sure that's

13   the testimony, but I think that's what he said in this

14   particular case.

15             MR. WHITNEY:  Your Honor, I'm not attaching

16   anything to this.  The government did that.  Not me.  The

17   government sent that notice to Mr. Harris.  I didn't.

18             THE COURT:  I understand that, but the mere fact

19   they sent a notice to him doesn't mean --

20             MR. WHITNEY:  I understand that.

21             THE COURT:  -- that that's evidence that in fact

22   the gun was not in possession of Mr. Benton.

23             MR. WHITNEY:  True, but it's certainly some

24   evidence that at least the government thought that Mr.

25   Harris may have some interest in that firearm.  That's all I

1      was trying to tell the Court.

2                  THE COURT:  But that happens on a regular basis,

3      Mr. Whitney.  You know, if there is two occupants in the

4      home, whatever the case might be, in a forfeiture case the

5      government would, in an abundance of caution, send notice to

6      anyone who might have an interest.

7          You have an obligation, right, to prove to me that gun

8      was not connected to the firearm -- or to the drug offense,

9      right?

10                 MR. WHITNEY:  Right.

11                 THE COURT:  Okay.  So what evidence do you have

12     other than the notice that was sent?

13                 MR. WHITNEY:  I put on the evidence.  I would

14     like to spread on the record some other arguments.

15                 THE COURT:  Well, arguments is fine, but we need

16     evidence.

17         Again, if you file an objection, it's more than just

18     argument.  You can argue.  I would be glad to hear your

19     argument.  But in the absence of any evidence, then that

20     makes it a bit challenging for me.

21                 MR. WHITNEY:  I don't think the officer testified

22     that the cocaine that Mr. Benton sold, offered to sell

23     previously, was crack cocaine.

24                 THE COURT:  All right.  It was cocaine base.

25     I'll stand corrected.

1          MR. WHITNEY:  No, I don't think he said --

2          THE COURT:  I think that's what he said.  Do you

3   want to correct me if I'm wrong?  Do you want to re-call

4   him?  Do you want to make sure we're clear?

5          MR. WHITNEY:  The cocaine that was offered that

6   you picked up on the wire, was it cocaine or cocaine base?

7          DETECTIVE GILBRIDE:  Cocaine.

8          MR. WHITNEY:  Cocaine.  Not base.

9          THE COURT:  Well, this was the cocaine -- my

10  understanding, it was the cocaine that was of poor quality.

11         MR. WHITNEY:  Correct.

12         THE COURT:  So you're saying that it wasn't base,

13  it couldn't have been from the three kilos that were in the

14  safe?  Is that what you're saying?

15         MR. WHITNEY:  No.  I'm just saying that you said

16  cocaine base.

17         THE COURT: All right.  I apologize.  I'll stand

18  corrected.

19         MR. WHITNEY:  I'm just trying to make the record

20  clear.

21         THE COURT:  That corrects the record.  All right.

22  I will stand corrected.

23         MR. WHITNEY:  And the best evidence, that was not

24  sold.

25      The officer also testified that that cocaine didn't

1    come from the cocaine at that house because although the

2    government argues that it was minus grams here, typically a

3    kilo does not contain 1,000 grams.  You know that and I know

4    that.  We see it in every trial we have.  It's maybe 1,952

5    or 1,020.

6        That is no evidence of anything.

7                THE COURT:  All right.  I understand your

8    argument.  It doesn't change my analysis or my decision

9    because the drugs in question were cocaine of some form,

10   right?

11       We know the defendant has a long history of

12   trafficking in cocaine, as we'll discuss when we go back and

13   look at his record and the nature and circumstances of the

14   offense, his history and characteristics, the need for the

15   sentence imposed.

16       But he had possession of the three additional

17   kilograms in the safe.  They're obviously of value to him.

18   And what you're trying to say to me is that no, he never

19   really intended to sell these drugs because they were poor

20   quality.  And that argument, I don't think, carries much

21   weight because he valued them.  He kept them in the safe.

22       So if they were of no use to him, or of no value, or

23   he did not intend to sell them or make use of them, then he

24   wouldn't have maintained them in the safe, number one.

25       Number two, it's more than a stretch to say, Judge, he

1    never intended, this wasn't part of the scheme, the current

2    scheme/scam.  He's a drug distributor.  That's his life,

3    essentially, when you look at his record.  That's his

4    history.  Selling cocaine.  Of some sort.

5        And so the fact that this is a poor quality or had

6    been mixed poorly in my mind doesn't defeat the fact that

7    it's relevant conduct when you look at, again, the same

8    course of conduct.  It's the same course of conduct in that

9    he's selling cocaine.

10       Common scheme as the offense of conviction.  The

11   common scheme is selling cocaine.  That's why it's relevant.

12   That's why it's -- again, why I think that the objection is

13   not well-taken.

14           MR. WHITNEY:  Judge, this is cocaine base.  It's

15   not cocaine.  Two different things.

16           THE COURT:  I'm sorry, sir.  So you're suggesting

17   to me -- what difference does it make?

18           MR. WHITNEY:  Because he does have a long history

19   of selling cocaine but not cocaine base.

