1

2                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
3                         EASTERN DIVISION

4       UNITED STATES OF AMERICA,

5                Plaintiff,              Case No. 5:18CR406
                                         Akron, Ohio
6            vs.                         Wednesday, May 7, 2025
                                         1:40 p.m.
7       WILLIE R. BENTON, JR.,

8                Defendant.

9

10                  TRANSCRIPT OF EVIDENTIARY HEARING
                 BEFORE THE HONORABLE JOHN R. ADAMS
11                  UNITED STATES DISTRICT JUDGE

12      APPEARANCES:

13
        For the Government:   Peter E. Daly
14                            Office of the U.S. Attorney - Akron
                              2 South Main Street, Room 208
15                            Akron, Ohio 44308
                              (330) 375-5716
16
        For the Defendant:    J. Reid Yoder
17                            DiCaudo, Pitchford & Yoder
                              209 South Main Street, 3rd Floor
18                            Akron, Ohio 44308
                              (330) 762-7477
19
        Court Reporter:       Caroline Mahnke, RMR, CRR, CRC
20                            Federal Building & U.S. Courthouse
                              2 South Main Street, Suite 568
21                            Akron, Ohio 44308
                              (330) 252-6021
22

23

24
        Proceedings recorded by mechanical stenography; transcript
25      produced by computer-aided transcription.

1       Wednesday, May 7, 2025

2               THE COURT:  For the record, the Court has before

3       it today Case Number 5:18CR406.  The case is United States

4       of America versus Willie Benton.  We're here today for a

5       hearing regarding the defendant's 2255 motion.

6               Counsel for the government, are you ready to proceed?

7               MR. DALY:  Yes, Your Honor.  Good afternoon.

8       Peter Daly on behalf of the United States.

9               THE COURT:  Thank you.

10              Counsel for the defendant?

11              MR. YODER:  Good afternoon, Your Honor.  We are

12      prepared to proceed.  Reid Yoder on behalf of Willie Benton.

13              THE COURT:  Thank you.

14          I'm not sure how the parties wish to proceed.

15          Counsel for the government, do you wish to call a

16      witness, or how would you like to proceed?

17              MR. DALY:  No, Your Honor.  And I've discussed

18      the proceeding of today's hearing with Mr. Yoder.  It's my

19      understanding that he intends to call two witnesses, and we

20      would reserve cross-examination.

21              THE COURT:  Thank you.

22          Mr. Yoder, you may call your first witness.

23              MR. YODER:  Thank you, Your Honor.

24          The defense calls Detective Mike Gilbride.

25              THE COURT:  Sir, if you would approach the

1    witness stand, and please remain standing while I administer

2    the oath or affirmation.

3                        MICHAEL GILBRIDE,

4          of lawful age, a witness called by the government,

5            being first duly placed under oath, was examined

6                        and testified as follows:

7                    THE COURT:  All right, sir.  You can have a seat

8    in the witness stand.  Adjust the microphone so your

9    testimony can be heard.

10         Thank you.

11         Counsel, you may inquire.

12                    MR. YODER:  Thank you, Your Honor.

13                    DIRECT EXAMINATION OF MICHAEL GILBRIDE

14   BY MR. YODER:

15   Q.    Detective Gilbride, please state your name for the

16   record and spell your last name for the court reporter.

17   A.    Michael Gilbride.  Last name is spelled

18   G-I-L-B-R-I-D-E.

19   Q.    Where are you currently employed?

20   A.    Akron Police Department.

21   Q.    And how long have you been an Akron police officer?

22   A.    26 years.

23   Q.    Currently what position do you hold with the Akron

24   Police Department?

25   A.    I work in the Akron Municipal Court, court security.

1    Q.    All right.  Let's go a little bit over your career

2    with APD.

3          What positions have you held?

4    A.    I was a patrolman for two years.  The remainder of my

5    career was spent on various drug and narcotics units.

6    Q.    Have you been part of a task force in the Northern

7    District of Ohio?

8    A.    Yes.  I was assigned to the Drug Enforcement

9    Administration task force based out of Cleveland.

10   Q.    And how many years were you part of that task force?

11   A.    I started in October of 2014 and stopped summer of

12   2022.

13   Q.    Out of those eight years as part of a task force, how

14   many investigations did you either participate in or lead as

15   a task force officer?

16   A.    Maybe 50.

17   Q.    How many of those related to crimes dealing with

18   narcotics?

19   A.    All of them.

20   Q.    Were you also the lead investigator on numerous of

21   those investigations?

22   A.    Yes.

23   Q.    Prior to joining the task force, did you have any

24   other narcotics experience?

25   A.    Yes.  I worked in the Akron Police Department

1    narcotics unit, Akron Police Department SNUD unit, and I was

2    on the Akron Police Department SWAT team.

3    Q.    Do you have special training when it comes to

4    narcotics investigations?