20           THE COURT:  All right.  Well, I don't know

21   whether he was selling cocaine base.  Because the state -- I

22   suppose we can go back and have the probation officer pull

23   up the offense conduct in all the various state convictions

24   to determine were any of those cocaine base?  Or were any of

25   those just -- were they all just powder?

1          Because that's part -- I suppose we could do that, if

2     you want to try to address that issue, because he was

3     convicted of trafficking cocaine in 2001, possession of

4     cocaine in 2002.  He has another conviction of -- let's see,

5     possession of cocaine in 2007.  He has -- let me go through

6     here again, make sure I don't misstate anything.  We have

7     other -- we can go back and look and see if any of those

8     involve cocaine base.

9          MR. WHITNEY:  I don't know if it's that

10    important.  I'm just saying that for the record.  I'm trying

11    to make a record.

12         Isn't some of the best evidence that it wasn't for

13    sale because he didn't sell it?

14         THE COURT:  I don't know whether he was going to

15    sell it or not.  He possessed it.  He kept it in his safe.

16    What do you think he intended to do with it when he

17    maintained it in a safe?

18         MR. WHITNEY:  We heard in the wiretap somebody

19    wanted three keys and wanted it from that Merida load.

20         THE COURT:  All right.

21         MR. WHITNEY:  All right.  If he wanted to sell

22    it, why wouldn't he just say on June, whatever, the 16th, I

23    have three keys.

24         THE COURT:  All right.

25         MR. WHITNEY:  I mean, that's what I'm trying to

1   make a record of, Judge.

2               THE COURT:  I understand your record -- I

3   understand your argument, but I don't think your argument is

4   well-taken.

5               MR. WHITNEY:  Okay.

6               THE COURT:  I don't think you can take a

7   trafficker, a cocaine trafficker, and say, oh, I've got

8   three keys in the safe but I really never intended to sell

9   them because I didn't think they were of good quality, and

10  say it's not part of the same course of conduct when he's

11  still receiving kilograms of cocaine from another dealer,

12  distributing it, but yet to say, well, Judge, because it was

13  poor quality it couldn't be part of the same scheme or plan

14  or common scheme as the offense of conviction.

15      It's all the same.  It's trafficking in cocaine.  It's

16  distributing cocaine is what we call it here in Federal

17  Court.

18          Next argument regarding the firearm, please.

19          Do you have an argument you would like to make

20  regarding the firearm, sir?  Anything you would like to tell

21  me about why the gun shouldn't be counted?

22              MR. WHITNEY:  No, sir.

23              THE COURT:  Sir, just so it's clear, do you want

24  to put the officer on to confirm -- I want to make sure I

25  don't misstate or forget.  My understanding of his testimony

1    was that the pole camera was on the house and that he had

2    not seen the individual identified as the other occupant

3    come or go in that residence for three months.

4         Is that accurate?

5              DETECTIVE GILBRIDE:  Yes.

6              THE COURT:  Put him back on the witness stand.

7    Let's just -- I want to make sure that we have a record, so

8    it's clear and we don't have a misunderstanding.

9         I'm in trial.  It's busy.  And I apologize.

10                    MICHAEL GILBIRDE,

11         of lawful age, a witness called by the Government,

12          being first duly placed under oath, was examined

13                    and testified as follows:

14              THE COURT:  All right.  Thank you.

15         Counsel, please inquire about the information, please.

16         Mr. Whitney, you might want to make sure his

17    microphone is turned off.

18         You may proceed.

19              MR. HOWELL:  Thank you, Your Honor.

20              FURTHER EXAMINATION OF MICHAEL GILBRIDE

21    BY MR. HOWELL:

22    Q.   Detective Gilbride, who was the individual that I

23    think you referenced during your testimony you identified as

24    Mr. Benton's business partner?

25    A.   Devine Harris.

1    Q.    And how do you know he is his business partner?

2    A.    He is part owner of what was Club Utopia at 1507 South

3    Main Street which he lists as his home address.

4    Q.    And you mentioned that you had a pole cam installed

5    outside of 696 Carlyle?

6    A.    That's correct.

7    Q.    And did you personally review the footage from that

8    pole cam?

9    A.    Yes.

10   Q.    Approximately how long was it up?

11   A.    Roughly mid April until the day of Mr. Benton's

12   arrest, June 26.

13   Q.    And during that time, did you or any of your other

14   investigating officers ever see this Mr. Harris?

15   A.    No, I did not personally.

16   Q.    At that residence?

17   A.    That's correct.

18   Q.    All right.

19            THE COURT:  The firearm, just, again, to refresh

20   my memory here, the firearm was found where?

21            THE WITNESS:  Upstairs, northeast bedroom, next

22   to the safe.

23            THE COURT:  Next to the safe?

24            THE WITNESS:  Yes, sir.

25            THE COURT:  All right.  Thank you.

1    Counsel, you may inquire.

2    BY MR. HOWELL:

3    Q.    Just in regards to Government's Exhibit 3 that we have

4    in front of us here, Item Number 7 you indicated previously

5    was in the second floor northeast bedroom?