5    A.    Yes.

6    Q.    Briefly describe that.

7    A.    Through the Drug Enforcement Administration Basic

8    Narcotics Investigation School, the Advanced Narcotics

9    Investigation School, multiple Operation Jetway programs.

10   Q.    Have you had an opportunity to conduct investigations

11   in regards to cocaine and also crack cocaine?

12   A.    Yes.

13   Q.    Have you had an opportunity to be able to be around

14   crack cocaine, feel it, touch it, see it?

15   A.    Yes.

16   Q.    What about cocaine?

17   A.    Yes.

18   Q.    Do you have any knowledge about how generally those

19   particular types of drugs are packaged?

20   A.    Yes.

21              MR. YODER:  May I approach, Your Honor?

22              THE COURT:  Yes.

23              MR. YODER:  And before I approach, Your Honor, I

24   apologize.  Let me lay a foundation.

25   BY MR. YODER:

1   Q.   Are you familiar with the Willie Benton investigation?

2   A.   Yes.

3   Q.   Did you participate in that investigation?

4   A.   Yes.

5   Q.   Were you the lead investigator?

6   A.   Yes.

7   Q.   In regards to that investigation, did you also conduct

8   T3 wiretaps?

9   A.   Yes, I was the affiant for those Title III.

10  Q.   Did you listen to those T3 wiretaps?

11  A.   Yes.

12  Q.   Do you recall as you sit here today how long the

13  government was up on a wiretap listening to Willie Benton?

14  A.   Maybe three months.

15  Q.   So you applied three different times for a warrant?

16  A.   Definitely two.  Perhaps three.  I can't remember.

17  Q.   Okay.  And were you personally listening to those

18  conversations that Mr. Benton was having?

19  A.   Yes.

20  Q.   As a result of those conversations, did you come to

21  form an opinion of whether Mr. Benton was in fact

22  trafficking in a narcotic?

23  A.   Yes.

24  Q.   And was that opinion that he was trafficking in the

25  narcotic specifically of cocaine?

1    A.    Yes.

2    Q.    All right.  Did there come a time that you and your

3    other officers executed a search warrant on Mr. Benton's

4    home?

5    A.    Yes, June 26 of 2018.

6    Q.    And why that day?  What was important for that day?

7    A.    We were aware that Mr. Benton had received a supply of

8    cocaine.

9    Q.    I don't want to put you on the spot.  You maybe don't

10   recall this.  But when you look back on that, do you have

11   any personal knowledge of how many times Mr. Benton was

12   discussing either the purchase or the distribution of

13   cocaine?

14   A.    I don't know.

15   Q.    Was it multiple times?

16   A.    Yes.

17   Q.    All right.  And at any time during this investigation,

18   was there ever any mention of Mr. Benton selling what we

19   refer to as crack cocaine?

20   A.    No.

21   Q.    All right.

22              MR. YODER:  May I approach, Your Honor?

23              THE COURT:  Yes.

24              MR. YODER:  Thank you.

25   BY MR. YODER:

1  Q.    Detective Gilbride, can you identify the two packages

2  that I handed you?

3  A.    Cocaine recovered during the execution of the search

4  warrants.

5  Q.    All right.  And they're in two separate containers,

6  correct, plastic bags?

7  A.    Yes.

8  Q.    And you indicated that those were -- that's cocaine in

9  your opinion; is that correct?

10             MR. DALY:  Objection.

11             THE COURT:  Sustained.

12  BY MR. YODER:

13  Q.    Okay.  Are you aware of where those two packages came

14  from?

15  A.    Yes, the Benton's residence.

16  Q.    I'm showing you what we've labeled as Defense Exhibit

17  C.  Can you identify that photograph for me?

18  A.    It's the safe where these items were recovered from.

19  Q.    And when you say "these items," are you holding three

20  kilos at this point in time, are you aware of that?

21  A.    Yes.

22  Q.    All right.  And then I'm going to show you Defense

23  Exhibit B.

24             Are you familiar with this photograph?

25  A.    Yes.

1    Q.    All right.  Can you describe it for the Court?

2    A.    That's these items wrapped up.

3    Q.    All right.  And then specifically what we're looking

4    at, I want to point to it, is that a kilo wrapper in your

5    opinion?

6    A.    Yes.

7    Q.    Is that what you found that day on June 26?

8    A.    Yes.

9    Q.    And then there is a second one, and I'm pointing to

10   it?

11   A.    Yes.

12   Q.    Is that the same thing?

13   A.    Yes.

14   Q.    All right.  And then it looks like there is possibly

15   another plastic bag or a third wrapper in the back.  Do you

16   agree with that?

17   A.    Yes.

18   Q.    And it would be your testimony that there was three

19   kilos that were found in this safe?

20   A.    Correct.

21   Q.    Now, in the course of your investigation, you had told

22   us earlier that it was four kilos of cocaine that you also

23   found on that particular day, June 26; is that correct?