6    A.    That's correct.

7    Q.    And then the approximate three kilos, Items 9 and 10?

8    A.    That's correct, northeast bedroom.

9    Q.    Second floor northeast bedroom?

10   A.    Yes, sir.

11   Q.    All right.

12          THE COURT:  All right.  Thank you.

13          Counsel, do you wish to inquire further?

14          MR. WHITNEY:  No, Your Honor.

15          THE COURT:  All right, sir.  You may step down.

16          (Witness excused.)

17          THE COURT:  Based upon the evidence submitted

18   here, it's clear that the firearm was possessed in

19   connection with a drug-related offense.  And based on the

20   officer's testimony, I'll so find.  The objection will be

21   overruled.

22          So at this point, the Court will then turn to the

23   calculation of the advisory guidelines.  The guideline

24   calculation that the Court has, the recommended calculation

25   is as follows:

1          Base offense level is 34.  There is a two-level

2     enhancement for the possession of the firearm.  The adjusted

3     offense level becomes a 36.  Two levels for acceptance.

4          Does the government seek the third at this point?

5               MR. HOWELL:  Yes, Your Honor.  In regards to the

6     plea to Count 1, we would move for the third level.

7               THE COURT:  The total offense level becomes a 33.

8          The defendant's criminal history, based upon his

9     record, is a VI.  He has -- total number of points is 14.

10    And he committed the instant offense while under a criminal

11    justice sentence.  Apparently probation of some sort appears

12    to have been outlined in paragraph 63.

13         The advisory guideline range is 235 to 293.

14         Other than the objections I've previously addressed,

15    counsel for the government, do you have any objection to the

16    Court's advisory guideline calculation?

17              MR. HOWELL:  No, Your Honor.  The only other

18    thing that I would bring up is just in regards to the

19    potential for the obstructing guideline.  I think at this

20    time the government would not be moving for that.  We'll

21    just follow up and do our own investigation and handle that

22    in a different way.

23         So we won't be moving for that, so we have no

24    objection to the guidelines.

25              THE COURT:  Thank you.

1          Counsel for the defendant, other than the two

2   objections Ive addressed, do you have any other objection

3   you would like to raise?

4          MR. WHITNEY:  Your Honor, you did not address the

5   sentence disparity argument that I made.

6          THE COURT:  With regard to Mr. Merida?

7          MR. WHITNEY:  Yes, Your Honor.

8          THE COURT:  I'll address it when I address the

9   factors -- if you would like me to address it, I'll address

10  it now, I suppose, just so we have a record.

11         I've noted your objection or your indication as a

12  disparity.  The disparity in this case is based solely upon

13  the defendant's prior criminal record, his history, and

14  other factors.

15         Mr. Merida's advisory guideline range called for a

16  sentence of 60 months.  I varied upward in that case to 84

17  months.  So I went above and beyond the advisory guidelines,

18  of course subject to appeal.

19         This defendant's advisory guideline range is

20  substantially higher based upon the offense conduct as well

21  as his prior criminal history.

22         Mr. Merida's prior record, I believe -- let me just

23  confirm.  He was at an offense level 1 and is going to

24  be -- excuse me, a criminal history category I with an

25  offense level, if I'm not mistaken -- just let me pull it up

1    here for a moment so we have that information.

2           Michelle, would you approach for just one second,

3    please.

4           (Judge confers with probation officer.)

5               THE COURT:  Just a moment, counsel.  I believe I

6    may have left that PSI on my desk.  So I'll have it brought

7    out in a moment.

8               MR. WHITNEY:  Your Honor, I talked about the

9    criminal history, a motion to reduce his criminal history

10   category.

11              THE COURT:  Mr. -- your client's?

12              MR. WHITNEY:  Yes, Your Honor.

13              THE COURT:  We'll address that, too, in a moment.

14              MR. WHITNEY:  Okay.

15              THE COURT:  All right.  Mr. Merida, to address

16   any possible disparity as it relates to Mr. Merida, Mr.

17   Merida was offense level, based upon his offense conduct in

18   this particular matter, was offense level 25, total offense

19   level, that's after deductions for acceptance, criminal

20   history category I.  His guideline provisions was 60 to 71

21   months.

22          So he had no prior record, if any, to speak of.  A

23   limited record.  I believe he had, according to the PSI, one

24   conviction for disorderly conduct in 2014.  None.  No other.

25              His guideline range, recommended under the plea

1      agreement, was 60 to 71 months.  I varied up to 84 months

2      based upon the nature and circumstance of the offense.

3          So in terms of any disparity there may be between Mr.

4      Merida and Mr. Benton, it's primarily based upon the offense

5      conduct as it applies to Mr. Benton and more importantly

6      based upon his prior criminal record which places him at a

7      criminal history category VI.  And so -- as well as a

8      finding that the defendant -- the other finding that is

9      relevant to the matter.

10         Counsel, what if any argument now do you wish to make

11     regarding a downward departure?  Is that what you would like

12     to make, please?

13              MR. WHITNEY:  I set forth in the brief, Your

14     Honor, that out of his culpable offenses, 12 points, seven

15     of those were derived from misdemeanor convictions.

16         I would ask the Court to take that into consideration

17     and entertain a motion to reduce his criminal history

18     category by one.