24   A.    Yes.

25   Q.    Where were those four kilos found?

1    A.    In a cardboard box inside the residence.

2    Q.    Inside the residence?

3    A.    Yes.

4    Q.    All right.  We don't have those right now, but when

5    you look back on that, were those four kilos a different

6    texture of what the three kilos that were found in the safe

7    were?

8    A.    Yes.

9    Q.    Different color?

10   A.    Yes.

11   Q.    Was it a different smell?

12   A.    Yes.

13   Q.    How would you describe the three kilo wrappers that

14   you found in the safe on June 26?

15   A.    They appeared to be -- had been rewrapped with duct

16   tape.

17   Q.    Were you able to open them up or at least get a smell

18   of them?

19   A.    Yes.

20   Q.    What do you think it smelled like?

21   A.    They reminded me of strawberry.

22   Q.    Let's talk a little bit about the texture.  Was it a

23   hard texture, or was it a soft texture?

24   A.    No, it's floury.  Powder.

25   Q.    Powder?

1     A.    Yeah.

2     Q.    Was it -- what was the color of those three keys?

3     A.    Tan, I guess, cream-colored.

4     Q.    Okay.  Did all three of those different things we

5   talked about, the smell, the texture of them, you looking at

6   them, feeling them, did all of those things vary?  Were they

7   different than the four kilos that you found inside the

8   home?

9     A.    Yes.

10    Q.    Did you have an opportunity to interview Mr. Benton

11   that day?

12    A.    We did not interview Mr. Benton that day.

13    Q.    So you would have no information to be able to share

14   with the Court of what Mr. Benton would have alleged these

15   three kilos have been, what kind of substance they were?

16    A.    No.

17    Q.    Are you aware, as you sit here today, that the three

18   kilos early on, back in 2018, were sent to the Bureau of

19   Criminal Investigation for chemical analysis?

20    A.    Yes.

21    Q.    Have you seen that report?

22    A.    No.

23    Q.    May I show it to you?

24    A.    Sure.

25          MR. YODER:  May I approach, Your Honor?

1      THE COURT:  Yes.

2          Do you need him to hold onto the drugs, or do you want

3    to place them back on the table?

4              MR. YODER:  I can take them back.

5    BY MR. YODER:

6    Q.    Detective Gilbride, in the course of your employment

7    with the Akron Police Department, have you seen these

8    toxicology reports from the Bureau of Criminal Investigation

9    before?

10   A.    Yes.

11   Q.    Are you familiar with them?

12   A.    Yep.

13   Q.    Specifically in regards to this report, which is

14   labeled Defense Exhibit B, does it appear to be an analysis

15   of the drugs that were tested?

16   A.    Yes.

17   Q.    Is there a purity level that you see on that report?

18   A.    No.

19   Q.    Do you know why?

20             MR. DALY:  Objection.

21             THE COURT:  Sustained.

22             MR. YODER:  If he knows?

23             THE COURT:  How would he know?

24             MR. YODER:  I don't know.  That's what I'm

25   asking.

1    THE COURT:  All right.  We won't belabor it.

2    Do you know?

3    THE WITNESS:  I do not know.

4    THE COURT:  Thank you.

5    BY MR. YODER:

6    Q.    I would like to show you Defense Exhibit A.

7    MR. YODER:  May I approach, Your Honor?

8    THE COURT:  Yes.

9    BY MR. YODER:

10   Q.    Would you take a look at that, and then just look up

11   when you're ready.

12   Okay.  In that report, does it purport to show that

13   there was a chemical testing of the three kilos of cocaine

14   that were found in the safe?

15   THE COURT:  Let me back up.  Have you seen this

16   report before?

17   THE WITNESS:  Today.  Prior to coming in here.

18   THE COURT:  Go ahead.

19   MR. YODER:  Thank you, Your Honor.

20   BY MR. YODER:

21   Q.    Does it purport to show the purity of the three

22   samples that were tested from the safe on June 26 that you

23   recovered?

24   A.    Yes.

25   Q.    All right.  And do you agree that the purity of those

1    were approximately 7 percent purity of cocaine, 8.8 percent

2    purity, and 8 percent purity?

3              MR. DALY:  Objection.

4              THE COURT:  Basis.

5              MR. DALY:  Your Honor, he's simply reading the

6    lab report.  He has no way to know the accuracy of that

7    testing or what was done to determine the purity.

8              THE COURT:  I agree.  Sustained, counsel.

9              MR. YODER:  Okay.

10   BY MR. YODER:

11   Q.    Detective Gilbride, can you provide the Court with a

12   little background on the difference of the chemical compound

13   of crack cocaine and cocaine base in your opinion?

14   A.    What it's made out of?

15   Q.    Yeah, exactly.

16   A.    Well, you need heat and water to make crack cocaine.

17   And when you cook it out, it cooks out all the adulterants

18   that are commonly found in cocaine base.

19   Q.    And what kind of texture would be crack cocaine

20   compared to cocaine base?

21   A.    Like pebbles, like rocks.

22   Q.    Would it be hard?

23   A.    Yes.

24   Q.    Is that another street term for crack cocaine?

25   A.    Yes.

1    Q.    That individuals who are selling it refer to it as

2    hard?