19              THE COURT:  To reduce his what?  I'm sorry.

20              MR. WHITNEY:  To reduce his criminal history

21     category by one because it overrepresents the seriousness of

22     his criminal history pursuant to 4A1.1(b)(3)(B).

23              THE COURT:  So your argument is under 4A1.3?

24              MR. WHITNEY:  4A1.3(b), yes.

25              THE COURT:  All right.  So it's clear for the

1     record, the request for a downward departure, and under the

2     guideline under 4A1.3, the standard is if reliable

3     information indicates the defendant's criminal history

4     category substantially overrepresents the seriousness of the

5     defendant's criminal history or the likelihood the defendant

6     will commit other crimes, a downward departure may be

7     warranted.

8             Counsel for the government, do you have any response

9     you would like to make?

10            MR. HOWELL:  First, Your Honor, I do believe that

11    the convictions and his criminal history score is accurate.

12    We concur with probation's recommendation in the PSR.

13            I would also point out that if anything I believe it's

14    understated.

15            Specifically I'll cite to paragraph number 40, having

16    a weapon under disability, being a felon in possession of a

17    weapon, didn't score any points.  That was back in 2005.

18            Your Honor, we just have a ton of driving under

19    suspensions, OVI's, a number of things just indicating that

20    Mr. Benton just does not follow the law, and quite frankly,

21    just -- it's unbelievable how many arrests he has in here

22    for driving under suspension and OVI.

23            If anything, I think his criminal history is

24    understated.  Those aren't scored.  I mean, I've seen six

25    driving under suspensions here, and none of them have

1    scored.

2          So if anything, I think his criminal history is

3    understated, Your Honor.

4          THE COURT:  For the record, the Court will note

5    the request for a downward departure.  The standard is if

6    reliable information indicates the defendant's criminal

7    history category substantially overrepresents the

8    seriousness of the defendant's criminal history or the

9    likelihood the defendant will commit other crimes, a

10   downward departure may be warranted.

11         The request is denied.  The reasons are abundantly

12   clear from the PSI.  The defendant has an extensive criminal

13   record beginning in 2001.  If the focus is on whether the

14   defendant has -- I should consider a downward departure

15   based upon the misdemeanor offenses, the defendant has an

16   extraordinary record of misdemeanor offenses, let alone

17   felony convictions.

18         According to my count, the defendant -- and

19   before -- I've not touched on his felony convictions.  He

20   has referenced in the PSI, I believe, possession of alcohol

21   by a minor, two.  Open container, two.  Referenced at

22   paragraph 33, 35, 36, and 41.

23         He has four OVI's referenced at paragraph 38, 48, 57

24   and 59.

25         We have ten driving under suspensions at paragraph 43,

1    44, 45, 46, 47, 49, 50, 52, 55, and 60.

2              We have miscellaneous convictions of failure to

3    comply.

4              And then that is not touching upon, as I will at the

5    time of sentencing, his felony convictions involving

6    trafficking in cocaine, possession of cocaine, having

7    weapons under disability.

8              As an aside, when the Court considers a downward

9    departure and I consider whether the likelihood the

10   defendant will commit other crimes, if you review the PSI, I

11   won't go through them individually, you will note the

12   defendant has received on numerous occasions community

13   control or other noncustodial sanction for which he has

14   violated, including even violating such sanctions that have

15   been imposed for DUI.

16             So the defendant has an extensive record, and

17   unfortunately there is no basis for any downward departure.

18             So the guideline range that we have, that I will

19   consider in this particular case, is 235 months, as I've

20   indicated, to 293, is the advisory guideline calculation.

21             Mr. Whitney, I want to be sure I understand your

22   argument.  As I looked at the plea agreement, your argument

23   is that the Court should consider an offense level 32 for

24   purposes of sentencing.

25             Am I correct?

1       MR. WHITNEY:  That was in the plea agreement,

2   Your Honor, but we reserved the right to argue whatever

3   sentence is appropriate, we feel is appropriate.

4       The last paragraph of my brief indicated that without

5   the gun enhancement we were asking the Court -- without the

6   gun enhancement and with acceptance, we were asking the

7   Court to consider 25.

8       THE COURT:  25/VI?

9       MR. WHITNEY:  Yes, sir.

10      THE COURT:  25/VI would be -- an advisory range

11  would be what?

12      MR. WHITNEY:  25/IV is 110 to 137, Your Honor.

13      THE COURT:  All right.  Thank you.

14      Now, having said that and set forth the advisory

15  guidelines, counsel for the defendant, what if any argument

16  do you wish to make as to what type of sentence the Court

17  should impose and what if any other arguments -- I want to

18  be sure I haven't missed any arguments that you've raised as

19  it relates to sentencing, any requests for downward

20  departure, any other arguments you would like?  I want to

21  make sure I haven't missed them.  My apologies.  I've gone

22  over the pleadings and the papers and all of the documents.

23  I've been in trial, but I want to be sure I haven't missed

24  anything in an abundance of caution.