3    A.    Yep.

4    Q.    Do you know why that is?

5    A.    Because powder is referred to as soft.

6    Q.    Okay.  All of your experience as a narcotics officer,

7    as a task force officer, all of the investigations that

8    you've ever been involved in in your entire career, have you

9    ever seen crack cocaine packaged in kilo quantities?

10   A.    No.

11   Q.    Do you have an opinion of whether that's even

12   possible, chemically possible, to package crack cocaine in a

13   kilo quantity?

14   A.    No.

15   Q.    Do you know why it's not packaged in kilo quantities?

16   A.    It's usually broken down into smaller quantities to be

17   sold on the streets.  It's not sold in bulk.

18   Q.    Your testimony was clear that in your opinion that

19   this would be considered bad cocaine, correct, powder

20   cocaine?

21   A.    Yes, very much so.

22   Q.    And are you absolutely certain that in your opinion,

23   based on everything that you've gone through and your

24   experiences, that this is not considered crack cocaine?

25   A.    That's correct.

1      MR. YODER:  Your Honor, may I have one moment,

2  please?

3           THE COURT:  You may.

4  BY MR. YODER:

5  Q.    Detective Gilbride, I thank you for your time.

6           THE COURT:  Counsel you may examine.

7           MR. YODER:  Do you want me to take these down?

8           MR. DALY:  Sure, that's fine.

9           CROSS-EXAMINATION OF MICHAEL GILBRIDE

10  BY MR. DALY:

11  Q.    Good afternoon, Detective Gilbride.

12  A.    How are you doing?

13  Q.    You previously testified at Mr. Benton's sentencing

14  hearing on February 13, 2019; is that right?

15      Well, I'm not asking you specifically the date.  Did

16  you testify at Mr. Benton's sentencing hearing before this

17  Court?

18  A.    Yes.

19  Q.    And since that hearing, have you done any additional

20  investigation related to Mr. Benton's case?

21  A.    No, sir.

22  Q.    Have you obtained any new information since your

23  testimony at that sentencing hearing?

24  A.    No.

25  Q.    And fair to say, Detective Gilbride, you have a lot of

1    experience with drug investigations?

2    A.    Fair to say.

3    Q.    You've seen a lot of different types of narcotics in

4    your career?

5    A.    Correct.

6    Q.    But you are not a chemist.  You don't do forensic

7    testing on those substances.  19.

8          Is that right?

9    A.    I do not.

10    Q.    You testified a few moments ago that in your

11    experience, I think the question was is it physically

12    possible to package crack in a kilo quantity, and you said

13    no.

14    A.    I have not seen that in my career.  I can put it that

15    way.

16    Q.    Okay.  But just to be clear, the question was, and if

17    I were to ask you the question, is it possible to weigh out

18    a kilogram of crack cocaine and package it out?

19    A.    Theoretically, yes.

20    Q.    Okay.  It's just not something you've typically seen?

21    A.    Correct.

22    Q.    You were asked on direct examination about whether

23    during your investigation and listening to the wiretap

24    conversations you ever heard Mr. Benton talk about selling

25    crack cocaine.  And you said you hadn't.

1        Is that right?

2    A.    Not to my recollection, no.

3    Q.    Would you agree with me, though, there was discussion

4    of crack cocaine on the wire?

5    A.    Yes.

6    Q.    And specifically in the context of Mr. Benton actually

7    instructing somebody else on how to attempt to cook cocaine

8    into crack cocaine?

9    A.    That's correct.

10   Q.    So from that, you can surmise that Mr. Benton does

11   know how to make crack cocaine?

12   A.    Yes.

13   Q.    In your career as a narcotics investigator, did you

14   ever encounter situations where a drug dealer or drug

15   trafficker was in possession of a substance and didn't know

16   exactly what that substance was?

17   A.    No.

18   Q.    So it was never your experience that a trafficker,

19   maybe, was selling something they were calling heroin and it

20   turned out to be, for example, fentanyl?

21   A.    Yes, I am familiar with that.

22   Q.    Okay.  So there are times where a trafficker might

23   advertise a particular -- or use a term for a particular

24   substance that they're selling, but what they actually

25   possess is something chemically different.

1        Is that right?

2    A.    That's correct, yes.

3            MR. DALY:  I have nothing further.

4            THE COURT:  Thank you.

5        The exhibit with the safe that was shown to the

6    witness.

7            MR. YODER:  I've got two of them, Judge.  A or B?

8            THE COURT:  A.  The one with the safe opened is

9    the one I'm interested in.

10           MR. YODER:  Okay.

11           THE COURT:  The safe as we see it there.

12           THE WITNESS:  Yes, Your Honor.

13           THE COURT:  Is that after you and/or other agents

14   opened the safe?