25      Anything else?

1           MR. WHITNEY:  Judge, I think that the arguments

2    that I have in my trial brief, I think we've gone over all

3    of those.  We've noted the two from the presentence, the gun

4    as well as the relevant conduct objection, in addition, the

5    ones from my brief about sentence disparity, which the Court

6    went over, as well as the downward departure because of the

7    criminal history category.

8           So I think we've covered all of the objections I would

9    have, Your Honor.

10          THE COURT:  All right.  Thank you.

11          With regard to the kind of sentence I should impose,

12   do you wish to make any other arguments, Mr. Whitney?

13          MR. WHITNEY:  No, Your Honor.

14          You have, I think, before you -- we tried to show

15   you -- I would just indicate that he has family here, Judge,

16   that is with him.  The people in the back of the courtroom

17   are all members of his family.  He has a daughter that he

18   supports, as the presentence indicates.

19          We would ask the Court to consider those facts and

20   circumstances.  He has an alcohol problem, I think, as

21   outlined in the presentence as well as a marijuana problem.

22   We would ask the Court to consider some kind of drug

23   treatment while incarcerated at an institution closest to

24   Akron so that his family can support him.

25          And that is Elkton, but I'm not sure Elkton has a drug

1      program right now.  But we would ask the Court to consider

2      placement in the closest facility that offers the drug

3      program.

4                  THE COURT:  I'll make that recommendation.  Thank

5      you.

6            Mr. Benton, what if any statement do you wish to make

7      on your own behalf?

8                  THE DEFENDANT:  Basically that I'm done with this

9      chapter in my life.  And, yeah, I know I committed a lot of

10     crimes and did a lot of stuff in my past.  But I don't feel

11     like I should get 20 to 25 years of my life for this.

12           And besides that, that yes, I did intend to distribute

13     the four kilos, but the three was never at all intended to

14     be sold.  They were given to me years before this even

15     happened, before the DEA got ahold of me, and they've been

16     sitting there.

17           And the reason they were sitting there is because the

18     person was supposed to fix the stuff.  And it had nothing to

19     do with Merida at all.

20           So the four kilos that I did distribute with intent,

21     that prior whole year of 2018, yes, that's the crime that I

22     committed.

23           But to distribute seven kilos or ever to have sold

24     crack cocaine, never in my life.  I had never did that.  And

25     the agent should know, if he's been wiretapping me, and know

1      that I have not one time talked about an inch of selling no

2      crack cocaine.  That drugs was given to me by a supplier.

3      How it came is how I got it.  And I haven't touched it ever

4      since because it was unsellable.

5            And that's just all I have to say.

6                  THE COURT:  All right.  Thank you.

7            Counsel for the government, what's the government's

8      position regarding the matter?

9                  MR. HOWELL:  Your Honor, first of all, I just

10     want to address Mr. Benton's statements.

11           You know, Detective Gilbride was listening to the

12     wiretap and he flat out said he listened to calls where he

13     sold that dope.

14           So I appreciate what Mr. Benton is saying.  But based

15     upon what we have found in this investigation -- the other

16     thing that I would point out is this:  How many times have

17     we had cases come before this Court where you have people

18     that are offering to sell heroin and it turns out to be

19     fentanyl or carfentanil.

20           If we would have charged with possession with intent

21     to distribute that cocaine base, we would not have had the

22     burden of proving he knew what that drug was.  So if he

23     thought it was cocaine, if he wants to say all I deal with

24     is cocaine, and I got this, this isn't what I wanted, he

25     still possessed it with the intent to distribute.

1        So bottom line is, legally, whether he is saying he

2    had trouble selling it or that he couldn't sell it, the

3    bottom line is he still possessed it with the intent to

4    distribute for all the other reasons we already argued.

5        Mr. Benton's history indicates, as the Court I think

6    has referenced, his criminal history category does not even

7    take into account his weapon under disability, having a

8    weapon when he's not permitted to have one, trafficking in

9    cocaine, possession of cocaine, separate felony convictions

10   that are not counted with his criminal history score.

11       Your Honor, with Mr. Benton, he has been a long-time

12   problem for the Akron Police Department, for the DEA in this

13   area.  He is a large-scale drug dealer with connections out

14   of state as well as with Mr. Merida with all of his

15   connections.

16       He's a major problem in this area, and it's about time

17   that the federal government stepped in and stopped him from

18   doing what he has been doing for years.

19       And as you also indicated, he consistently gets a slap

20   on the wrist.  And because of that, he continues to do this.

21   And he is making a lot of money.  As you heard about him

22   sitting there on $100,000, Mr. Merida getting stopped with

23   $94,000.

24       Your Honor, we think that a sentence at the high end

25   of the guidelines is appropriate based upon his extensive

1      criminal history, the fact that he had seven kilograms of

2      cocaine and cocaine base in his residence along with a

3      firearm.  We think that a sentence at the high end of the

4      guidelines is appropriate.

5          Your Honor, we would also ask that you make the

6      forfeiture of the $94,000 that's cited in the plea agreement

7      and the indictment as well as the firearm and the

8      ammunition, if you would please indicate that as part of the

9      sentence and have that in the journal entry.

10                 THE COURT:  All right.  Thank you.

11         Just one moment.

12                 THE DEFENDANT:  Can I --

13         (Pause.)