15           THE WITNESS:  Yes.  They had to break into it.

16           THE COURT:  So you broke into the safe?

17           THE WITNESS:  Yes.

18           THE COURT:  I guess my point is, this wasn't how

19   you discovered the safe and the cocaine?

20           THE WITNESS:  No.  The first -- the other picture

21   shows it how it was, how we found it.

22           THE COURT:  So that shows you that the drugs were

23   secured in the safe in the locked safe?

24           THE WITNESS:  Yes, sir.

25           THE COURT:  All right.  Thank you.  That may

1    become relevant at another time.  That's the reason I ask.

2         Anything else, counsel?

3              MR. YODER:  Just briefly, Your Honor, following

4    up on Mr. Daly's questions.

5              REDIRECT EXAMINATION OF MICHAEL GILBRIDE

6    BY MR. YODER:

7    Q.   I want to go back to Mr. Daly's question about

8    packaging actually crack in a kilo quantity.  I think we

9    need to go into greater detail on that.

10        When you're cooking crack, it becomes a hard rocklike

11   substance, correct?

12   A.   Yes.

13   Q.   Would you be able to go and gather multiple rocks,

14   multiple crack rocks, and actually press them together and

15   have them hold together in a kilo quantity?

16   A.   No.  They would crumble.

17   Q.   Okay.  Let's talk about that analogy.

18        Would you agree that it's almost analogous to like a

19   cookie that you would crumble if it's all put together?

20   A.   Yes.

21   Q.   All right.  So that it would be impossible for

22   somebody to cook multiple smaller amounts of crack cocaine

23   and then try to press them together into a kilo quantity?

24   A.   Yes, I would agree with that.

25   Q.   Mr. Daly asked you a question about when you're on the

1    wire and you were listening to Mr. Benton, that there was a

2    conversation you overheard about him instructing another

3    person how to cook crack cocaine, correct?

4    A.    Yes.

5    Q.    All right.  Now, specifically it was in

6    regards -- there was somebody who called, and correct me if

7    I'm wrong, somebody called and they weren't able to cook it

8    into crack.  And he suggested that they put it into a

9    refrigerator to cool it?

10   A.    Yes.

11   Q.    Does that also assume then that what Mr. Benton had

12   sold that person was not in a crack state if that person was

13   trying to create it into crack?

14   A.    Yes.

15   Q.    So it would have been in powder form, again?

16   A.    Correct.

17   Q.    And again would indicate, based on your investigation,

18   that Mr. Benton sells powder cocaine?

19   A.    Yes.

20             MR. YODER:  Nothing further.

21             THE COURT:  Anything else?

22             MR. DALY:  No, Your Honor.  Thank you.

23             THE COURT:  All right, sir.  You can step down.

24   You're excused.

25             THE WITNESS:  Thank you.

1      THE COURT:  Counsel, you can call your next

2    witness.

3      MR. YODER:  Your Honor, we have one additional

4    witness.  The defense calls Willie Benton.

5      THE COURT:  All right.  Since he is in custody,

6    he can remain seated.

7      Counsel, you can inquire of him at the table as long

8    as he speaks into the microphone.

9                      WILLIE BENTON,

10              of lawful age, the defendant herein,

11          being first duly placed under oath, was examined

12                  and testified as follows:

13      MR. YODER:  Judge, can I go to the other side?

14    Because it's kind of awkward.

15      THE COURT:  You can actually use the podium

16    because if you don't you'll be blocking my view.  And his

17    demeanor is, like any other witness, is important.

18      MR. YODER:  Am I blocking now?

19      THE COURT:  It's a little bit of a challenge.

20    You need to stand somewhere and speak loudly.  Otherwise

21    I'll have the marshals move him to the witness stand.

22      MR. YODER:  Can I go over here, Pete?

23      THE COURT:  That will be fine.  Thank you.

24      Just make sure the bright green light on the base of

25    the microphone indicates it's working so you can be heard.

1          Thank you very much.

2          Counsel, you can inquire.

3                    DIRECT EXAMINATION OF WILLIE BENTON

4     BY MR. YODER:

5     Q.    Mr. Benton, please state your name for the record.

6     A.    Willie Benton.

7     Q.    How old are you, Willie?

8     A.    42.

9     Q.    Where are you currently incarcerated?

10    A.    Hazelton.

11    Q.    How long have you been incarcerated for?

12    A.    Seven years now.

13    Q.    And are you serving the time that you were sentenced

14    to by this Court?

15    A.    Yes.

16    Q.    For possession with intent to distribute a dangerous

17    drug?

18    A.    Yes.

19    Q.    I want to take you back to June 26 -- actually, let's

20    go back further.

21          During the original case, while the case was pending

22    prior to you entering a guilty plea, were you represented by

23    another attorney?

24    A.    Yes, Mr. Larry Whitney.

25    Q.    Did he represent you through the entire process?

1    A.    Yes.

2    Q.    And did he also appear on your behalf at the

3    sentencing hearing?

4    A.    Yes.

5    Q.    Was there an evidentiary hearing that had been

6    requested, to your knowledge?