14                 MR. WHITNEY:  May the defendant speak one more

15     time?

16                 THE COURT:  Very briefly, sir.

17                 THE DEFENDANT:  Just one more thing I needed to

18     say.  The part when he was saying about the junk and that I

19     was trying to sell that, that had nothing to do with them

20     three kilos also.  Them three kilos never were touched.

21     They were still in the thing.

22         That stuff that he's talking about that was junk was

23     prior stuff that Merida had brung.  Yes, all of that has to

24     do with the four kilos and that trafficking of the cocaine

25     case.

1          The three kilos that was in there was never touched or

2     tried to be sold.  If it would have been sold, it wouldn't

3     have been part of junk because they couldn't do nothing with

4     it at all.  Yes, I did possess it, or whatever, but I did

5     not have the intent to distribute it at all.  The junk stuff

6     was the prior stuff Merida had brung.

7          If they would seen that in the texts and brung that

8     evidence and showed that to us in the court to prove that

9     that was the same type of drugs, was the main fight in the

10    case about the relevant conduct, because them other three

11    kilos was never with intent to be sold.  That's only the

12    point I was trying to get across.

13                THE COURT:  Thank you.

14          For the record, the Court has carefully considered the

15    matter.

16          The nature and circumstance of the offense are spelled

17    out in the PSI in great detail.  We also have the offense

18    conduct which is set forth in the PSI as well as the

19    parties' plea agreement.

20          And I won't restate them all for the record.

21          Here, on June 26, 2018, Mr. Benton received a call

22    from -- and this is a summary -- from the codefendant,

23    Armando Merida, in which they discussed meeting regarding a

24    drug transaction.

25          Mr. Merida drove to Mr. Benton's residence, delivered

1      approximately 3,956 grams of cocaine.

2           Mr. Merida walked out of Mr. Benton's residence with a

3      bag containing $94,190 which was recovered during a traffic

4      stop.

5           The agents executed a search warrant of Mr. Benton's

6      residence, recovered a firearm and ammunition.

7           Agents also discovered 3,956 grams of cocaine,

8      recovered three bricks containing a yellow substance.  And

9      of course we heard testimony today about exactly what that

10     substance was.  It was later determined that the 2,923 grams

11     of the yellow substance contained cocaine base, according to

12     the PSI.

13          The details of the offense are outlined in paragraphs

14     12 through 14 of the presentence report.

15          The history and characteristics of the defendant.

16     He's 36 years old.  There may have been -- it doesn't appear

17     there are juvenile adjudications, although we have some

18     related, I believe -- just one moment.

19          The convictions are related to -- may have been

20     related to underage possession of alcohol by a minor when he

21     was under the age of 21, appears to be the case.

22          He has 30 adult convictions ranging from possession of

23     alcohol by a minor to having weapons under disability.

24          And as I've already outlined, which I'll outline

25     again, it gives you an idea and a reason why the defendant

1      is facing and will serve a long and lengthy sentence.

2          We can begin with his drug trafficking related

3      offenses.  Paragraph 32 is where we begin.  I want to also

4      indicate when I reference these convictions, I think it's

5      also relevant for any reviewing court to note that when you

6      review the convictions themselves, it's also worthy of note

7      on how many occasions the defendant has received forms of

8      community sanctions that have not been complied with in

9      which this defendant has been given numerous chances to

10     change his behavior, modify his behavior, and that has

11     certainly not been effective.

12         At paragraph 32 we have trafficking in cocaine at the

13     age of 18.  Two years of community control.

14         And then he obviously violated community control on

15     October 22.  The violation was related to a possession of

16     cocaine in 2002 thereafter.

17         So we have this history starting at that very young

18     age of a drug trafficker of cocaine as outlined in these two

19     convictions.

20         We have also other felonies worthy of note.  We have

21     having weapons under disability.  In that case, one year of

22     custody was suspended, two years of probation.  And then of

23     course the defendant violated his community control.  He was

24     ordered, as part of that sentence, to serve -- work at the

25     Oriana House work release program, and obviously he violated

1     that community sanction.

2         Possession of cocaine in 2007, 18 months custody

3     suspended, two years probation.

4         And he pled guilty in 2009 to community control

5     violation, was sentenced to 18 months in prison.

6         And then, once again, we have, as I've already

7     outlined -- and I apologize.  We can continue on.  We have

8     weapon under disability at paragraph 53, at age 30.  One

9     year incarceration.

10        The Court granted judicial release.  November 26,

11    2013, the defendant was granted judicial release, placed on

12    two years of community control.  And then ultimately there

13    was some placement in intensive supervision.  It doesn't

14    appear that there was a violation, but indeed, he was

15    certainly given an opportunity there.

16        We have a failure to comply, obstructing official

17    business.  That is a misdemeanor.

18        And we do have a warrant which was issued for the

19    probation violation.  He was on probation, it appears, for a

20    signal of a police officer, resisting arrest, and that

21    appears to have been in place, or probation, at the time of

22    this offense conduct.