7    A.    No, I didn't get one.

8    Q.    Okay.  Is that something that you had requested, that

9    you wanted?

10   A.    Yes.

11   Q.    All right.  Let's talk a little bit about the day of

12   June 26.

13         Do you remember that day?

14   A.    Yes.

15   Q.    All right.  Was that the day that there was a federal

16   search warrant executed on your home?

17   A.    It wasn't a federal search warrant, no.

18   Q.    State search warrant?

19   A.    Yes.

20   Q.    Okay.  Were you present at that time?

21   A.    Yes.

22   Q.    Who else was present in the home?

23   A.    My mother.

24   Q.    Okay.  When the task force came in, we've heard

25   testimony from Detective Gilbride that there was four kilos

1    of powder cocaine that were found?

2    A.    Yes.

3    Q.    Do you agree or do you admit that those were your four

4    kilos?

5    A.    Yes.

6    Q.    And when did you receive those?

7    A.    That day.

8    Q.    All right.  Where were they located in the home?

9    A.    In the kitchen.

10   Q.    What were you planning on doing with them?

11   A.    Selling them.

12   Q.    And how were those packaged?

13   A.    In kilo wrappers.

14   Q.    All right.  You saw what we've labeled as Defense

15   Exhibit B.  Is that your safe?

16   A.    Yes.

17   Q.    Where was that safe located?

18   A.    Upstairs in the bedroom in a closet.

19   Q.    You see the items in that safe.  Can you describe

20   those for me?  Tell me what they are.

21   A.    Yes.  They're three kilo wrappers that were not good

22   at all.

23   Q.    All right.  The four kilos that had just arrived at

24   your home that day of the 26th, were they similarly packaged

25   to those three kilos in the safe?

1    A.    Yes, they were similar.

2    Q.    So all four of them weighed approximately one kilo,

3    correct?

4    A.    Exactly.

5    Q.    And to your knowledge, what was the weight of the

6    three kilos that you had in your safe?

7    A.    Should have been the same.

8    Q.    How long had you had those three kilos in your safe?

9    A.    They were there for about two years.  They were sold

10   to me and I couldn't do nothing with them, so I left them in

11   the safe.

12   Q.    Okay.  Let's unpack that.

13         Why couldn't you do anything with them?

14   A.    I couldn't sell them.  Nobody would buy it.

15   Q.    Why?

16   A.    Because the -- how it looked.  It smelled.  It looked

17   like it was fake, basically.

18   Q.    When you received these, describe for us what they

19   looked like to you?

20   A.    Like Bisquick mix, like the agent said.

21   Q.    Did you purchase all three of them at the same time?

22   A.    Yes.

23   Q.    All right.  And when they arrived, did you have an

24   opportunity to feel the texture of them?

25   A.    Yep.  I opened them.  It didn't look right.  And I put

1   them in the safe.  And the guy was supposed to exchange

2   them -- that has nothing to do with this -- but he never

3   did, and that's why they were sitting there.

4   Q.    Why not dispose of them if you couldn't use them?

5   A.    It was worth money to me, basically, and he was

6   supposed to exchange them.  So that's why they sat.

7   Q.    So you were waiting for this gentleman or this woman,

8   whoever it was, to come and make it right?

9   A.    Basically, yeah.  It was about two years before the

10  investigation, though.

11  Q.    All right.  Let's go back then two years from that

12  investigation.

13        On that particular deal that you had, can you tell

14  this Court what in fact you ordered from this individual?

15  A.    Three keys.

16  Q.    Of what?

17  A.    Cocaine.

18  Q.    How are you so certain of that?

19  A.    Because I always buy cocaine.

20  Q.    Now, Willie, you have, and I think you've acknowledged

21  this, that you have a past with trafficking and dealing with

22  cocaine; is that correct?

23  A.    Yes.

24  Q.    Narcotics?

25  A.    Yes.

1  Q.   All right.  Had you ever seen crack cocaine in your

2  life?

3  A.   Yes, I have seen it.

4  Q.   Okay.  In what quantities have you seen it?  How is it

5  packaged?

6  A.   Crack usually be in quarters, eight balls, ounces.

7  Q.   Okay.  When you received those three keys two years

8  prior to June 26, what did you believe it was that the

9  person had brought you?  Did you believe that it was crack?

10 A.   No, I believed it was cocaine.  It was in a powder

11 form.

12 Q.   How are you so certain of that?

13 A.   Well, I looked at it.  It was powder.

14 Q.   Describe for the Court what it would look like if it

15 was actually crack cocaine compared to powder cocaine?

16 A.   It wouldn't look nothing like how it looked like that.

17 It would not be a brick wrapper.  It would not be a thousand

18 grams.  Don't nobody buy a thousand grams of crack at one

19 time.  And it would be a rocklike form.  Not a powder form.

20 Crack is a rocklike form.

21 Q.   Did you have a chance to smell the three keys that you

22 got?