23        Now, I've certainly seen longer records as it relates

24    to felony records, but then when you turn to the defendant's

25    record as it relates to misdemeanors -- and one might say,

1    well, Judge, they're simply misdemeanors.  They are

2    misdemeanors, but they are numerous.  They are so numerous

3    to indicate this is a defendant that cannot comply with the

4    law.  It's abundantly clear.  There is nothing that can be

5    done or that law enforcement has done or that any previous

6    relatively short sentences have done to deter the defendant.

7         He has possession of alcohol, open containers I've

8    referenced earlier.  Paragraphs 33, 35, 36, and 41.

9         Two alcohol and two open container.

10        Yes, misdemeanors.  The numbers become important.

11        OVI, four of them.  38, 48, 57, and 59.

12        And if you look at them, you will see, at least in

13   one, if my memory serves me correctly, even when the

14   defendant is ordered or directed to engage in some sort of

15   treatment program, by way of example at paragraph 18, he

16   fails to comply.

17        So warrants are issued for failure to complete house

18   arrest, things of that nature.  So that's the history here.

19        We have the various OVI's.

20        We have ten driving under suspensions for which the

21   defendant apparently does not care.  He will continue to

22   drive whether -- he wishes to drive.  He will continue to

23   drive.  Ten convictions.

24        And along with the miscellaneous failure to comply.

25        And then as we turn to his history and

1      characteristics, we know here from this offense conduct,

2      this is not a low-level drug trafficker.  This is an

3      individual who is dealing in multiple kilograms of cocaine.

4      And he is receiving, based upon the amounts of money in

5      question, we know he is a major drug trafficker in our

6      community.  As such, he is certainly, unfortunately, a

7      person that needs to be removed from society for a lengthy

8      period of time.

9              And so one might ask, and that is the question, when

10     you look at the history and characteristics of the defendant

11     and then you turn to the need for the sentence imposed, what

12     if anything in this record would give anyone any hope that

13     this defendant will ever comply with the law, will ever find

14     his way to comply with even the basic laws of the state,

15     laws of the country?

16             Driving under suspension, OVI, they're misdemeanors,

17     but he just continues to do what he wants to do, in

18     violation of the law.

19             And then, again, of course, the most serious of what

20     we have here is the multiple -- multi kilo drug trafficker

21     involved with individuals from outside the country, Mr.

22     Merida, as we know, who is -- that's his source.  He is able

23     to source drugs from a major drug trafficker like Mr.

24     Merida, in my opinion.  So we know this is a defendant who

25     deserves and must be deterred by a lengthy sentence.

1          Now, some might argue that 235 to 293 is excessive,

2     it's greater than necessary, but in light of this

3     defendant's record, his history, his pattern, as well as his

4     presentation here in court -- he wants to deny what is

5     obvious.  He has drugs in the safe, but no, I didn't really

6     intend to sell them, Judge.  So I really wasn't going to

7     sell those drugs.  They were valuable to me.  I kept them in

8     my safe.  But I really didn't want to sell them, really

9     didn't intend to.  They were junk.  Well, if they were junk

10    they would have been disposed of.

11         So it's clear to me this defendant, unfortunately, I

12    don't think that he understands the seriousness of his

13    conduct and why it is that he's going to serve such a

14    lengthy period of time.

15         And so we do need to note that there is a risk to the

16    community.  We are dealing with a drug epidemic in this

17    state and in this country.  It's not limited to just

18    opioids.  It's not limited to just fentanyl, carfentanil.

19    We have cocaine.  Cocaine is a serious matter.  We know that

20    cocaine poses serious issues for individuals, addiction,

21    potentially death.  While there is no evidence this drug was

22    mixed with fentanyl or carfentanil or anything else, we do

23    know that is occurring.

24         So all of those things mean that individuals like Mr.

25    Benton must serve lengthy sentences to promote respect for

1    the law, protect the public, and make sure that this

2    defendant doesn't return to his drug trafficking activity.

3         And while I would be tempted to impose a sentence

4    outside of the guidelines in this case based upon all I've

5    heard and seen today and listening to all of the evidence

6    that we have here today, this defendant is certainly

7    someone, unfortunately, that needs to be sentenced to a

8    lengthy time in order to deter him and protect the public.

9         For those reasons I will do the following:  Pursuant

10   to the Sentencing Reform Act of 1984 and 18 United States

11   Code 3553(a), the defendant will be sentenced in the Bureau

12   of Prisons for the term of 260 months.  It's the mid range

13   of the guidelines.  I believe it's appropriate for all the

14   reasons I've just stated.

15        When he is released from prison he'll be placed on

16   supervised release for a term of ten years.  Hopefully when

17   he's released he will have learned a trade or become -- some

18   rehabilitation while in the Bureau of Prisons.

19        Ten years of supervised release, I believe, is

20   appropriate in order to supervise the defendant to make sure

21   he does not return to the type of activity that he's

22   essentially lived his entire life, and that is drug

23   trafficking.

24        We'll waive the fine.

25        Special assessment of $100 is due immediately.

1          All the standard conditions will apply.

2          Restitution is not an issue.

3          The defendant will submit to one drug test within 15

4     days of being released from prison, at least two periodic

5     drug tests thereafter as determined by the Court.  He will

6     obviously be subject to substance abuse testing and

7     treatment.