23 A.   Yeah, it had a little sweet smell to it.

24 Q.   And it would be your testimony that you just believed

25 that you would not be able to sell it to anybody because of

1    the poor quality?

2    A.    It knew it was fake as soon as I seen it.

3    Q.    All right.  You had an opportunity to discuss this

4    matter with me in great detail, correct?

5    A.    Yes.

6    Q.    And we've gone over everything, correct?

7    A.    Yes.

8    Q.    Are you aware as you sit here today that we received a

9    forensic laboratory test from NMS Laboratories?

10   A.    Yes.

11   Q.    All right.  Have you had an opportunity to review that

12   report?

13   A.    Yes.

14   Q.    All right.  Are you aware as you sit here today that

15   the three kilos that we presented to Detective Gilbride had

16   been tested by NMS Labs?

17   A.    Yes.

18   Q.    And they were tested for the purely of them, correct?

19   A.    Exactly.

20   Q.    As you sit here today, are you aware of what the

21   purity of those three kilos came back to?

22   A.    Yes.

23              MR. DALY:  Objection.

24              THE COURT:  Sustained.

25         Counsel, we have the report.  Next question.

1          Objection sustained.

2              MR. YODER:  I'm not going to ask him about what

3      his understanding was.  I would like to ask him, with your

4      permission, Judge, I would like to ask him, did that affirm

5      his position that the cocaine was not able to be used for

6      resale value?

7              THE WITNESS:  Yeah, definitely.  Eight percent

8      level, I couldn't sell it at all.

9              THE COURT:  Do you have an objection, counsel?

10             MR. DALY:  Objection.

11             THE COURT:  It is.  Sustained, counsel.

12             MR. YODER:  All right.

13     BY MR. YODER:

14     Q.   You had an opportunity to also -- and I know not all

15     of them, but you had an opportunity to review some of the

16     wire communications that the government had, correct?

17     A.   Wiretaps?

18     Q.   Yes.

19     A.   No, I still haven't heard those either.

20     Q.   Okay.  Let me ask it another way.

21          To your knowledge, was there any discussions between

22     you and a third party or any person in regards to the sale

23     of crack cocaine?

24     A.   No, not at all.

25     Q.   It's your testimony that you were selling cocaine in

1    powder form?

2    A.    Cocaine only.

3              MR. YODER:  May I have one moment, Your Honor?

4              THE COURT:  Yes, sir, you may.

5              MR. YODER:  No further questions, Your Honor.

6              THE COURT:  Thank you.

7         Counsel, you may cross-examine.

8         Just a moment.  Let Mr. Yoder get situated, please.

9         Counsel, you may inquire.

10             MR. DALY:  Thank you, Your Honor.

11               CROSS-EXAMINATION OF WILLIE BENTON

12   BY MR. DALY:

13   Q.    Mr. Benton, you testified a moment ago that you were

14   aware that your counsel, Mr. Yoder, arranged for independent

15   testing of all of the drugs in this case, but specifically

16   we're talking about the three kilograms taken from that

17   safe.

18        You're aware of that, right?

19   A.    Yes.

20   Q.    You're also aware that there is no chemist in NMS Labs

21   here to testify; is that right?

22   A.    Yeah.

23   Q.    And is it your understanding that that's because there

24   is no chemist from NMS that could provide any new

25   information as to whether those three kilograms are crack or

 1   powder?

 2            MR. YODER:  Objection.

 3            THE WITNESS:  No.

 4            THE COURT:  I'll allow it.

 5            MR. YODER:  Judge, the only way he would be aware

 6   of that --

 7            THE COURT:  Counsel, I'm just going to allow the

 8   question.  I think it's appropriate based on what we know

 9   and based on his testimony.

10       Go ahead.

11            THE WITNESS:  Yeah, I remember last time we was

12   in court the Judge said that we couldn't.

13   BY MR. DALY:

14   Q.   Are you aware that your attorney made a motion for the

15   Judge to reconsider that ruling, and the Judge said he would

16   allow testimony from a forensic expert, a chemist?

17   A.   No, he told me that everything would be limited, that

18   I only could argue certain things.  I never knew nothing

19   about no forensic coming.

20   Q.   Okay.

21            MR. DALY:  I have nothing further, Your Honor.

22            THE COURT:  Thank you.

23       All right.  Counsel, anything else on behalf of the

24   defendant?

25            MR. YODER:  Judge, I don't.

1      Your Honor, at this time the defense would rest,

2  pending the admission of Exhibits A through D.

3          THE COURT:  All right.  Any objection?

4          MR. DALY:  No, Your Honor.

5          THE COURT:  They will be admitted.

6      With regard to -- I'm sorry.  Mr. Yoder, do you have

7  something else?

8          MR. YODER:  No, Judge.  I was just going to ask

9  the Court whether you would permit just a brief closing.

10         THE COURT:  Well, what I was going to do is

11 suggest to the parties, if you would like, to submit your

12 arguments in writing.  It's entirely up to you how you want

13 to proceed.