8          Based upon his numerous OVI's, there will also be a

9     prohibition against any and all alcohol use.  And he will be

10    subject to testing for both drugs as well as alcohol.

11         And his residence will be subject to a search and

12    seizure.  He must submit his person, property, house,

13    residence, vehicle, paper, computers, other electronic

14    communications or data storage devices or media to a search

15    conducted by his probation officer.

16         Failure to submit to that search may be grounds for

17    revocation.  He needs to warn other occupants that the

18    premises may be subject to a search pursuant to this

19    condition.  And may conduct the search only when reasonable

20    suspicion exists that the defendant's violated a condition

21    of supervision.  And it must be conducted at a reasonable

22    time.

23         I will note for the record I've reviewed all the

24    materials that have been submitted here and addressed all

25    the arguments.  I will not consider the Facebook posting.

1    While it's deeply troubling, and I'm not sure how we will

2    address it, the government may address it, and I'm not sure

3    how the Court addresses it, but I'm not -- I am not going to

4    consider it for purposes of this sentencing hearing.  It may

5    be a matter that is investigated otherwise and addressed

6    otherwise by the government.

7         And we will need to address how we go about those

8    Title III disclosures in the future, I would suspect.

9         Under *U.S. versus Bostic*, any objections, corrections,

10   any arguments that have not been previously raised that I

11   can address on behalf of the government, please?

12             MR. HOWELL:  No objection, Your Honor, and I

13   apologize if I missed it, but if you would include the

14   forfeiture.

15             THE COURT:  I did not, and I thank you for

16   calling it to my attention.

17        The Court orders forfeiture of the 94,000-some odd

18   dollars along with the forfeiture of the firearm in this

19   particular matter.

20        Mr. Whitney, other than the objections you've already

21   raised, any other arguments under *Bostic*, objections,

22   corrections, any arguments you would like me to address

23   before we adjourn?

24             MR. WHITNEY:  No, Your Honor, except for the

25   exhibits.  Could we put those in an envelope.  The

1   government had one.  I had -- I'll call them sentencing

2   exhibits, so they would move along with the case.

3          THE COURT:  I'll mark them and make sure they go

4   along with the case.

5          MR. WHITNEY:  We would move for the introduction

6   of those.

7          MR. HOWELL:  Yes, Your Honor.  And just for

8   purposes of the record, we will not be submitting Government

9   Exhibit 1, which includes the Facebook post, but we did have

10  Government Exhibit 2 and 3.  We'll submit those.

11         THE COURT:  The reports regarding the drug

12  analysis?

13         MR. HOWELL:  The drug analysis and then the

14  evidence report about where the items were found.

15         THE COURT:  All right.  Any objection, Mr.

16  Whitney?

17         MR. WHITNEY:  No, Judge.  And I had A through J,

18  and, you know, I would ask to put those all in an envelope.

19         THE COURT:  We'll make them part of the record in

20  the case for purposes of appeal.

21      Any other objections, corrections, anything else?

22         MR. HOWELL:  No, Your Honor.

23         THE COURT:  Mr. Whitney?

24         MR. WHITNEY:  Nothing further.

25         THE COURT:  Mr. Benton, you may have an appeal

1     filed from the Court's sentence.  That's a matter you can

2     discuss with Mr. Whitney.  He will explain that to you.  Any

3     notice of appeal must be filed no later than 14 days after

4     we reduce your sentence to writing.

5          If you're shown to be indigent, without sufficient

6     funds to retain an attorney, then we will appoint an

7     attorney for purposes of that appeal and provide you the

8     necessary papers and transcripts.

9          Do you understand that?

10               THE DEFENDANT:  Yes.

11               THE COURT:  Mr. Whitney, you can file the notice

12    of appeal, and if you're going to continue on, that's fine.

13    If not, let us know and we'll appoint an attorney.

14          All right.  Thank you very much.  That will be the

15    Court's order.

16          (Proceedings concluded at 3:30 p.m.)

17

18

19

20

21

22

23

24

25

1                         I N D E X

2     DIRECT EXAMINATION OF MARQUETE FULLMORE        7

3     BY MR. HOWELL

4     DIRECT EXAMINATION OF KEITH TAGGART            12

5     BY MR. HOWELL

6     CROSS-EXAMINATION OF KEITH TAGGART             16

7     BY MR. WHITNEY

8     DIRECT EXAMINATION OF MICHAEL GILBRIDE         19

9     BY MR. HOWELL

10    CROSS-EXAMINATION OF MICHAEL GILBRIDE          26

11    BY MR. WHITNEY

12    REDIRECT EXAMINATION OF MICHAEL GILBRIDE       46

13    BY MR. HOWELL

14    RECROSS-EXAMINATION OF MICHAEL GILBRIDE        47

15    BY MR. WHITNEY

16    FURTHER EXAMINATION OF MICHAEL GILBRIDE        63

17    BY MR. HOWELL

18

19                     C E R T I F I C A T E

20

21        I certify that the forgoing is a correct transcript

22    from the record of proceedings in the above-entitled matter.

23

24                S/Caroline Mahnke            5/7/2019

25                Caroline Mahnke, RMR, CRR, CRC    Date