14     I'll take the matter under advisement.  I'm not going

15 to issue a decision today.  I'm going to go back and look at

16 the evidence, the testimony, the report, the expert's

17 report, along with the other parts of the record, the

18 affidavits in support of the wiretap warrants.  That will be

19 relevant, I would think.  And the search warrant.

20     And I do have one other question which we can, again,

21 we can address if appropriate.

22     But do you wish to -- if you wish to argue, you may,

23 although, again, I'm going to allow post-hearing briefing if

24 you would like.

25         MR. YODER:  Judge, we can brief it, if that's

1    your preference.  I have no problem with that.

2                   THE COURT:  All right.  Thank you.

3          And then the other question, I will tell you, I will

4    ask our probation department to undertake, because I think

5    it's relevant, subject to the parties' wishes, the defendant

6    has a history of trafficking in cocaine, according to his

7    PSI.  One trafficking, a second possession of cocaine,

8    another possession of cocaine -- and I'm just dealing with

9    strictly his drug-related record, not other record.

10         And I would be interested to know whether any of those

11   prior convictions, or if all, involved powder or if any

12   involved crack.  I think it would be relevant to the issue

13   before the Court.

14                  MR. YODER:  Judge, we would have no opposition to

15   that.

16                  THE COURT:  All right.  We can certainly check if

17   we have time or if probation wishes to do that.

18         How much time do you need, Mr. Yoder?  It's your

19   issue.  How much time do you need to file any motion -- or

20   any, I should say, any briefing?

21                  MR. YODER:  Judge, I would like to request the

22   transcripts as well, so I was going to say maybe 30 days.

23                  THE COURT:  That's fine.  30 days.

24         Would the government like a like period of time to

25   respond?

1      MR. DALY:  Yes, Your Honor.  Thank you.

2      THE COURT:  That's fine.

3      Once we have it, we'll have your briefing, then we can

4  go ahead and address the issue before the Court.  And then

5  depending on the outcome, we can decide what further

6  proceedings may be necessary.

7      Anything else?

8      MR. DALY:  Not from the government, Your Honor.

9      MR. YODER:  Judge, would the Court allow us to

10  perhaps supplement the oral argument as well if we find

11  relevant things, for example, what you just pointed out,

12  which would maybe be the PSI, the T3 wiretaps, the

13  affidavits to the warrants as well?

14      Or is that something that you would be looking into

15  independently?

16      THE COURT:  If you would like to, you may.

17      I'm going to look at the affidavits in support of the

18  wiretap, and I'm going to look at the affidavits in support

19  of the search warrant because I think that's all relevant,

20  specifically as to what conversations were had and the

21  background.

22      It's entirely up to you.  If you want to supplement

23  the record -- I think they're already part of the record.  I

24  think that information would have been available during

25  discovery in the underlying case way back when.

1       MR. YODER:  We just haven't received the wiretap

2    audio.  That's the only thing we haven't received through

3    our discovery request.

4       THE COURT:  I don't know if that's still

5    available.  If you have the transcripts, I would think that

6    would be more than sufficient.  I don't think there is

7    any -- I doubt -- I don't know.  I shouldn't speculate.  I

8    shouldn't guess.

9        But given the age of the case and the passage of time,

10   the appeal has run, there was an appeal.

11       Do you know, counsel for the government?

12      MR. DALY:  Specifically, no, Your Honor, but

13   based on what I know of practices, I believe the audio

14   should still be available.  And I'll work with Mr. Yoder on

15   that.

16      THE COURT:  That's fine.  If you would like to,

17   you're free to do that.  I'm not sure what difference the

18   audio makes vis-a-vis the transcript, unless you think there

19   may be some discrepancy.  You can certainly sort that out.

20       All right.  We'll put up an order granting 30 days for

21   each side.  One brief for each side.  And then we'll take

22   the matter under advisement.

23       Thank you very much.  We appreciate it.

24       Have a good afternoon.

25      MR. DALY:  Thank you, Your Honor.

1          MR. YODER:  Thank you, Your Honor.

2          THE COURT:  You're welcome.

3       (Proceedings concluded at 2:15 p.m.)

4

5              C E R T I F I C A T E

6

7       I certify that the forgoing is a correct transcript

8    from the record of proceedings in the above-entitled matter.

9

10             S/Caroline Mahnke            5/19/2025

11          Caroline Mahnke, RMR, CRR, CRC    Date

12

13                  I N D E X

14    DIRECT EXAMINATION OF MICHAEL GILBRIDE         3

15    BY MR. YODER

16    CROSS-EXAMINATION OF MICHAEL GILBRIDE         16

17    BY MR. DALY

18    REDIRECT EXAMINATION OF MICHAEL GILBRIDE      20

19    BY MR. YODER

20    DIRECT EXAMINATION OF WILLIE BENTON           23

21    BY MR. YODER

22    CROSS-EXAMINATION OF WILLIE BENTON            31

23    BY MR. DALY

24

25