The Honorable Judge Adams
2. S. Main St ste 575
Akron oh 44308

5:18-CR-406

United States District Court
for The Northern District of
Ohio

FILED

JUN 0 3 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
AKRON

28 U.S.C. 2255 Rule #7

## EXPAND The Record

BASED ON NEW 4Th Amendment violations

Willie Benton #65749060

On May 7Th 2025 I was in court for a limited evidentiary hearing. At close of hearing Judge informed me and my Counsel to write up memorandum in a time frame of 30 days. I have recently just recieved my full discovery ofter 7 years and like before with my counsel who did not do his investigative duties never went over my search warrants with me. My counsel I have now have not been to visit me to go over my search warrants once again I am being deprived effective counsel. I am asking The court to be allowed to EXPAND THE RECORD based on new evidence of 4Th Amendment violations with my search warrants. I am asking for more time to submit my memorandum due to my counsel not being available to properly go over my discovery with my search warrants being in violation of my 4th Amendment Rights. Municipal Court Search Warrants was authorized to search do to probable cause heard on wiretaps and TFO misled city judge to believe was

a state matter when was specifically
a federal investigation. Municipal
Court lack jurisdiction to search
for federal evidence. Please Respond
to my Request to Amend or under
28 U.S.C. 2255 #7 EXPAND
The Record.

And a full evidentiary hearing to settle
these disputes of my Counsel not
Reviewing warrants still til This day also
at preliminary hearing as evident in
my Exhibits I was never put on
notice or given opportunity to
Challenge my Search WARRANTS And
Affidavits to my
Municipal Count Warrants due to
The proceedure TFO's used and filed
Criminal Complaint same day
Judge or Prosecution never disclosed
There were other Warrants And
Affidavits involve in my case.

Putting on Notice With Courts
Before 30 day Thank you
time limit on         Willie Benton
Motions due.         #65749060
Need more time to file memorandum.

# Rules Governing Proceedings under

28 U.S.C.

2255

## Rule #7

### Expanding The Record

(a) IN general.

If The motion is not dismissed, The Judge may direct The parties to expand The Record by submitting additional materials relating to The Motion.

## Rule #8

(a) Determining whether to hold a hearing. If The motion is not dismissed The COURT must review The Answer, any transcripts and records of prior proceedings, and any materials submitted under Rule #7 to determine whether a evidentiary hearing is warranted.

Marquette Fullmore
1332 Hartford Ave
Akron OHio 44320

A
10 a

CLEVELAND OH  440
12 MAY 2025  PM 3  L

FOREVER USA



Willie Benton #65749060
2240 Hubbard Rd
Youngstown, OH 44505

44505-315740

# Rules Governing Proceedings under 28 U.S.C 2255

Rule # 8(b) Reference to a magistrate Judge. A judge may under 28 U.S.C. §636(b), Refer the motion to a magistrate judge to conduct hearings and to file proposed findings of facts and recommendations for disposition. When they are filed, the clerk must promptly serve copies of The proposed findings and Recommendations on all parties. The Judge <u>must</u> determine De Novo any proposed finding or recommendation to which objection is made. The Judge may accept, reject, or modify and proposed finding or recommedation.

U.S. Judge Magistrate Kathleen B. Burke

while he's vacationing in Colorado. It would mean too (and conversely) that a Kansas magistrate judge could issue warrants effective anywhere in the country (or maybe even worldwide) so long as he happens to be physically present in his assigned district, even when his physical location is immaterial to the proceedings. And it's pretty hard to imagine a reason underlying a statute like that — while it's simple enough to see the sense of the statute as it was written. *See generally United States v. Strother*, 578 F.2d 397 (D.C. Cir. 1978).

Taking in the statute's legal surroundings provides further confirmation of the conclusion its plain language and logic already suggest.

Consider the statutory structure surrounding § 636(a). It reveals that § 636(a)'s three specified geographic areas are not empty categories but fit with and find content in other easily identified statutes. First, "within the district in which sessions are held by the court that appointed the magistrate judge" is linked to 28 U.S.C. §§ 81-131 (2012), which designate the boundaries of federal districts and the locations of court sessions. In turn, "other places where that court may function" points to 28 U.S.C. § 141(b) (2012), which authorizes special court sessions outside the district. And "elsewhere as authorized by law" references laws like § 219 of the Patriot Act, which empowers magistrate judges to issue search warrants for property beyond their district if certain terrorism activities might have occurred within their district. USA PATRIOT ACT, Pub. L. No. 107-56, § 219, 115 Stat. 291 (2001).

-7-

Emergency Motion for full evidentiary hearing Based on New Evidence and Expand the Record under 28 U.S.C. 2255

I have a pending 28 U.S.C 2255 Claim Ineffective assistance of claim for not independently testing drugs or consulting an expert and now on Remand have found counsel failed to file timely motion. to suppress evidence of unlawful Search seizure and arrest due to Initial warrants by Municipal court. Mr. Malarik counsel at initial apperance failed to suppress warrants and evidence of municipal warrants as well maybe because he was unaware and magistrate or prosecution failed to disclose

Case: 5:18-cr-00406-JRA  Doc #: 145  Filed: 06/03/25  9 of 73.  PageID #: 1073
Case: 22-3676    Document: 20-2    Filed: 10/23/2023    Page: 6

No. 22-3676
- 6 -

Accordingly, we **VACATE** the district court's judgment on Benton's certified claim and **REMAND** for the district court to conduct an evidentiary hearing in accordance with this order.

ENTERED BY ORDER OF THE COURT

Deborah S. Hunt, Clerk

This was a preliminary violation of Fed. R. Crim. P 5(a) and 5(d) failure to bring in front of Magistrate in state court because of Delay by federal arrest complaint done on same day.

Also have evidence That TFO officer used a municipal court judge with no prosecutor to issue a search warrant for his own federal investigation without oversight of federal proceedures. This violates 4Th Amendment rights and shows prejudice he act on his own accord. No federal warrant to search was executed or ever authorized by federal Authority.



uncorrected by the district court—can be grounds for finding deficient performance." *Howard v. United States*, 743 F.3d 459, 464 (6th Cir. 2014).

A defendant is subject to the higher statutory penalties for offenses involving "cocaine base" if the offense involved "cocaine in its chemically basic form," regardless of whether it is in the form colloquially known as "crack cocaine." *DePierre v. United States*, 564 U.S. 70, 72, 89 (2011); *see* 21 U.S.C. § 841(b)(1). In contrast, the sentencing guidelines limit "cocaine base" to "crack," defined as "the street name for a form of cocaine base, usually prepared by processing cocaine hydrochloride and sodium bicarbonate, and usually appearing in a lumpy, rocklike form." USSG § 2D1.1(c), comment. (n.(D)). Thus, in order to apply the higher offense levels for "cocaine base" in the § 2D1.1 drug quantity table, "the Government must prove by a preponderance of the evidence that the defendant possessed 'crack' as defined by § 2D1.1." *United States v. Jones*, 159 F.3d 969, 982 (6th Cir. 1998).

The government argues that the record establishes that the substance was crack, citing Taggart's testimony that laboratory testing showed that the substance contained cocaine base. Forensic testing, however, cannot distinguish between crack and other forms of cocaine base. *United States v. Kimbrough*, 376 F. App'x 592, 595 (6th Cir. 2010) (noting that crack is a street term, not a chemical term). Rather, when the identity of the substance is disputed, the government typically meets its burden by presenting additional evidence that the substance is crack. For example, in *Jones*, the analyst who tested the substance testified both that it contained cocaine base and that, based on his visual observation, it was crack; a law enforcement officer and a confidential informant both testified that the substance was crack; and recorded phone calls indicated that the defendant was cooking powder cocaine into crack and selling it. *See* 159 F.3d at 982. Similarly, in *Kimbrough*, officers who saw the substance all identified it as crack. *See* 376 F. App'x at 595; *see also United States v. Moore*, 90 F. App'x 460, 465 (6th Cir. 2004) (affirming enhanced sentence for crack cocaine where a forensic chemist testified that the substance contained cocaine base and the purchaser of the substance identified it as crack).

The government engaged in a federal investigation yet sought a municipal court warrant alledging state offenses. In order to avoid the requirements of Fed. R. Crim. P. Rule 41 and violated 4th Amendment Rights of unreasonable search and seizures by state authority in federal prosecutions. This Conduct constitutes an unlawful circumvention of constitutional protections protected by 4th Amendment. As such the search was invalid and all resulting evidence must be suppressed and conviction vacated. Petitioner Respectfully Requests This Court to grant an emergency full evidentiary hearing to resolve factual disputes regarding the legality of my search seizure and arrest by TFO under color of law

denied the motion without an evidentiary hearing, concluding that Benton could not establish that, but for the failure to test the substance or consult an expert, the outcome of the proceedings would likely have been different. We granted a COA as to whether counsel was ineffective for failing to test the substance or consult an expert to support the argument that the substance was not crack cocaine.

On appeal, Benton argues that counsel performed unreasonably by failing to ensure that the substance in the safe was in fact crack cocaine and that the district court erred by denying him an evidentiary hearing. The government counters that Benton cannot show deficient performance or prejudice because the record establishes that the substance in the safe was crack cocaine for purposes of the sentencing guidelines, arguing that Taggart "unequivocally testified that the three kilograms contained crack cocaine."

*Abuse of Discretion for prosecutor Again*

"In reviewing the denial of a 28 U.S.C. § 2255 motion, we apply a de novo standard of review to the legal issues and uphold the factual findings of the district court unless they are clearly erroneous." *Greer v. United States*, 938 F.3d 766, 770 (6th Cir. 2019) (quoting *Hamblen v. United States*, 591 F.3d 471, 473 (6th Cir. 2009)). "Ineffective assistance of counsel claims are mixed questions of law and fact, which appellate courts review de novo." *United States v. Doyle*, 631 F.3d 815, 817 (6th Cir. 2011). We review the refusal to conduct an evidentiary hearing on a § 2255 motion for an abuse of discretion, and a hearing "is required unless the record conclusively shows that the petitioner is entitled to no relief." *Campbell v. United States*, 686 F.3d 353, 357 (6th Cir. 2012) (quoting *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999)).

To establish ineffective assistance of counsel, Benton must show that (1) counsel performed deficiently and (2) the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Where ineffective assistance at sentencing is asserted, prejudice is established if the movant demonstrates that his sentence was increased by the deficient performance of his attorney." *Spencer v. Booker*, 254 F. App'x 520, 525 (6th Cir. 2007). "[A]n attorney's failure to object to an error in the PSR's calculation of the guidelines—if left



*Show All Things Larry Whitney did Not do At All.*

and to consider this in conjunction with pending 28 U.S.C. 2255 ineffective assistance of counsel claim for failing to independently test drugs or consult an expert, as well as failure to file timely motion to suppress evidence or go over warrants and affidavits with client effectively.

• "Elkins v United States, 364 U.S. (1960)
  (In determining whether there has been an unreasonable search and seizure by state officers a federal court must make a independent inquiry ...)

• "Byars v United States, 273 U.S. (1927)"
  [Evidence of a crime discovered by a federal officer, in making a search without lawful WARRANT may not be used against ~~him~~ the victim of the unlawful search where a timely challenge has been interposed.)

• "Weeks v United States, 232 U.S. (1914)
  (where letters and papers of the accused were taken from his premises by an officer of the United States, acting under color of office but without any search warrant and in violation of constitutional rights of accused under the 4th Amendment and a seasonable application for return of the letters and papers has been refused, and they are used in evidence over his objection, prejudicial error is committed, and judgment should be reversed.)

At a pretrial hearing before Benton entered his plea, the parties explained to the court that there remained a dispute as to whether the substance in the safe could be treated as crack cocaine under the sentencing guidelines. Defense counsel acknowledged that the BCI's lab results showed that the substance contained cocaine base but noted that "it didn't look like crack cocaine" and that he might conduct independent testing. Similarly, at the plea hearing, defense counsel again indicated that he would likely request independent testing of the substance from the safe to show that it was cocaine, rather than crack. Counsel ultimately did not do so, however, and the presentence report (PSR) treated the possession of the substance in the safe as "relevant conduct" under USSG § 1B1.3(a)(2) and treated the substance as crack cocaine, increasing Benton's base offense level and sentencing range. *See* USSG § 2D1.1(c), comment. (n.(D)).

At sentencing, Benton's counsel did not directly dispute BCI analyst Keith Taggart's testimony that the substance contained "cocaine base, crack cocaine." Nor did counsel argue that the substance should not be treated as crack for purposes of USSG § 2D1.1. Instead, he elicited testimony from the investigating officer that the cocaine in the safe was of extremely poor quality and argued that, as a result, Benton's possession of it should not be considered relevant conduct. The district court, however, rejected Benton's argument that the substance, because it was "highly adulterated" and unsellable "junk," should not be considered relevant conduct. *See Benton*, 957 F.3d at 699-700. On appeal, Benton challenged the relevant-conduct finding, arguing that he did not intend to distribute the crack cocaine from the safe because of its poor quality and thus his possession of it could not be considered part of the same course of conduct as his offense of conviction. *See id.* at 700-01. We rejected his argument, concluding that the district court did not clearly err by finding that Benton intended to sell the crack cocaine despite its poor quality. *Id.* at 702-03.

In 2021, Benton filed a § 2255 motion, claiming that his counsel was ineffective for, among other things, failing to independently test the substance in the safe and consult with an expert on drug type and purity. He argued that, had counsel done so, he could have shown that the substance was not crack cocaine, which would have resulted in a lower guidelines range. The district court

"Barrington v. United States"
(5th cir 1986)

("Bare Bones" affidavit frequently condeemned by The Supreme court as insufficient to support probable cause.") My criminal complaint is a "Bare Bones" affidavit.

"Kimmelman v. Morrison, 477 U.S. (1986)
(only those habeas petitions who can prove under Strickland that they have been denied a fair trail by The gross incompetance of their attorneys are entitled to the writ and to re trail without The challenged evidence.)

( While the failure to file a suppression motion does not constitute per se (IAC) The record clearly reveals that attorney failed to file a timely suppression motion, not due to trail strategy considerations, but because he was unaware of The municipal warrant, and the states intentions or involvement to introduce The evidence in federal court. Due to the failure to conduct any pretrail discovery duties, such failure under Strickland was not reasonable and in accord with prevailing professional norms.

NOT RECOMMENDED FOR PUBLICATION

No. 22-3676

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

> **FILED**
> Oct 23, 2023
> DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| WILLIE R. BENTON, JR., | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| UNITED STATES OF AMERICA, | ) | OHIO |
| | ) | |
| Respondent-Appellant. | ) | |

O R D E R

Before: SUTTON, Chief Judge; SUHRHEINRICH and DAVIS, Circuit Judges.

Willie R. Benton, Jr., a federal prisoner represented by counsel, appeals a district court judgment denying his motion to vacate his sentence under 28 U.S.C. § 2255, claiming ineffective assistance of counsel. The parties have waived oral argument, and the panel unanimously agrees that oral argument is not needed. *See* Fed. R. App. P. 34(a). Because the district court erred in not granting an evidentiary hearing on one of Benton's claims, we remand.

In 2018, Benton pleaded guilty to conspiracy to possess with the intent to distribute and to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846, arising from his purchase of approximately four kilograms of powder cocaine from his co-defendant. *See United States v. Benton*, 957 F.3d 696, 699 (6th Cir.), *cert. denied*, 141 S. Ct. 831 (2020). In exchange for his plea, the government dismissed a second count related to Benton's possession of approximately three kilograms of a substance, found in a safe in his house, that was later determined by the Ohio Bureau of Criminal Investigation (BCI) Laboratory to contain cocaine or cocaine base. *See id.*

*[handwritten annotations in left margin:]* Why was Dismissed

*[handwritten annotations at bottom:]* Because Prosecutor new wns not Crack Instead Vindictively Pursues and Above his Discretion by Adding As "Relevant Conduct" for Sentencing As Crack!

ON June 26th 2018

TFO Michael Gilbride sought and ~~exe~~ executed a search warrant issued by the Akron Municiple Court, despite the investigation being clearly part of an ongoing federal case, involving DEA. The municipal court lacked jurisdiction to issue a warrant for a federal investigation, and TFO failed to inform the court of this fact. This omission suggests intentional or reckless misrepresentation, constituting bad faith under "Franks v Deleware. The misuse of a municiple warrant to circumvent federal warrant requirements and judicial oversight violates my 4th Amendment Rights.

Syllabus

that a defendant used, attempted to use, or threatened to use physical force. But while many who commit the crime of attempted Hobbs Act robbery do use, attempt to use, or threaten to use force, the government's problem is that no element of attempted Hobbs Act robbery requires the government to prove such facts beyond a reasonable doubt. The government maintains that anyone who takes a substantial step toward completing Hobbs Act robbery always or categorically poses a "threatened use" of force because the word "threat" can be used to speak of an abstract risk. The government submits that the elements clause uses the term to require only an objective, if uncommunicated, threat to community peace and order. But when Congress uses the word "threat" in such an abstract and predictive (rather than communicative) sense, it usually makes its point plain. The textual clues in the statute point in the opposite direction of the government's reading. Moreover, the government's view of the elements clause would have it effectively replicate the work formerly performed by the residual clause. Under usual rules of statutory interpretation, the Court does not lightly assume Congress adopts two separate clauses in the same law to perform the same work. See, *e.g.*, *Mackey* v. *Lanier Collection Agency & Service, Inc.*, 486 U. S. 825, 839, n. 14. Pp. 7–10.

(3) The government's final theory accepts that a conviction under the elements clause requires a communicated threat of force and contends that most attempted Hobbs Act robbery prosecutions involve exactly that. But whatever this argument proves, the theory cannot be squared with the statute's terms. Congress in the elements clause did not mandate an empirical inquiry into how crimes are usually committed, let alone impose a burden on the defendant to present proof about the government's own prosecutorial habits. Attempted Hobbs Act robbery does not categorically require proof of the elements § 924(c)(3)(A) demands. That ends the inquiry, and nothing in *Gonzales* v. *Duenas-Alvarez*, 549 U. S. 183, suggests otherwise. Pp. 10–13.

979 F. 3d 203, affirmed.

GORSUCH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and BREYER, SOTOMAYOR, KAGAN, KAVANAUGH, and BARRETT, JJ., joined. THOMAS, J., and ALITO, J., filed dissenting opinions.

AARRON Howell

The prosecution initiated against me relied on evidence obtain through a search warrant unlawfully issued by a court lacking jurisdiction and false statements and Representations of Evidence (CRACK and GUN) that was Never mentioned in indictment. The charges were never charge and dismissed threw state just indicted by federal government immediately, Despite the clear procedural and constitutional violations, shows malice and bad faith.

Opinion of the Court

*Alvarez* suggests otherwise.[3]

\*

The government quickly abandons the legal theory it advanced in the courts of appeals—and neither of the two new options it auditions before us begins to fill the void. In § 924(c)(3)(A), Congress did not condition long prison terms on an abstract judicial inquiry into whether and to what degree this or that crime poses a risk to community peace and safety. Nor did it mandate an empirical inquiry into how crimes are usually committed, let alone impose a burden on the defendant to present proof about the government's own prosecutorial habits.

Congress tasked the courts with a much more straightforward job: Look at the elements of the underlying crime and ask whether they require the government to prove the use, attempted use, or threatened use of force. Following

---

[3] JUSTICE ALITO offers still another argument on the government's behalf. According to our colleague, the crime of completed Hobbs Act robbery requires the government to prove beyond a reasonable doubt, and a unanimous jury must agree on, the particular "means" by which the defendant committed his offense—by "actual" force, "threatened force," "violence," or "fear of injury." § 1951(b)(1); *post,* at 3–6 (dissenting opinion). And because attempts to commit robbery by *some* of these means could qualify as crimes of violence under § 924(c)(3)(A), JUSTICE ALITO would classify the *entire* offense of attempted Hobbs Act robbery a "crime of violence." *Post,* at 6. But the parties have not whispered a word about any of this. Perhaps for good reason too. For one thing, it is unclear whether the Act's "means" clause sets forth elements or merely lists alternative ways a defendant may take or obtain property against the victim's will. If the latter is true, as some courts have held, a jury need unanimously conclude only that the defendant used one of the listed means; it need not agree on which one. See, *e.g., United States* v. *St. Hubert,* 909 F. 3d 335, 348–349 (CA11 2018); *United States* v. *Hancock,* 168 F. Supp. 3d 817, 821 (D MD 2016). For another, even assuming the Act is divisible in the sense he suggests, JUSTICE ALITO acknowledges that his some-is-good-enough approach defies this Court's precedents. *Post,* at 6; see *Descamps* v. *United States,* 570 U. S. 254, 260–264 (2013).

TFO officer Michael Gilbride acted on a warrant issued by the City Municiple Court, which lacked jurisdiction over the federal offenses alleged in the investigation mentioned in the affidavit of Search Warrant. The warrant was recklessly used as a pretext to arrest me without proper federal authorization, constituting an ILLEGAl arrest IN violation of the 4Th Amendment.

I was deprived of my liberty without due process when officers, under color of LAW, secured a warrant from a court Not a federal court oR State court a city court judge without proper jurisdiction and concealed the federal nature of the investigation from the issuing judge. This procedural misconduct denied me The opportunity to challenge The validity of the warrant before my Arrest.

(Slip Opinion) OCTOBER TERM, 2021 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## UNITED STATES *v.* TAYLOR

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 20–1459. Argued December 7, 2021—Decided June 21, 2022

For his participation in an unsuccessful robbery during which his accomplice shot a man, respondent Justin Taylor faced charges of violating the Hobbs Act, 18 U. S. C. §1951(a), and of committing a "crime of violence" under §924(c). The Hobbs Act makes it a federal crime to commit, attempt to commit, or conspire to commit a robbery with an interstate component. §1951(a). Section 924(c) authorizes enhanced punishments for those who use a firearm in connection with a "crime of violence" as defined in either §924(c)(3)(A)—known as the elements clause—or §924(c)(3)(B)—known as the residual clause. Before the District Court, the government argued that Taylor's Hobbs Act offense qualified as a "crime of violence" under §924(c). Taylor ultimately pleaded guilty to one count each of violating the Hobbs Act and §924(c). The District Court sentenced Taylor to 30 years in federal prison—a decade more than the maximum sentence for his Hobbs Act conviction alone. Taylor later filed a federal habeas petition focused on his §924(c) conviction, which was predicated on his admission that he had committed both conspiracy to commit Hobbs Act robbery and attempted Hobbs Act robbery. Taylor argued neither Hobbes Act offense qualified as a "crime of violence" for purposes of §924(c) after *United States* v. *Davis*, 588 U. S. ___. In *Davis*, this Court held that §924(c)(3)(B)'s residual clause was unconstitutionally vague. *Id.*, at ___–___. In his habeas proceeding, Taylor asked the court to apply *Davis* retroactively and vacate his §924(c) conviction and sentence. The government maintained that Taylor's §924(c) conviction and sentence remained sound because his crime of attempted Hobbs Act robbery qualifies as a crime of violence under the elements clause. The Fourth Circuit held that attempted Hobbs Act robbery does not qualify as a crime of violence under §924(c)(3)(A). The Fourth Circuit vacated

"Elkins v United States" (1960 U.S.)

Evidence obtained by state during a search which if conducted by federal officers would have violated defendants immunity from unreasonable search and seizure under the 4th Amendment was inadmissable. That in determining whether unreasonable search by state officers federal courts must make a independent inquiry.

This was never done on June 28, 2018 or in a state proceeding as well because evidence was immediately change into a criminal complaint with a different story.

No. 14-3035, *United States v. Krueger*

**GORSUCH**, Circuit Judge, concurring in the judgment.

At the heart of the Fourth Amendment lies the promise that the government will not search your home without a warrant, your consent, or at least some real emergency. To justify its search of a home in this case the government relies exclusively on the claim that it had a warrant. But — and by its own concession — the magistrate judge who issued the warrant lacked statutory authority to do so. In this appeal, the government asks us to overlook this defect and declare the warrant somehow valid all the same for Fourth Amendment purposes. A sort of phantom warrant, then, disappearing whenever you look to positive law and manifesting itself only before the Constitution. It's certainly a bold claim — but one I find no more persuasive for it.

*

Here's the source of the government's problem. The Federal Magistrates Act identifies only three geographic areas in which a federal magistrate judge's powers are effective:

> Each United States magistrate judge . . . shall have [1] within the district in which sessions are held by the [district] court that appointed the magistrate judge, [2] at other places where that [district] court may function, and [3] elsewhere as authorized by law . . .  all powers and duties conferred or imposed upon United States commissioners by law or by the Rules of Criminal Procedure . . . . 28 U.S.C. § 636(a) (2012).

The problem in this case is that a magistrate judge purported to exercise power in none of these places. The government "readily concede[s]" that the

Defendant  Willie Benton 65749060
   addresses The court on Remand
to expand The record,


I was deprived of my liberty
   without due process when TFO
officers, under color of law, secured
a warrant from a municiple
   court without proper jurisdiction
and concealed The federal nature
Of the investigation from The
issuing judge. This procedural
misconduct denied me The
opportunity to challenge the
validity of The municiple warrant

are the objects of that sentence, and the language beginning "within the district" is a prepositional phrase that modifies (and so limits the reach of) the verb "shall have." In this way, the grammatical structure of the sentence indicates that magistrate judges shall have those powers specified by rule or other law (e.g., Rule 41), but those powers are effective only in certain specified geographic areas — and, as we've seen, none of those areas is implicated here. So malign your high school grammar class all you want and rejoice in the fact no one teaches it anymore: it holds the key to the statute before us and, really, there just isn't any better preparation for the job of understanding and giving effect to so many of the complex (often run-on) sentences that (over?) populate today's statute books.

Confirming this reading of § 636(a) is that any other interpretation would render large chunks of the law superfluous. So, for example, as best I can tell from its very occasional intimations in this direction, the government seems to think we might fairly interpret § 636(a) as delegating to rulemakers the authority to give magistrate judges any power exercisable anywhere the rulemakers might choose to specify. But reading the statute in this way would render Congress's express territorial limitations pointless. The statute might as well be written this way: "Magistrate judges shall have all powers and duties conferred or imposed by law or by the rules." Without careful attention to which phrases modify which words — without attention, yes, to the sentence's grammar — words drop out and the statute's meaning changes entirely. Following the government's occasional

-5-

before my arrest in your court
on June 28, 2018. And neither
did your court make a
independent iquiry about this
municiple court evidence
being used in your criminal
Complaint arrest. Im
Requesting a full evidentrary
hearing on this matter.
The prosecution initiated against me relied
on evidence he witheld this day in
Court obatained through a municiple
search warrant unlawfully issued by a
court lacking jurisdiction. (Fed. R. CRIM. P.)
The charges where never in a state Rule 12(b)(2))
court due to complaint done same day.
The continued pusuit of charges, despite

For my part, I do not doubt that the error here is one of statutory dimension, just as the government (sometimes) concedes.  As a matter of plain language, the statute indicates that rulemakers may provide *what* powers a magistrate judge will have.  But the statute also expressly and independently limits *where* those powers will be effective.  Section 636(a) says that a magistrate judge "shall have" what "powers and duties" the rules and other laws may afford but only "within the district" where he is appointed to serve, "at other places" where his court may function, or "elsewhere" as authorized by law.  And the problem in this case is that a magistrate judge purported to exercise a Rule 41 power to issue a warrant (a what) but purported to exercise that power in a place (a where) that meets none of the statutory criteria.[2]

Put in a way your high school English teacher might appreciate, the magistrate judge is the subject of the sentence in § 636(a), his powers and duties

---

every pertinent respect, as binding as any statute duly enacted by Congress, and federal courts have no more discretion to disregard the Rule's mandate than they do to disregard constitutional or statutory provisions."); *United States v. Lane*, 474 U.S. 438, 448 n.11 (1986) ("[O]n its face, Rule 52(a) admits of no broad exceptions to its applicability.").

[2] When it comes to the question *what* powers § 636(a) affords, some read the statute as conferring only those "powers" that were conferred to U.S. "commissioners" by rule prior to 1968, when the statute was enacted.  Others suggest that the statutory language permits rulemakers to add further powers as they wish.  Happily, that issue isn't one we have to tangle with today.  *See In re Search of Scranton Hous. Auth.*, 487 F. Supp. 2d 530, 534 (M.D. Pa. 2007); *see also Gomez v. United States*, 490 U.S. 858, 865 (1989); *Stuart v. Rech*, 603 F.3d 409, 411 (7th Cir. 2010); *United States v. Douleh*, 220 F.R.D. 391, 393-94 (W.D.N.Y. 2003).

the clear procedural and constitutional violations shows. malice and bad faith. On June 26th 2018 TFO Michael Gilbride Sought and executed a search warrant issued by Akron Municipal Court despite the investigation being clearly part of an ongoing federal case involving DEA and a wirtap Title III authorized by Judge Adams. The municipal court lacked jurisdiction to issue a warrant for a federal investigation, and TFO's failed to inform state court and federal court on June 28th 2018 of these facts. This omission suggests intentional or reckless misrepresentation Constituting Bad faith under Franks v Delaware The misuse of a municipal warrant to circumvent federal warrant Requirements

unless and until the defendant shows prejudice flowing from the violation.  And the government suggests that the defendant in this case cannot show any prejudice flowing from the fact that a Kansas magistrate judge issued the contested warrant, for an Oklahoma magistrate judge surely would have issued the same (and otherwise lawful) warrant if asked.  By its own terms, however, the precedent on which the government rests for the notion that the defendant must prove prejudice — *United States v. Pennington*, 635 F.2d 1387 (10th Cir. 1980) — applies *only* when a defendant claims a violation of Rule 41.  *Pennington* imposes no similar duty on defendants claiming a violation of a statutory command or the Fourth Amendment (or for that matter any other rule of criminal procedure).  *See id.* at 1390.  So, as it happens, quite a lot turns on the question whether the error before us implicates only Rule 41 or also a federal statute.[1]

---

[1]  I confess I question *Pennington*'s prejudice requirement even when applied only to Rule 41 violations.  The Federal Rules of Criminal Procedure expressly prescribe a standard for evaluating whether their violation is sufficiently grave to warrant remedial action:  it's Rule 52(a)'s harmless error standard.  That standard requires the government to prove any violation of Rule 41 to be harmless before it may be overlooked.  *Pennington* improperly reverses that burden — and does so not only without any authority in the rules themselves but without any regard to the fact Rule 52(a) speaks precisely and very differently to the same issue.  I appreciate that *Pennington* took its cue from Judge Friendly's opinion in *United States v. Burke*, 517 F.2d 377 (2d Cir. 1975).  *See* George E. Dix, *Nonconstitutional Exclusionary Rules in Criminal Procedure*, 27 Am. Crim. L. Rev. 53, 93 (1989).  But it turns out that neither *Pennington* nor *Burke* supplies any plausible reason or authority to replace Rule 52(a) with an atextual rule of decision that shifts the burden from the government to the defendant — and does so, curiously, for but a single rule of procedure.  *See generally Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988) ("It follows that Rule 52 is, in

and judicial oversight
violates my 4Th Amendment Rights.

The arresting officer acted on a
Warrant issued by Akron Municipal
Court, Which lacked jurisdiction
over The federal offenses alleged
in the investigation. The warrant
was used as a pretext to arrest
me without proper federal
authorization, constituting
an illegal arrest in your court
Room on June 28, 2018 in
violation Of my 4Th Amendment
Rights.

#65749060 / Willie Benton

statute imposes geographic limitations on the powers of magistrate judges. Reply Br. at 16. The government readily concedes, too, that a federal magistrate judge assigned to the District of Kansas violated these restrictions when he purported to warrant the search of a home in Oklahoma. *See id.* And surely that's right: warranting a search in Oklahoma — authorizing governmental intrusion into private property located there — is exercising power *in* Oklahoma. And just as obviously, Oklahoma isn't within the District of Kansas, it isn't a place where the Kansas federal district court may function, and it isn't a place where the Kansas magistrate judge is otherwise specifically authorized to act by law. So putting the point plainly, the warrant on which the government seeks to justify its search in this case was no warrant at all when looking to the statutes of the United States.

*

This is a point worth pausing over. For while in some places the government's briefs candidly admit that the warrant in this case was indeed statutorily invalid in light of § 636(a)'s territorial restrictions, in other places its briefs seem to take the view that any infraction in this case implicated only Rule 41 of the Federal Rules of Criminal Procedure and not any statutory command.

Neither is it surprising that the government might wish to elide the distinction between a violation of the rules and a violation of statute, for the government proceeds to ask us to apply a circuit precedent holding that we should not suppress evidence found in searches that violate only the terms of Rule 41

-2-

(5th) Amendment   That no person shall be deprived of life, liberty, or property without due process of <u>law</u>.

that a conviction in federal courts, the foundation of which is evidence obtained in ~~the~~ disregard of liberties deemed fundamental by the Constitution, cannot stand.
"Byars, Weeks, Elkins, v U.S.

Fed. R. Crim. P. Rule 5(a) in general.
  (A) a person making an <u>arrest</u> within the United States must take the defendant without unnecessary <u>delay</u> before a Magistrate judge, or before a state or local judicial officer as Rule 5(c) provides unless a statue provides otherwise.

5(d) Procedure in a felony case.
(1) advice. If the defendant is charged with a felony the judge must inform the defendant of the following: (A) the complaint against him and any affidavits filed with it. (D) Any right to a preliminary hearing.

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JAMMIE COLLIER,

      Petitioner,              Case Number 2:23-CV-12511
                              HONORABLE NANCY G. EDMUNDS
v.                            UNITED STATES DISTRICT JUDGE

UNITED STATES OF AMERICA,

      Respondent,

_____/

**OPINION AND ORDER SUMMARILY DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS***

This matter is before this Court on a petition for a writ of habeas corpus brought pursuant to 28 U.S.C. § 2241. Jammie Collier, (Petitioner), is currently incarcerated in the Clare County Jail in Harrison, Michigan. Petitioner challenges his federal prosecution for being a felon in possession of a firearm, which remains pending in the federal court. For the reasons that follow, the petition for writ of habeas corpus is SUMMARILY DENIED.

### I. Background

Petitioner is currently being charged in the United States District Court for the Eastern District of Michigan with Felon in Possession of a Firearm. The case remains pending before Judge F. Kay Behm. Petitioner is represented by counsel in that case. [1]

Petitioner in his current habeas petition alleges that his speedy trial rights are being violated. Petitioner also claims he is being denied the effective assistance of counsel.

---

[1] See *United States v. Collier,* No. 4:23-cr-20283 (E.D. Mich.) Petitioner has already had two attorneys withdraw from the case but a third attorney was recently appointed by Judge Behm to represent Petitioner. This Court is permitted to take judicial notice of companion criminal cases in a Petitioner's case. *See e.g. United States v. Rigdon,* 459 F. 2d 379, 380 (6th Cir. 1972).

1

1

1

2                    UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
3                          EASTERN DIVISION

4      UNITED STATES OF AMERICA,

5              Plaintiff,          Case No. 5:18MJ1122
                                   Akron, Ohio
6          vs.                     Thursday, June 28, 2018
                                   2:21 p.m.
7      ARMANDO V. MERIDA,

8              Defendant.

9                          AND

10     UNITED STATES OF AMERICA,

11             Plaintiff,          Case No. 5:18MJ1123
                                   Akron, Ohio
12         vs.                     Thursday, June 28, 2018
                                   2:21 p.m.
13     WILLIE R. BENTON, JR.,

14             Defendant.

15

16         TRANSCRIPT OF INITIAL APPEARANCE
17     BEFORE THE HONORABLE KATHLEEN B. BURKE
          UNITED STATES MAGISTRATE JUDGE
18

19

20

21

22

23

24     Proceedings recorded by ECRO; transcript produced by
       computer-aided transcription.
25

*Handwritten annotations:* June 28; 2:21 p.m.; 26th 2 days later 6:30pm; Criminal complaint waived, Affidavit and Arrest to the Feds; #10 for and #11; Kathleen B. Burke; Exhibit "A"; Illegal Arrest; Deprivation of Due Process (Preliminary Violation); Prosecution did not give notice and I did not get opportunity to Challenge City Search or Arrest?

Case: 5:18-cr-00406-JRA  Doc #: 145  Filed: 06/03/25  37 of 73.  PageID #: 1101
Case: 5:18-cr-00406-JRA  Doc #: 59  Filed: 02/15/19  2 of 14.  PageID #: 455

2

```
 1    APPEARANCES:              Prosecutorial Misconduct

 2    For the Government:   Aaron P. Howell
                            Office of the U.S. Attorney - Akron
 3                          2 South Main Street, Room 208
                            Akron, Ohio 44308
 4                          (330) 375-5716

 5    For Defendant Merida:
                            Carlos Warner
 6                          Office of the Federal Public Defender
                            Skylight Office Tower, Suite 750
 7                          1660 West Second Street
                            Cleveland, Ohio 44113
 8                          (216) 522-4856

 9    For Defendant Benton:
                            Donald J. Malarcik, Jr.   advise me
10        INEFFECTIVE       Gorman Malarcik Pierce   to waive
                            54 East Mill Street, Suite 400
11        COUNSEL           Akron, Ohio 44308          Hearing
                            (330) 253-0785
12    When a city                          Failed to do
      search warrant                       investigative duty
13    was never mentioned
      Court Reporter:       Caroline Mahnke, RMR, CRR
14                          Federal Building & U.S. Courthouse
                            2 South Main Street, Suite 568
15                          Akron, Ohio 44308
                            (330) 252-6021

16
        "ELKINS V. United STATES", 364 U.S.
17
18    The court held that in determining whether  (1960)
19    there has been an unreasonable search and
      seizure by state officers, a state court
20    federal court must make an independent
21    inquiry, whether or not there has been such
      an inquiry by a state court, and
22    irrespective of how any such inquiry may
23    have turned out.
24    Magistrate Judge or prosecutor Aarron Howell
25    never made this inquiry. Kathleen Burke
      never made independent inquiry and Aarron
      Howell never made attempt to disclose to
      the judge shows malice and Bad Faith.
```

1                    Thursday, June 28, 2018

2              THE DEPUTY CLERK:  All rise.  This Honorable

3     United States Court for the Northern District of Ohio is now

4     open for the transaction of business.  The Honorable

5     Kathleen B. Burke presiding.

6              You may be seated.

7              The case before the Court carries Case Number

8     5:18MJ1122, United States of America versus Armando V.

9     Merida, and Case Number 5:18MJ1123, United States of America

10    versus Willie R. Benton, Junior.

11             THE COURT:  Good afternoon.

12             Would counsel for the United States please identify

13    himself?

14             MR. HOWELL:  Good afternoon, Your Honor.

15             Aaron Howell on behalf of the United States.

16             THE COURT:  And would counsel for Defendant

17    Merida please identify himself?

18             MR. WARNER:  Good afternoon, Your Honor.

19             Carlos Warner, Assistant Federal Defender.

20             THE COURT:  Good afternoon.

21             Mr. Warner, I've been advised that your client, Mr.

22    Merida, requires the services of an interpreter.  Is that

23    correct?

24             MR. WARNER:  Yes, Your Honor.

25             THE COURT:  All right.  So let's have counsel

Case: 5:18-cr-00406-JRA Doc #: 145 Filed: 06/03/25 39 of 73. PageID #: 1103
Case: 5:18-cr-00406-JRA Doc #: 59 Filed: 02/15/19 4 of 14. PageID #: 457

4

1  finish identifying themselves.

2       Counsel for Defendant Benton?

3            MR. MALARCIK:  Your Honor, good afternoon.

4       Attorney Don Malarcik here on behalf of Mr. Benton.

5            THE COURT:  Good afternoon.

6       And we do have an interpreter on the line.  Ms. Teresa

7  Salazar, I believe, is the name.

8       Ms. Salazar, are you there?

9            THE INTERPRETER:  I am, Your Honor.

10           THE COURT:  All right.  Our courtroom deputy will

11  swear in the interpreter.

12      (The interpreter was sworn in.)

13           THE INTERPRETER:  Good afternoon, Your Honor.

14  Teresa Salazar, federally certified staff interpreter for

15  the U.S. District Court for the District of Colombia.

16           THE COURT:  Good afternoon.

17      Let me now ask counsel whether they will stipulate to

18  the qualifications of our interpreter, Ms. Salazar?

19           MR. HOWELL:  The United States would, Your Honor.

20           THE COURT:  And Mr. Warner?

21           MR. WARNER:  Yes, Your Honor.  Thank you.

22           THE COURT:  All right.  We also have a pretrial

23  services officer, Officer Dennis Reed, who is here seated in

24  the jury box.

25      So, Mr. Merida and Mr. Benton, this is your initial

Case: 5:18-cr-00406-JRA Doc #: 59 Filed: 02/13/19 5 of 14. PageID #: 456
Case: 5:18-cr-00406-JRA Doc #: 145 Filed: 06/03/25 40 of 73. PageID #: 1104

5

1    appearance on the charges that have been brought against you

2    in this case.

3         During today's proceeding, I will first see that you

4    are advised of the charges brought against you and of the

5    penalties associated with those charges.

6         Second, I will advise you of your right to counsel and

7    make sure that you have an attorney if you do not have one.

8         Third, I will advise you of the right to remain

9    silent.

10        Fourth, I will find out if you wish to have a

11   preliminary hearing to determine whether probable cause

12   exists for the charges against you.  If you do, I will make

13   arrangements for that hearing.

14        And finally, I will address any motion that the

15   government may have for detention or bond pending further

16   proceedings in this case.

17        So the first order of business is to advise you of the

18   charges against you.

19        You have been brought here today on an arrest warrant

20   and complaint.

21        Mr. Howell, would you please describe the offenses

22   that the defendants are charged with and the penalties

23   associated with those charges?

24             MR. HOWELL:  Yes, Your Honor.

25        Both defendants are charged with violations of Title

Case: 5:18-cr-00406-JRA  Doc #: 145  Filed:  06/03/25  41 of 73.  PageID #: 1105
Case: 5:18-cr-00406-JRA  Doc #: 59  Filed: 02/15/19  6 of 14.  PageID #: 459

6

1    21 United States Code, Section 841(a)(1) and (b)(1)(A) as

2    well as Title 21 United States Code, Section 846 for, first,

3    to possession with intent to distribute approximately 7

4    kilograms of cocaine, a Schedule II controlled substance, as

5    well as conspiracy to possess with intent to distribute that

6    same controlled substance.

7            The offense carries with it a maximum term of up to

8    life in prison, a minimum mandatory term of ten years, up to

9    a $10 million fine, and a supervised release term of at

10   least five years.

11           THE COURT:  All right.  Thank you, Mr. Howell.

12       Mr. Merida, before we proceed further, I'm going to

13   ask you to confirm that you've had an opportunity to speak

14   with the interpreter, Ms. Salazar, and that you do

15   understand what's going on in the courtroom with the

16   assistance of Ms. Salazar.

17       So do you understand what's happening here with the

18   interpreter's assistance?

19           DEFENDANT MERIDA:  (Through Interpreter) Yes.

20           THE COURT:  All right.  Mr. Merida, have you

21   received a copy of the complaint and the attached affidavit?

22           DEFENDANT MERIDA:  Yes.

23           THE COURT:  And Mr. Benton, have you received a

24   copy of the complaint and the attached affidavit?

25           DEFENDANT BENTON:  Yes.

Case: 5:18-cr-00406-JRA Doc #: 145 Filed: 06/03/25 42 of 73. PageID #: 1106
Case: 5:18-cr-00406-JRA Doc #: 59 Filed: 02/15/19 7 of 14. PageID #: 460

7

 1          THE COURT:  I'm now going to speak with the

 2     defendants about their right to counsel.

 3          You do have a right to be represented by an attorney

 4     at every stage of the proceedings in this case.  If you are

 5     not able to afford to hire an attorney, the Court will

 6     appoint one without cost to you to represent you.

 7          Mr. Merida, do you understand your right to an

 8     attorney?

 9          DEFENDANT MERIDA:  (Through Interpreter) Yes.

10          THE COURT:  And Mr. Benton, do you understand

11     your right to an attorney?

12          DEFENDANT BENTON:  Yes.

13          THE COURT:  Mr. Merida, I received a financial

14     affidavit indicating that you wish to have the Court appoint

15     counsel.  I'm going to hold that up and ask if your

16     signature is at the bottom of the page.

17          DEFENDANT MERIDA:  (Through Interpreter) Yes.

18          THE COURT:  And Mr. Merida, do you understand

19     that the information that you filled in on this

20     affidavit -- did you fill this in with the help of your

21     attorney, the numbers on the page?

22          DEFENDANT MERIDA:  Yes.

23          THE COURT:  Okay.  Do you understand that this

24     information that has been filled in on your behalf is

25     subject to the penalties for perjury if it is not truthful?

1          DEFENDANT MERIDA:  Yes.

2          THE COURT:  Is the information that you filled in

3    here truthful to the best of your knowledge?

4          DEFENDANT MERIDA:  Yes.

5          THE COURT:  All right.  The Court does find you

6    eligible for the appointment of counsel and appoints the

7    Office of the Federal Public Defender to represent you.  Mr.

8    Warner from that office is here seated next to you.  So do

9    you understand that you will be represented by Mr. Warner

10    and his office?

11          DEFENDANT MERIDA:  Yes.

12          THE COURT:  Mr. Benton, I received a financial

13    affidavit submitted on your behalf.  There is a signature at

14    the bottom of the page.

15      Is that your signature?

16          DEFENDANT BENTON:  Yes.

17          THE COURT:  And do you understand that the

18    information that you submitted in this affidavit is subject

19    to the penalties for perjury if it is not truthful?

20          DEFENDANT BENTON:  Yes.

21          THE COURT:  Is the information truthful to the

22    best of your knowledge?

23          DEFENDANT BENTON:  Yes.

24          THE COURT:  The Court has reviewed the affidavit

25    and finds you eligible for the appointment of counsel.  You

Case: 5:18-cr-00406-JRA Doc #: 145 Filed: 06/03/25 44 of 73. PageID #: 1108
Case: 5:18-cr-00406-JRA Doc #: 59 Filed: 02/15/19 9 of 14. PageID #: 462

9

1    will be represented by Mr. Don Malarcik who is seated next

2    to you.

3        Do you understand, Mr. Benton, that Mr. Malarcik will

4    be your attorney in this case?

5        DEFENDANT BENTON:  Yes.

6        THE COURT:  The next thing I'm going to talk with

7    you about is your right to remain silent.  You do have the

8    right to remain silent.  You're not required to make any

9    statement.  And any statement you do make may be used

10    against you.  If you start to make a statement, you may stop

11    at any time.  You may also speak with your attorney at any

12    time.

13        Mr. Merida, do you understand your right to remain

14    silent?

15        DEFENDANT MERIDA:  Yes.

16        THE COURT:  And Mr. Benton, do you understand

17    your right to remain silent?

18        DEFENDANT BENTON:  Yes.

19        THE COURT:  Mr. Merida, you have also the right

20    to have your consulate notified that you have been detained

21    here.  They may be able to assist you and to help you

22    communicate with your family and other matters that they may

23    be able to help you with.

24        Do you wish to have the consulate notified?

25        MR. WARNER:  Judge, we can handle that.  We did

10

1    discuss that briefly in our time, and we would make any

2    notification if that's required.

3    But we thank the Court for inquiring.

4    THE COURT: Okay. And you can make that request

5    at a later date. He does have the right to do that at any

6    time during these pretrial proceedings.

7    All right. So I'm now going to speak with you about

8    your right to a preliminary hearing. You've been brought

9    here on a criminal complaint and affidavit and an arrest

10    warrant issued on the basis of those documents.

11    You do have a right to a preliminary hearing to

12    determine if probable cause exists for the charges made

13    against you.

14    And I believe that Mr. Merida does want such a

15    hearing. Is that correct, Mr. Warner?

16    MR. WARNER: That's right, Your Honor.

17    THE COURT: And Mr. Malarcik, I thought I was

18    informed that Mr. Benton had waived preliminary hearing.

19    Is that correct?

20    MR. MALARCIK: That is correct, Your Honor.

21    THE COURT: All right. I just need to find the

22    form.

23    Here it is.

24    So, Mr. Benton, I'm going to hold up the waiver form.

25    There is some signatures on the page. It looks like your

11

*Rule 12(b) 2 motion can be raised at any time when court lacks jurisdiction*

1    signature is on the top line on the right side.

2              Is that correct?

3              DEFENDANT BENTON:  Yes.

4              THE COURT:  And do you understand what I said

5    about your right to a preliminary hearing?  By submitting

6    this waiver you're giving up the preliminary hearing.

7              Do you understand that?   *Grand Jury Preliminary Errors*

8              DEFENDANT BENTON:  Yes.   *Rule 12(b)(a) lack jurisdiction*

9              THE COURT:  And by giving up the preliminary

10   hearing, waiving the preliminary hearing, the case will be

11   submitted to the grand jury and the grand jury will

12   determine whether to issue an indictment.

13             Do you understand that?   *GRAND JURY ERROR*

14             DEFENDANT BENTON:  Yes.   *accepting evidence of city Search Warrant*

15             THE COURT:  Okay.  And is it your wish to waive

16   the preliminary hearing?   *unreasonable search and seizure*

17             DEFENDANT BENTON:  Yes.

18             THE COURT:  Okay.  The Court will approve your

19   waiver of the preliminary hearing.   *lack jurisdiction to*

20             And with respect to Mr. Merida, I believe that all

21   counsel are available on Friday, July 6 at 10:00 a.m.

22             Is that correct, Mr. Warner?   *INDICT*

23             MR. WARNER:  Correct, Your Honor.   *Grand Jury*

24             THE COURT:  All right.  So the preliminary

25   hearing will take place in this courtroom before me on

*Elkins v. U.S. (1960)*

*Could not challenge my city warrant affidavits before my arrest and indictment*

*"Collier" "Martin"*

*4th Amendment violation* *"Franks v Delaware"*

*Rule 12(b)(3)(B)(I) A defect in the indictment 12(b)(3)(B)(v) failure to state offense*

*CRACK GUN*

1    Friday, July 6 at 10:00 a.m.

2        Mr. Merida, you do have the right to waive the

3    preliminary hearing, and I believe your attorney, Mr.

4    Warner, has been provided a copy of the waiver.  So if you

5    wish to waive, he will simply need to notify Mr. Howell and

6    notify the Court prior to the time set for this hearing.

7        At this time I will ask Mr. Howell if the government

8    has a motion regarding detention or bond?

9            MR. HOWELL:  Yes, Your Honor.  The United States

10    is requesting pretrial detention for both defendants.

11            THE COURT:  All right.  Mr. Merida --

12            MR. WARNER:  Oh, no.  We're just signing -- we're

13    fine, Your Honor.  We anticipate that we're going to conduct

14    that detention hearing at the same time.

15            THE COURT:  Okay.

16            MR. WARNER:  And so to that end, we would ask for

17    the extra statutory two days.  I believe that would be the

18    fifth day.

19            THE COURT:  All right.  We'll address that in a

20    minute.  I think Mr. Howell has indicated the government is

21    asking for detention as to both defendants.

22        And in Mr. Merida's case, I understand he's not

23    waiving the detention hearing.  So that hearing will take

24    place at the same time on the same date as the preliminary

25    hearing, Friday, July 6 at 10:00 a.m.

Case: 5:18-cr-00406-JRA Doc #: 145 Filed: 06/03/25 48 of 73. PageID #: 1112
Case: 5:18-cr-00406-JRA Doc #: 59 Filed: 02/15/19 13 of 14. PageID #: 466

13

1          Again, you have the opportunity to waive that hearing,

2   Mr. Merida, prior to the time set for the hearing.

3          With respect to Mr. Benton, I received a waiver form.

4          So, Mr. Benton, is that your signature on the top line

5   of the waiver?

6          DEFENDANT BENTON: Yes.

7          THE COURT: Mr. Benton, you have a right to a

8   hearing, a detention hearing, on the government's motion for

9   detention.

10          By submitting this waiver you are giving up the right

11   to the hearing. And you will be detained pending the trial

12   of this case, although you do reserve the right to raise the

13   issue of detention at a later date if your circumstances

14   should change.

15          So, Mr. Malarcik, have you explained that to Mr.

16   Benton?

17          MR. MALARCIK: I have, Your Honor. Mr. Benton is

18   on probation currently. There is some indication that the

19   Court may impose a holder. I told Mr. Benton I'll look into

20   that. If that changes, he has the right to readdress the

21   issue of detention at that time.

22          THE COURT: That's correct. And I did see in the

23   pretrial services report the indication that Summit County

24   Adult Probation was requesting a holder.

25          MR. MALARCIK: Yes, Your Honor.

1          THE COURT: All right. So, Mr. Benton, do you

2    understand what the Court said and do you understand what

3    your attorney said about the detention?

4          DEFENDANT BENTON: Yes.

5          THE COURT: That you're waiving the detention

6    hearing, but you reserve the right to raise it at a later

7    date if your circumstances should change.

8        So with that, do you wish to waive the detention

9    hearing at this time, Mr. Benton?

10         DEFENDANT BENTON: Yes.

11         THE COURT: All right. The Court will approve

12    the waiver of the detention hearing.

13        At this time, both defendants will be remanded to the

14    custody of the United States marshal, and we will have the

15    scheduled hearings next week unless we receive a waiver from

16    Mr. Merida.

17         THE DEPUTY CLERK: All rise.

18      (Proceedings concluded at 2:35 p.m.)

19             C E R T I F I C A T E

20        I certify that the forgoing is a correct

21    transcript from the record of proceedings in the

22    above-entitled matter.

23

24        S/Caroline Mahnke         2/15/2019

25         Caroline Mahnke, RMR, CRR     Date

*[handwritten top:]* 912, 913 ... *(illegible) ... Procedure*

*[handwritten right:]* STATE Evidence and crimes for a federal

*[handwritten left margin, vertical:]* I, a federal law enforcement officer or an attorney for the government ... Serious legal issue 2 ... a municipal judge signs a warrant in a federal case that could be a serious ... EXHibit B1

IN THE AKRON MUNICIPAL COURT
SUMMIT COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO | ) | |
| CITY OF AKRON | ) SS: | |
| SUMMIT COUNTY | ) | AFFIDAVIT FOR SEARCH WARRANT |

Detective M.V. Gilbride # 1182, being first duly sworn according to law, deposes and says that he believes and has good cause to believe that books, records, (including those stored electronically to include cellular phones, "Blackberry" messaging devices), documents, receipts, notes, ledgers and other papers and electronic equipment to store information relating to the possession, transportation, ordering, purchase and distribution of controlled substances, in particular, cocaine, bank statements and records and other items evidencing the obtaining, secreting, transfer and/or concealment and/or expenditure of money; financial proceeds, namely U.S. Currency, photographs, indicia of occupancy; and other fruits, instrumentalities and evidence related to drug trafficking are being illegally possessed within 698 (SOUTHERN unit) (APARTMENT) (DUPLEX) AKRON, SUMMIT COUNTY, OHIO 44310 which is a blue with white trim, , 2 1/2 story, wood frame, multi-unit residence which faces east toward Carlysle Street. 696 Carlysle Street is the southern unit of the side-by-side duplex and 698 Carlysle Street is the northern unit of the side-by-side duplex. Both units are contained in a single dwelling sub-divided into separate units. The driveway is located directly south of the main structure and there in so apparent garage. The residence is further described as being the fourth structure on the west side of Carlysle Street north of Shelby Street. There are no visible numerals on the residence as viewed from Carlysle Street. Also to be searched is the curtilage to the premises.

If found, such items as: books, records, (including those stored electronically to include cellular phones, "Blackberry" messaging devices), documents, receipts, notes, ledgers and other papers and electronic equipment to store information relating to the possession, transportation, ordering, purchase and distribution of controlled substances, in particular, cocaine, bank statements and records and other items evidencing the obtaining, secreting, transfer and/or concealment and/or expenditure of money; financial proceeds, namely U.S. Currency, photographs, indicia of occupancy; and other fruits, instrumentalities and evidence related to drug trafficking. will be seized and used as evidence in the prosecution of the person found in control for a violation of Section 2925.11 of the Ohio Revised Code, "Drug Abuse" and Section 2925.03 "Drug Trafficking". *[handwritten:]* STATE Crimes

THIS KNOWLEDGE IS BASED UPON THE FOLLOWING FACTS:

1.  Affiant is a member of the Akron Police Department, and has been so employed for the past 19 years. Affiant's current assignment is with the Akron Narcotics Detail as a Task Force Officer (TFO) of the Drug Enforcement Administration (DEA) Cleveland District Office (CDO) Enforcement Group 2. Affiant has been a DEA TFO since October 2014.

2.  Affiant's experience as a DEA TFO includes, but is not limited to: physical surveillance; supervising the purchases of controlled substances by undercover agents and informants; acting in an undercover capacity to purchase controlled substances; debriefing persons arrested and convicted of drug trafficking offenses about their illegal activity; compiling, organizing and analyzing pen register and telephone toll data; interviewing witnesses; drafting

search warrants seeking seizure of illegal drugs and other evidence of drug violations; searching locations and seizing narcotics, "tools of trade," documents, and the monetary gains of narcotics trafficking; drafting and executing court authorized Title III wire interception orders; supervising investigators during court authorized wiretaps; providing Grand Jury and court testimony; assisting Assistant U.S. Attorneys in the prosecution of defendants on trial for Federal drug violations; testifying as both a fact witness and an expert "opinion" witness concerning the violations of Federal and State drug laws.

*[handwritten in left margin: Not Signing and if a Agent don't have to assist?]*

I have had formal law enforcement training and also have been personally involved in numerous investigations of offenses involving the possession, sale, storage, and distribution of heroin, methamphetamine, crystal methamphetamine, cocaine, crack cocaine, and marijuana. I have been involved in numerous prior wiretap investigations which focused on dismantling organizations involved in the distribution of narcotics.

3. I have used confidential informants on numerous occasions to investigate individuals and drug trafficking organizations (DTOs). Through informant interviews, and extensive debriefings of individuals involved in narcotics trafficking, I have learned the manner in which individuals and organizations distribute controlled substances in Ohio, the domestic United States and areas abroad.

4. I have supervised purchases of controlled substances by informants, cooperating witnesses, and undercover officers, as well as acted in an undercover capacity. I have extensive experience conducting street surveillance of individuals engaged in narcotics trafficking activities. I have also participated in the execution of numerous search warrants where controlled substances, drug paraphernalia, drug trafficking records, and drug proceeds were seized by law enforcement.

5. Through training and experience, I am very familiar with the appearance and street names of various controlled substances, including heroin, methamphetamine, crystal methamphetamine, cocaine, crack cocaine and marijuana. I also know the street values of different quantities of these controlled substances, and am familiar with the methods used by drug dealers to package and prepare controlled substances for sale.

6. Through training and experience, I am also familiar with the language used by drug traffickers to discuss their illegal activities. I know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances.

7. Through training and experience, I know that individuals engaged in organized drug distribution maintain telephone contact with various persons throughout the country from whom they receive drugs, drug paraphernalia, drug information, and information on law enforcement efforts, as well as information about others in the local area who are competing in the unlawful activity. The use of telephones, especially cellular telephones, is essential for maintaining timely long-distance and local contacts with the drug suppliers, and down the organizational chain to the local traffickers.

8. Affiant knows narcotics distributors will frequently use pre-paid cellular telephones due to their anonymity and the ease of obtaining and/or discarding the telephone in the event the individual feels he has been compromised. Organized drug traffickers prefer to use these cellular telephones to thwart law enforcement efforts, and can increase service minutes at any time with

little or no inconvenience or disruption to their illegal activities. Furthermore, drug traffickers often use multiple cellular telephones to facilitate narcotics related transactions.

9. Affiant knows from training and experience that narcotics traffickers more recently have begun using text messaging to further their illicit business. The text message enables the professional drug dealer to instantly communicate with associates in a secure setting. Furthermore, it adds a layer of protection because of its anonymous nature, that is, the message is sent from a cellular telephone, but cannot be conclusively linked to an individual (unlike a voice communication).

10. Finally, As a result of training and experience, Affiant knows the following about drug traffickers:

10a. Individuals who deal in illegal controlled substances maintain books, records, notes, ledgers, and other papers relating to current and past manufacture, transportation, purchase, sale, and distribution of controlled substances, even though such documents may be in code. Such drug records can also be stored in computer memory media.

10b. Individuals who deal in illegal controlled substances frequently take, or cause to be taken, photographs of themselves, their associates, their property and their product.

10c. Individuals who are engaged in large-scale narcotics operations usually maintain readily available and substantial amounts of United States currency in order to finance ongoing drug business.

10d. Individuals who deal in illegal controlled substances often seek to conceal profits and proceeds by placing assets in names other than their own, to include multiple individual or business names.

10 e. Although assets may be titled in other persons' or company names, individuals who deal in illegal controlled substances continue to use those assets and exercise dominion and control over them. Such defacto ownership is often proven during residence searches by the drug dealers' possession of the assets themselves or documentation, titles keys, etc., even though the assets may be titled in a third party name.

10 f. Individuals who deal in illegal controlled substances usually do not report their illegal earnings on tax returns. Comparing large defacto assets to small reported income is powerful evidence of money laundering and tax evasion crimes. When this difference is divided by an established profit margin per unit of drugs, the size of a drug dealer's past drug transactions can be revealed.

10g. Individuals who are engaged in large-scale narcotics operations frequently attempt to legitimize profits derived from their narcotics business. Affiant knows that to accomplish these goals, those engaged in drug trafficking commonly utilize false and fictitious personal or business records, shell corporations and business front, and sham transactions involving foreign and domestic banking transactions, securities, cashier's checks, money drafts and real estate.

10h.  Affiant knows that it is essential that members of such organized groups personally meet with larger drug suppliers to obtain the illegal goods they resell to their customers for a profit.  It is also essential that they occasionally meet with other members of their drug distribution conspiracy to divide their illegal proceeds.  Documentation evidencing such travel can usually be found in the residences/businesses of the drug organization's members.

10i.  Affiant further knows from his training and experience that persons involved in the illicit distribution of controlled substances nearly always attempt to conceal their identities, the locations at which drug transactions take place, the locations where they store their drugs, and the flow of proceeds derived from their illicit drug transactions into "clean" currency.  In addition, it is Affiant's experience that drug traffickers seldom will conduct drug transactions at their primary residence for fear of being robbed of drug proceeds and/or narcotics by other drug traffickers, and/or to thwart law enforcement detection.

10j.  Finally, through training and experience, Affiant knows that even though drug transactions take place at varied locations, substantial drug traffickers, such as the subjects of this investigation, almost always keep records/documents/papers relating to their associates, including telephone and other contact numbers, and drug transactions, including records of receipt and distribution of drugs and money, even though these records are often in code.  Unlike obviously incriminating or consumable items, these types of records, documents and papers, as well as those described above tend to be viewed by drug traffickers as rather innocuous and not particularly incriminating; thus such items are likely to be kept for lengthy periods of time.  Furthermore, these "personal" type of items are almost always found at the traffickers' residence, even if that location changes (*i.e.*, the trafficker moves to a new residence).  These types of records, documents, and papers also are frequently kept at business or other locations used by traffickers to conduct illegal transactions.

## BASIS OF INFORMATION

11.  Except as otherwise noted, the information set forth in this Affidavit has been provided to myself and by members of the Akron - Summit County(HIDTA) Initiative, DEA SAs, or other law enforcement agents or officers.  Unless otherwise noted, whenever in this Affidavit I assert that a statement was made, the information was provided by another law enforcement officer (who may have had either direct or hearsay knowledge of the statement) to whom I have spoken or whose report I have read and reviewed.  Likewise, information resulting from physical surveillance, except where otherwise indicated, does not necessarily set forth my observations, but rather has been provided directly or indirectly through members of the HIDTA, other DEA SAs, or other law enforcement officers who conducted the surveillance.  Likewise, any information pertaining to vehicles and/or registrations, personal data on subjects, and record checks has been obtained through the Law Enforcement Automated Data System (LEADS) from the State of Ohio or the National Crime Information Center (NCIC) computers.

21.  All subscriber, toll record, pen register and trap and trace information contained herein was obtained by court order or subpoena.

12.  During the course of this investigation, <u>federal</u> and <u>local</u> law enforcement agents directed controlled drug purchases.  The agents advised me that the controlled drug purchases were conducted in the following manner, unless otherwise specified: agents searched the confidential source purchasing the drugs for drugs and money before the controlled purchase.

Agents placed a body recorder and/or electronic transmitter on the body of the confidential source and agents provided the confidential source with official authorized funds to purchase narcotics. Agents gave the confidential source instructions to attempt the drug purchase from a specified subject. Law enforcement personnel maintained constant audio and/or visual surveillance, to the extent practicable, of the confidential source during the transaction. Upon completion of the attempted drug purchase, law enforcement personnel promptly met with the confidential source and again searched the source and secured from him any just purchased substance(s). All purchased substance(s) were field-tested by law enforcement personnel and will be submitted to a federal, state, or local laboratory for analysis.

13. During the course of this investigation, conversations of the target subjects were consensually recorded by confidential sources herein. Unless otherwise noted, these consensually recorded conversations were made at the direction of me, and either in my presence and/or my colleagues'. One of my colleagues or I also observed the number that the confidential source dialed.

## RELIABILITY OF CONFIDENTIAL SOURCES

14. During the course of this investigation, law enforcement agents and officers received information from confidential sources concerning **WILLIE R. BENTON JR.** Affiant has outlined information from one confidential sources in this Affidavit. Affiant labeled the confidential sources as "CS" followed by a number designation. Additionally, Affiant only refers to the confidential sources in the masculine gender throughout the Affidavit, without regard to the actual gender of the confidential source. To the extent practicable, law enforcement has corroborated the information provided by the confidential sources through physical surveillance, reviewing records, monitoring consensually recorded telephonic and personal conversations and other investigative techniques.

### CS-1

15. CS-1 has provided information to the Summit County Drug Unit and DEA since May of 2017. To the extent practicable, law enforcement has corroborated much of the information provided by CS-1, which has been corroborated through independent investigation, statements of other confidential sources, police reports, physical surveillance, consensual recordings, controlled purchases of drugs, and other law enforcement activities. CS-1 has provided reliable information in the past concerning drug trafficking in the Akron, Ohio, area, and has proactively assisted law enforcement by making controlled purchases. As it relates to this investigation, CS-1 pro-actively assisted law enforcement by making a controlled drug purchase from **WILLIE R. BENTON JR. AKA: "Ghetto"**. CS-1 has a drug related criminal history and CS-1 is still actively providing information to law enforcement. CS-1 received prosecutorial consideration for the information provided.

16. Based upon the totality of the foregoing, I believe in the reliability of the information provided by CS-1.

## FACTS AND CIRCUMSTANCES REGARDING PROBABLE CAUSE

*[handwritten annotations: "This is why got warrant for city", "So what was warrant actually for?", "a buy on March 15", "But on June 26 got a text trans til te III drugs on way!"]*

16. Because this affidavit is submitted for the limited purpose of securing a drug and records and documents search warrant for the above-described premises as a result of an ongoing pattern of criminal conduct , Affiant has not included each and every fact known concerning this investigation. Affiant has only set forth the facts that Affiant believes are essential to establish the necessary foundation for the requested warrant/order.

17. On March 15, 2018, CS-1 purchased approximately 126 grams of cocaine for $4,500.00 from **BENTON JR.** during a controlled buy at 696 Carlysle Street Akron, Ohio. *[handwritten: authorized]*

*[handwritten left margin: "State Crimes is probable cause. They use for a federal case?"]*

18. Prior to meeting and under the direction of investigators, CS-1 made prior arrangements to "*meet*" with **BENTON JR.** and purchase narcotics. Specifically, at approximately 1:52 p.m., CS-2 sent **BENTON JR.** a text message to TT-1 that read: "*What up*". [Note: Earlier on March 15, 2018 at approximately 11:47 a.m. **BENTON JR.** sent an outgoing SMS message from TT-1 to CS-2 that read: "Yooooooo". DEA SA Wehrmeyer confirmed the contact with **BENTON JR.** by reviewing and photographing CS-1's text message(s) with **BENTON JR.** as well as examining CS-1's cellular telephone SMS history. Affiant believes CS-1 attempted to make contact with **BENTON JR.** to conduct a cocaine transaction by texting 'What up'. **BENTON JR.** confirmed his availability to conduct a cocaine transaction by texting 'Yooooooo'.

19. Prior to the controlled buy and in the presence of SA Wehrmeyer, and myself, CS-1 made a consensually recorded (outgoing) call from his cellular telephone to **BENTON JR.** at TT-1. SA Wehrmeyer observed the CS dial the above number for **BENTON JR.** **BENTON JR.** answered the phone and stated, "*Yeah.*" CS-1 stated, "*Shit I was ready.*" [to conduct a cocaine transaction]. **BENTON JR.** asked, "*You was talking the same one?*" [CS-1 was previously in the company of an unknown individual who purchased 1/8 kilogram of cocaine from **BENTON JR.** at 696 Carlysle.] CS-1 replied, "*Yeah. Yup.*" Both parties began talking over each other and became inaudible. CS-1 then asked, "*Huh?*" **BENTON JR.** replied "*Yeah on the north come on.*" [at 696 Carlysle Street located in North Akron] CS-2 responded, "*Alright.*"

20. Following the phone call between CS-1 and **BENTON JR.**, investigators established fixed surveillance at 696 Carlysle Street, Akron, Ohio. CS-1 traveled to 696 Carlysle Street and entered the residence through the rear, west-side door. While in the residence, agents overheard (via the transmitting device) **BENTON JR.** and CS-1 conducting a drug transaction. Surveillance units observed CS-2 leave 696 Carlysle Street, Akron, Ohio and followed him to a prearranged meet location where he relinquished the evidence.[1]

21. After the meeting CS-1 was debriefed by SA Wehrmeyer and Affiant. CS-1 stated he entered the residence through the rear door and into the kitchen after **BENTON JR.** let him in the house. CS-1 counted out the money and placed the currency on the kitchen counter top. **BENTON JR.** had the cocaine prepared for CS-1 to take and had placed the cocaine on the kitchen counter top. CS-2 took possession of the cocaine and then left the residence.

---

[1] Upon acquiring the evidence, it was processed and field tested by investigators prior to being submitted to the Ohio Bureau of Criminal Identification and Investigation for further analysis. The lab results are pending and the substance weighed approximately 126 gross grams and tested positive via Voltox field test kit for the presence of cocaine.

22. On May 17, 2018 and June 14, 2018, United States District Judge John Adams, Northern District of Ohio, Eastern Division, signed an Order authorizing the initial interception of wire and electronic (text messages) communications to and from TT-1 cellular telephone known to be possessed and used by **WILLIE R. BENTON JR.** Monitoring and interception pursuant to the Court's Order commenced on April 18, 2018, and will *CEASE* on July 13, 2018, at approximately 11:59 p.m.

23. Court-authorized monitoring of TT-1 pursuant to the May 17, 2018 and June 14, 2018 Orders has resulted in the interception of significant narcotics-related telephone conversations and SMS / text messages. Affiant has probable cause to believe, based on a review of the wire communications to date, that **BENTON JR.** is principally a wholesale source of supply of cocaine and a retail source of supply of crystal methamphetamine to individuals in the Akron, Ohio, area to include **TERRENCE F. BOYD,** and **MATTHEW VIRDEN.** Additionally, I believe **BENTON JR.** has obtained cocaine and is currently obtaining cocaine from **ARMANDO MERIDA.**

24. On May 22, 2018 at approximately 7:38 p.m. **BOYD** placed an outgoing call from cellular facility (330) 344-0272 to **BENTON JR.** at TT-1. During the conversation **BOYD** stated, "I got another shitty bite, man, but god damn, man." **BENTON JR.'s** response was inaudible. **BOYD** then stated, "Shit, I know you don't want to be going through that, you wanting, I know it's all dust, he don't want to pick none of the chunks out." **BENTON JR.'s** response was again inaudible as he was mumbling. Shortly after **BOYD** stated, "I can't hear you bro. Your phone breaking up." **BENTON JR.** stated, "Yeah, there ain't no chunk in that motherfucker, but I show it to you." Shortly after **BOYD** stated, "I know, I'm not about to (inaudible) he ain't gonna want no dust though. That's the only problem. I try to figure something out." I believe **BOYD** informed he had a sale of crystal methamphetamine arranged referred to as a 'bite' with a drug customer however the drug customer wanted the crystal methamphetamine to be in chunks without any dust and cutting agent in the bag.

25. On May 22, 2018 at approximately 7:43 p.m. **BOYD** placed an outgoing call from cellular facility (330) 344-0272 to **BENTON JR.** at TT-1. During the conversation **BOYD** stated, "Let me get one for (inaudible) I'm trying to make these fly, he's gonna buy it anyway." After a brief conversation negotiating the price of the crystal methamphetamine **BOYD** asked, "Got two?" **BENTON JR.** replied, "Yeah." **BOYD** asked, "Are you northy?" **BENTON JR.** responded, "Yeah." **BOYD** stated, "Yep. I'll be there. I'm gonna take it straight to him. Yeah, my girl, my girl gonna take me." **BENTON JR.** responded, "Yeah." I believe **BOYD** initially asked **BENTON JR.** for one ounce of crystal methamphetamine by stating 'let me get one'. **BOYD** assured **BENTON JR.** that he was trying to sell the ounces of crystal methamphetamine by stating ' I'm trying to make these fly' and that **BOYD's** customer was going to buy the ounce anyway despite the fact that the ounce was comprised of powdery crystal methamphetamine and not chunks of the contraband. Shortly after **BOYD** asked if **BENTON JR.** had two ounces of crystal methamphetamine to which **BENTON JR.** replied 'Yeah'. **BOYD** asked if **BENTON JR.** was at 696 Carlysle Street referred to as 'northy' as the residence is located in north Akron and **BENTON JR.** confirmed he was there. **BOYD** confirmed he was coming to get the crystal

methamphetamine by stating 'Yep. I'll be there' and that he was taking the crystal methamphetamine straight to the customer. **BOYD** went on to inform **BENTON JR.** that his (**BOYD**) girlfriend was going to drive him to pick up the crystal methamphetamine from **BENTON JR.** and deliver it to the customer.

26. On May 22, 2018 at approximately 8:55 p.m. **BOYD** placed an outgoing call from cellular facility (330) 344-0272 to **BENTON JR.** at TT-1. During the conversation **BOYD** asked, "Bro, where you at bro?" **BENTON JR.** replied, "On the porch waiting for you." **BOYD** asked, "Huh?" **BENTON JR.** responded, "Sitting on the porch waiting for you." **BOYD** asked, "You are where?" **BENTON JR.** replied, "Sitting on the porch waiting for you." **BOYD** stated, "Oh, alright. I'm pulling up." I believe **BENTON JR.** informed **BOYD** he was sitting on the front porch of 696 Carlysle Street awaiting **BOYD's** arrival to give him 2 ounces of crystal methamphetamine. **BOYD** informed **BENTON JR.** that he was pulling up to the residence shortly.

27. At approximately 9:05 p.m. investigators of the Akron / Summit County HIDTA initiative observed via pole camera fixed on the rear of the residence as **BENTON JR.** walked across the driveway (presumably front porch) of 696 Carlysle Street and approach a white Jeep Cherokee that arrived and parked in the street near the driveway. Shortly after, the white Jeep Cherokee departed and **BENTON JR.** returned to 696 Carlysle Street.

28. Undercover investigators followed the white Jeep Cherokee as it left 696 Carlysle Street and confirmed the license plate as Ohio registration HHT 6058 registered to Sarah A. Allen of 1853 Delia Avenue Akron, Ohio. Surveillance of the vehicle continued to until uniformed Akron Police Patrol officers initiated a traffic stop near the intersection of W. Market St. and S. Rose Blvd. as a result of the failure to utilize a turn signal at the intersection of Portage Path and Bailey Avenue. During the traffic stop the driver was found to be Sarah Allen and the front seat passenger was identified as **BOYD**. Both parties stated they were coming from the store where they had purchased several DVD movies and were going home to watch them. Neither party mentioned leaving from 696 Carlysle Street nor meeting with **BENTON JR.** Allen was informed of her failure to utilize a turn signal and given a verbal warning for the violation. Both parties were released from the traffic stop after confirmation of their identities and a negative check for outstanding arrest warrants. The surveillance operation was then terminated.

29. On May 29, 2018 at approximately 3:28 p.m. Armando **MERIDA** placed an outgoing call from cellular facility (330) 475-9715 to **BENTON JR.** at TT-1. During the conversation **MERIDA** asked, "What's up? Hey, how much you owe me?" **BENTON JR.** replied, "Shit, I don't even know man. We need to talk. When we sitting down? I'm waiting on you." **MERIDA** responded, "Alright. I'll be there at uh, like 4:30 almost 5 o'clock. I believe **MERIDA** asked **BENTON JR.** how much **BENTON JR.** owed him from the previous cocaine delivery that **MERIDA** provided to **BENTON JR.** on consignment. **BENTON JR.** stated he did not know the amount and asked to sit down with **MERIDA** to discuss the matter. **MERIDA** told **BENTON JR.** he would meet with him between 4:30 and 5:00 P.M.

30. On May 29, 2018 at approximately 4:30 p.m. **BENTON JR.** placed an outgoing call from TT-1 to **MERIDA** at cellular facility (330) 475-9715. During the conversation **BENTON JR.** stated, "Yo." **MERIDA** replied, "Hey, I'm here." **BENTON JR.** replied, "Alright. Me too."

*as of MAY 29 start on Wiretaps May 17Th*

*I'm waiting on Them*

*↑ I'm waiting on drugs*

*No waiting on drugs*

*Evidence of They NO that NO drugs on 696 or 696*

**MERIDA** stated, "Five minutes. Alright." I believe both parties confirmed to meet and discuss money owed for cocaine in five minutes after the call ended."

31. On May 29, 2018 at approximately 4:36 p.m., TFO Brian Callahan observed (via pole camera) **BENTON JR.**'s vehicle arrive at 696 Carlysle Street, Akron, Ohio. At approximately 4:40 p.m., TFO Callahan observed a juvenile female exit the passenger side of **BENTON JR.**'s vehicle and entered the residence. **BENTON JR.** also exited his vehicle and entered the residence. After a short time, **BENTON JR.** and the juvenile female exited his residence and **BENTON JR.** escorted the juvenile female into the adjoining residence, which is known to investigators to be occupied by **BENTON JR.**'s mother Crystal Shannon. **BENTON JR.** then returned to his residence.

32. On May 29, 2018 at approximately 4:43 p.m., TFO Callahan observed a white Ford van displaying Ohio license plate PJQ-2983 arrive at 696 Carlysle Street, Akron, Ohio. **ARMANDO MERIDA** exited the white Ford van and walked into **BENTON JR.**'s residence.

33. On May 29, 2018 at approximately 4:46 p.m., TFO Callahan observed **ARMANDO MERIDA** walk out of **BENTON JR.**'s residence, enter the white Ford van, and depart the residence. TFO Callahan positively identified **MERIDA** after viewing his Summit County Jail booking photograph.[2] **MERIDA**'s height and weight also appeared similar to the height and weight listed on his license.

34. On May 29, 2018 at approximately 4:47 p.m. **BENTON JR.** placed an outgoing call from TT-1 to an unknown male at cellular facility (234) 788-5839. During the conversation **BENTON JR.** stated, "Alright. They just pulled up on me man. They said this weekend or next for sure." The unknown male replied, "Oh yeah?' **BENTON JR.** stated, "Yup I'm just calling to let you know." The unknown male asked, "Who? Our people or them other one?" **BENTON JR.** replied, "Oh no, our people. You know how they handle us." The unknown male replied, "Alright, yeah. (Inaudible) waiting man I'm ready. **BENTON JR.** stated, "Patiently, that's what I said. Patiently waiting man because I need every god damn crumb fuck that." The unknown male stated, "I ain't gonna lie bro, I been , I ain't been this focused in my life man. **BENTON JR.** responded, "Yup I got you soon man." The unknown male replied, "Help me help you man." **BENTON JR.** stated, "You already know I gotcha." The unknown male responded, "Alright." I believe **BENTON JR.** stated his cocaine supplier (**MERIDA**) just stopped by **BENTON JR.**'s residence and informed **BENTON JR.** he would be getting a shipment of cocaine this weekend or the following weekend. The unknown male asked if it was **MERIDA** or a different supplier and **BENTON JR.** told him it was **MERIDA** referred to as 'our people' and that they always take good care of **BENTON JR.** when providing him with large amounts of high quality cocaine. The unknown male assured **BENTON JR.** he was ready to help **BENTON JR.** by stating 'I ain't been this focused in my life man. **BENTON JR.** assured the unknown male he would give cocaine to him by stating 'Yup I got you soon.'

35. On May 29, 2018 at approximately 4:50 p.m. **BENTON JR.** placed an outgoing call from TT-1 to an unknown male at cellular facility (234) 706-1101. During the conversation **BENTON JR.** stated, "Yeah, the one, two, three is en route. The unknown male responded, "Ah,

---

[2] **MERIDA** was booked into the Summit County Jail on July 28, 2014 for the offense of Domestic Violence under the name of Armando Velasco. I am aware his full name is Armando Velasco **MERIDA**.

*Akron*

okay." I believe **BENTON JR**. informed the unknown male that cocaine was enroute and the unknown male replied okay.

36. On May 29, 2018 at approximately 4:56 **BENTON JR**. sent an outgoing SMS message from <u>TT-1</u> to **MATTHEW VIRDEN** at cellular facility (234) 706-1101 that read: "Going down soon". I believe **BENTON JR**. informed the unknown male that a shipment of cocaine would be arriving soon (from **MERIDA**).

37. On May 29, 2018 at approximately 6:34 p.m. **VIRDEN** utilizing cellular facility (234) 706-1101 sent an outgoing SMS message to **BENTON JR**. at <u>TT-1</u> that read: "Need 2 when ever ready". I believe the unknown male asked for 2 kilograms of cocaine whenever **MERIDA** brings them.

*Wanting on drugs*

38. On May 29, 2018 at approximately 6:37 **BENTON JR**. sent an outgoing SMS message from <u>TT-1</u> to **VIRDEN** at cellular facility (234) 706-1101 that read: "Yup". I believe **BENTON JR**. assured the unknown male that he would give him 2 kilograms upon their arrival from **MERIDA**.

39. On May 29, 2018 at approximately 9:49 p.m. an unknown male utilizing cellular facility (216) 414-9577 sent an outgoing SMS message to **BENTON JR**. at <u>TT-1</u> that read: "Damn. Piano dude came?" I believe the unknown asked if **BENTON JR.'s** cocaine supplier came by **BENTON JR.'s** house. I am aware from training and experience that cocaine suppliers are sometimes referred to as a 'piano man' as pianos have keys which is coded language for kilograms.

40. On May 29, 2018 at approximately 10:07 p.m. **BENTON JR**. sent an outgoing SMS message from <u>TT-1</u> to an unknown male at cellular facility (216) 414-9577 that read: "Yup". I believe **BENTON JR**. confirmed that his cocaine supplier (**MERIDA**) came by to see him earlier (and assured him of an upcoming delivery of cocaine).

41. On June 5, 2018 at approximately 5:11 p.m. **MERIDA** placed an outgoing call from cellular facility (330) 957-9907 to **BENTON JR**. at TT-1. During the conversation **MERIDA** asked, "You good? You got me today or you wanna make it tomorrow?" Both parties were having difficulty understanding each other as they were talking over each other and **MERIDA** speaks with a heavy Spanish accent. Later in the conversation **MERIDA** stated, "Twenty minutes? No, no, no, no, no. Cancel, cancel. Let's go by (inaudible) and, and, and tomorrow 5:30. I'll be there. Okay?" **BENTON JR**. replied, "5:30 tomorrow it's gonna be ready?" **MERIDA** replied, "Yes." **BENTON JR**. replied, "Alright. Please man. I need you. Please, I'm waiting. Alright. Alright. Alright." **MERIDA** responded, "Okay. Okay. I believe **MERIDA** asked if **BENTON JR**. wanted to meet immediately for **MERIDA's** cocaine delivery or wait until the following day. Both parties had difficulty understanding each other and **MERIDA** finally informed **BENTON JR**. they would meet the following day (June 6, 2018) to conduct the transaction. **BENTON JR**. asked if the cocaine would be ready and **MERIDA** replied, 'Yes'. **BENTON JR**. began insisting on the cocaine delivery by stating, 'Please man. I need you'.

*Now still waiting*

42. On June 5, 2018 at approximately 5:23 p.m. **BENTON JR**. sent an outgoing SMS message from TT-1 to an unknown male at cellular facility (234)706-1101 that read: "2morrow

by 7 have al ready what u want". Affiant believes **BENTON JR.** informed the unknown male
that tomorrow by 7 p.m. he would have the cocaine ready for the unknown male and asked how
much cocaine he wanted.

43. On June 6, 2018 investigators conducted all-day surveillance of **MERIDA** and
**BENTON JR.** in an attempt to determine where **MERIDA** obtained the cocaine from and
surveil the subsequent delivery to **BENTON JR.** Shortly after 4:30 p.m. **BENTON JR.** was
observed via pole camera as he arrived at 696 Carlysle Street. At approximately 4:43 p.m.
**BENTON JR.** placed an outgoing call from **TT-1** to **MERIDA** at (330) 957-9907 that
**MERIDA** did not answer. At the same time air and ground surveillance units noted **MERIDA**
and 3 unidentified Hispanic male were apparently packing up **MERIDA's** van and getting off
work for the day. At approximately 4:58:07 p.m. **MERIDA** sent an outgoing SMS message from
(330) 957-9907 to **BENTON JR.** at **TT-1** that read: "No no call". At approximately 4:58:22 p.m.
**MERIDA** sent an additional outgoing SMS message from (330) 957-9907 to **BENTON JR.** at
**TT-1** that read: "Hot". I believe **MERIDA** instructed **BENTON JR.** not to call his phone as
**MERIDA** was aware of law enforcement presence and / or surveillance units referring to them as
'hot'. I am aware from training and experience in similar investigations that "hot" is common
street terminology frequently used to describe law enforcement presence. Additionally, during
the surveillance operation **MERIDA** was observed on 2 occasions looking up at a helicopter
assigned to air surveillance of **MERIDA.** After the second time **MERIDA** looked up at the
helicopter it was removed from surveillance however, it was too late and the surveillance
operation was later terminated when **BENTON JR.** finally left 696 Carlysle Street (presumably
when he realized **MERIDA** was not coming to deliver the cocaine).

44. At approximately 9:30 p.m. **BENTON JR.** sent an outgoing SMS message from **TT-
1** to **MERIDA** at (330) 957-9907 that read, "Ok let no when." I believe **BENTON JR.** told
**MERIDA** to let him know when **MERIDA** was ready to conduct the cocaine delivery.

45. On June 7, 2018 at approximately 6:47 p.m. **MERIDA** placed an outgoing call from
cellular facility (330) 690-5014 to **BENTON JR.** at **TT-1.** During the conversation **MERIDA**
stated, "Hey, hey, I got no nothing. Okay?" **BENTON JR.** replied, "Alright." **MERIDA** then
stated, "Alright. And I got something behind me. I think. I don't know. I'm not sure. Somebody
but I just gotta be away for a couple weeks Okay? For sure because I no wanna goin to jail.
Alright?" **BENTON JR.** replied, "Alright. Alright." Shortly after **MERIDA** stated, "Alright. I
call you, I call you." **BENTON JR.** responded, "Alright. Bless you." **MERIDA** reiterated, 'No
call me on the other phone." **BENTON JR.** responded, "Alright." I believe MERIDA informed
**BENTON JR.** that he did not have cocaine referred to as 'I got no nothing' and that he believed
he may have been followed by law enforcement on June 6 by stating 'And I got something
behind me, I think. I don't know.' **MERIDA** informed **BENTON JR.** he would not be able to
supply him with cocaine for a couple weeks by stating 'I just gotta be away for a couple weeks'
until things settled down, because if it was in fact law enforcement following him he did not
want to get caught delivering cocaine to **BENTON JR.** and risk going to jail. **MERIDA** then
told **BENTON JR.** not to call him at his (330) 957-9907 phone anymore suspecting that in mite
be subject to Title III interception.

46. On June 15, 2018 at approximately 11:01 a.m. **BENTON JR.** placed an outgoing call
from **TT-1** to **MERIDA** at cellular facility (330) 957-9907. During the call **BENTON JR.**
stated, "Yo" and **MERIDA** responded, "Yeah." **BENTON JR.** stated, "Call me." **MERIDA**

replied, "What I told you? What I told you?" **BENTON JR.** stated, "I, I ain't know the number, just call me." **MERIDA** then hung up the phone on **BENTON JR.** I believe **BENTON JR.** called **MERIDA** to check the status of a cocaine delivery **MERIDA** was to send to **BENTON JR.** **MERIDA** became angry with **BENTON JR.** because **BENTON JR.** called his phone after being instructed by **MERIDA** not to call it. **BENTON JR.** tried to tell **MERIDA** that he didn't know **MERIDA**'s new phone number thus he had to call **MERIDA** at (330) 957-9907. **MERIDA** then hung up the phone on **BENTON JR.**

47. On June 18, 2018 at approximately 7:03 p.m. **MERIDA** placed an outgoing call from cellular facility (330) 541-6143 to **BENTON JR.** at **TT-1**. During the conversation **MERIDA** stated, "Never call me on my phone. My phone is bad number, you know? It's my business phone at work. Okay?" **BENTON JR.** replied, "Yeah. What's up?" **MERIDA** stated, "Okay, uh, I'm pass for there tomorrow at I can (inaudible)." **BENTON JR.** asked, "What?" **MERIDA** replied, 'I'm pass over there five thirty (5:30) tomorrow." **BENTON JR.** responded, "Alright. I'll be there." **MERIDA** stated, "Alright, thank you." I believe **MERIDA** instructed **BENTON JR.** not to call his primary phone (330) 957-9907 because he uses it for his legitimate dry wall business. **MERIDA** went on to tell **BENTON JR.** that he planned on meeting with **BENTON JR.** the following day (June 19, 2018) at 696 Carlysle Street and **BENTON JR.** confirmed he would be there.

48. On June 19, 2018 at approximately 7:56 a.m. **BENTON JR.** sent an outgoing SMS message from **TT-1** to an unknown individual at (330) 615-9176 that read: "Mite go down today". I believe **BENTON JR.** informed the unknown individual that he might receive a delivery of cocaine today (from **MERIDA**).

49. On June 19, 2018 at approximately 6:37 p.m. **BENTON JR.** sent an outgoing SMS message from **TT-1** to **VIRDEN** at cellular facility (234) 706-1101 that read: "What u wanted". **BENTON JR.** immediately sent another SMS message from **TT-1** to **VIRDEN** at cellular facility (234) 706-1101 that read: Get ready next hour". I believe **BENTON JR.** asked **VIRDEN** how much cocaine he wanted and that it would be delivered to **BENTON JR.** in the next hour.

50. On June 19, 2018 at approximately 6:39 p.m. **VIRDEN** sent an outgoing SMS message from cellular facility (234) 706-1101 to **BENTON JR.** at **TT-1** that read: "3". I believe **VIRDEN** asked **BENTON JR.** for 3 kilograms of cocaine.

51. On June 19, 2018 at approximately 7:38 p.m. **MERIDA** sent an outgoing SMS message from cellular facility (330) 541-6143 to **BENTON JR.** at **TT-1** that read: "10 mines". **BENTON JR.** immediately replied back from **TT-1** to **MERIDA** at cellular facility (330) 541-6143 with an SMS message that read: "Ok". I believe **MERIDA** told **BENTON JR.** he would arrive at 696 Carlysle Street to meet in ten minutes.[3]

52. On June 19, 2018 at approximately 8:20 p.m. **BENTON JR.** placed an outgoing call over **TT-1** to **VIRDEN** at cellular facility (234) 706-1101. During the conversation **BENTON**

---

[3] At approximately 8:15 p.m. investigators observed via pole camera, a red, 2010 Toyota 4DR sedan bearing Ohio registration HLD 9609 arrive at 696 Carlysle Street. A Hispanic male exited the passenger seat of the vehicle and met with **BENTON JR.** at the rear door and entered the residence. Both parties engaged in a brief verbal conversation in the rear doorway. At 8:20 p.m. the Hispanic male exited the rear door and returned to the vehicle which then departed.

JR. stated, "They pulled up talking about two more days but it's for sure. Man I thought they was pulling up with it. They pulled, they pulled up to fucking talk. I'm mad." **VIRDEN** stated, "Man, dog. You been sitting here and I'm up here sweating bullets man counting this mother fucking money man." Shortly after **VIRDEN** asked, "You said what?" **BENTON JR.** stated, "...this is some bullshit. They just, just left, man. That's why." Shortly after **VIRDEN** asked, "What is wrong with these mother fuckers, man." **BENTON JR.** replied, "Man, they talking about some bullshit. And they wanted to make sure I'm ready and they had to wait until something (inaudible) some bullshit. But they said for sure Friday or Saturday, they said." **VIRDEN** asked, "Is it right?" **BENTON JR.** replied, "Oh yeah, they said they had to make sure it was right and this, and this, and that. A whole bunch of bullshit." **VIRDEN** responded, "Man." **BENTON JR.** stated, "I'm just (inaudible) said two more days though, a couple more days." **VIRDEN** replied, "Alright." I believe **BENTON JR.** told **VIRDEN** that he had just met with his Hispanic cocaine supplier and they told him it would be two more days and they would deliver him cocaine and that the deal was for sure. **VIRDEN** became angry because he assumed the cocaine was being delivered on June 19, 2018 thus, **VIRDEN** began traveling towards 696 Carlysle Street with a substantial amount of currency to purchase some of the cocaine from **BENTON JR. VIRDEN** was worried that he was going to be stopped by police with the currency referred to as 'sweating bullets'. **VIRDEN** reiterated that the cocaine would be delivered Friday (June 22) or Saturday (June 23). **VIRDEN** asked if it was going to be a significant delivery referred to as 'Is it right' to which **BENTON JR.** confirmed by stating 'Oh yeah'.

53. On June 19, 2018 at approximately 8:23 p.m. **BENTON JR.** sent an outgoing SMS message from TT-1 to an unknown individual at cellular facility (234) 706- 9585 that read: "Man they just pul to c what up talking 2 mo days". I believe **BENTON JR.** told the unknown individual that his cocaine suppliers just pulled up to see if **BENTON JR.** was ready to accept a delivery of cocaine and that the delivery would arrive in 2 more days.

54. On June 19, 2018 at approximately 8:28 p.m. an unknown individual sent an outgoing SMS message from cellular facility (234) 706-9585 to **BENTON JR.** at **TT-1** that read: "Fuck it we gone wait peace be steal my nigga". I believe the unknown individual stated: we are going to wait in peace (for the cocaine delivery) and for **BENTON JR.** to be still.

55. On June 19, 2018 at approximately 8:29 p.m. **BENTON JR.** sent an outgoing SMS message from **TT-1** to an unknown individual at cellular facility (234) 706-9585 that read: "Rite it on way tho sit ttgggt). I believe **BENTON JR.** stated, "Right it (the cocaine) is on the way sit tight."

56. On June 19, 2018 at approximately 8:24 p.m. **BENTON JR.** sent an outgoing SMS message from **TT-1** to an unknown individual at cellular facility (216) 835-9396 that read: "2 mo days they talking". The unknown individual immediately sent an outgoing SMS message from cellular facility (216) 835-9396 to **BENTON JR.** at **TT-1** that read: "Ok". I believe **BENTON JR.** informed the unknown individual that his cocaine supplier(s) told him the cocaine would be delivered to **BENTON JR.** in 2 more days.

57. On June 19, 2018 at approximately 8:25 p.m. **BENTON JR.** sent an outgoing SMS message from **TT-1** to an unknown individual at cellular facility (330) 697-4316 that read: "They talking couple mo days". I believe **BENTON JR.** informed the unknown individual that his cocaine supplier(s) told him the cocaine would be delivered to **BENTON JR.** in a couple more days.

58. On June 19, 2018 at approximately 8:26 p.m. an unknown individual sent an outgoing SMS message from cellular facility (330) 697-4316 to **BENTON JR.** at **TT-1** that read: "Damn had people ready". I believe the unknown individual was frustrated as the individual

assumed the cocaine would be available on June 19 and the individual had customers ready to purchase it.

59. On June 19, 2018 at approximately 8:26 p.m. **BENTON JR.** sent an outgoing SMS message from **TT-1** to an unknown individual at cellular facility (330) 697-4316 that read: "Man me too smh". I believe **BENTON JR.** the unknown individual he also had customers waiting for cocaine and he too was frustrated referred to as 'smh' known to an abbreviated form of "shaking my head".

60. On June 19, 2018 at approximately 8:34 p.m. an unknown individual sent an outgoing SMS message from cellular facility (330) 697-4316 to **BENTON JR.** at **TT-1** that read: "Is it fasho u think". I believe the unknown individual asked **BENTON JR.** if the cocaine delivery was for sure going to happen.

61. On June 19, 2018 at approximately 9:04 p.m. **BENTON JR.** sent an outgoing SMS message from **TT-1** to an unknown individual at cellular facility (330) 697-4316 that read: "Yup". I believe **BENTON JR.** confirmed the cocaine delivery was "for sure".

62. On June 22, 2018 at approximately 6:57 a.m. **BENTON JR.** sent an outgoing SMS message from **TT-1** to **MERIDA** at cellular facility (330) 541-6143 that read: "I'm up". I believe **BENTON JR.** told **MERIDA** he was awake and ready to accept a delivery of cocaine from **MERIDA**.

63. Affiant is aware from a review of pole camera footage, intercepted conversations, physical surveillance and other law enforcement activities that **BENTON JR.**'s mother Crystal Shannon resides at 698 Carlysle Street known to be the duplex apartment next to **BENTON JR.**'s apartment of 696 Carlysle Street where **BENTON JR.** conducts the bulk of his drug trafficking activities. A review of pole camera footage clearly shows **BENTON JR.** has access to 698 Carlysle Street as he has been observed on multiple occasions entering and exiting the apartment on his own. Additionally, a review of the Summit County Auditor's website reveals that **BENTON JR.** and Crystal Shannon are the listed owners of the structure which contains both apartment units. Affiant has included a copy of the Summit County Auditor's information identifying **BENTON JR.** and Crystal Shannon with this Affidavit. Due to these circumstances as well as the proximity of 698 Carlysle Street to 696 Carlysle Street (directly next door) to where **BENTON JR.** conducts the bulk of his drug trafficking activities and for the reasons enumerated above, Affiant requests authority to conduct a records and documents search warrant at 698 Carlysle Street.

### AFFIANT'S CONCLUSIONS

64. Based upon the foregoing, Affiant asserts there is probable cause to believe that **WILLIE R. BENTON JR., ARMANDO MERIDA, TERRENCE BOYD, MATTHEW VIRDEN,** and others known and unknown, are presently involved in violation of Ohio Revised Code 2925.03 Trafficking in Drugs (cocaine and/or crystal methamphetamine) and 2925.11 Possession of Drugs (cocaine and/or crystal methamphetamine). Additionally, **BENTON JR.** has displayed an ongoing pattern of criminal conduct at 696 Carlysle Street that has been confirmed through a controlled purchase of cocaine on March 15, 2018, pole camera surveillance, physical surveillance, intercepted conversations and SMS messages, and other law enforcement activities. As a result of this conduct Affiant has probable cause to believe cocaine and crystal methamphetamine are being stored, and will continue to be stored at 698 Carlysle Street Akron, Ohio.

65. Affiant knows from personal participation in this investigation and from information provided by investigating detectives that surveillance, controlled buys, undercover operations, and interviews has revealed a substantial cocaine trafficking conspiracy involving **WILLIE R. BENTON JR., ARMANDO MERIDA** and others known and not yet known. Based on the foregoing and the nature of the above ongoing investigation, there is probable cause to believe that the requested warrant and order will continue to provide evidence regarding the activities described above.

66. Affiant is aware that illegal drug transactions involve the transfer of large quantities of cash and that in the affiant's experience such transactions involve records and documents relating to drug sales and accompanying cash transfers.

67. Affiant, through personal experience and training, is aware that individuals involved in the illegal activity of trafficking in controlled substances maintain their own security by use of firearms and other weapons. Affiant requests authority to search all individuals coming into the premises or who are on the curtilage or within the premises at the time of the execution of the search warrant in order to insure the safety of such individuals, the investigating officers and innocent persons. Due to **BENTON JR.'s** extensive criminal history to include convictions for drug trafficking Affiant will utilize a SWAT Team as a means of securing the residence and to ensure the safety of all parties present during the execution of the warrant.

68. Personal knowledge of the affiant that persons involved in drug trafficking often keep written records of such drug transactions and equipment and scales used for the processing and packaging of drugs for sale.

69. Personal knowledge of the affiant that the Controlled Substance: cocaine, crystal methamphetamine, and marijuana is easily disposed of because of it's characteristics (lack of bulk, texture and it's flammability) and has noted through his experience and training that even relatively large quantities of cocaine, crystal methamphetamine, and marijuana may be disposed of by burning for flushing down the commode, and act which can be done in seconds. Though this affiant will fully comply with notice of entry and authority to search, the affiant maintains that the circumstances enumerated (easy disposal by burning or flushing) herein mandate that a swift entrance into the above described premises is essential to avoid the destruction of evidence, and to protect the safety of all parties involved.

70. Personal knowledge of the Affiant that the controlled substance, crack cocaine, may be possessed in quantities which are relatively low in bulk and weight and are easily secreted within the clothing of the possessor, a search of the occupants of the house is thereby necessary.

71. Affiant requests authority for a night time search for the reasons that affiant has reason to believe that the events listed above and the scope of the investigation may continue into the night time hours and, through affiant's experience and training, individuals involved in illegal drug sales maintain late hours in pursuit of their illicit enterprise.

72. This Affidavit was reviewed by City of Akron, Ohio Police Legal Advisor Craig Morgan and subsequently approved.

AFFIANT

Sworn to and subscribed in my presence by the above named Affiant this 25 day of June, 2018.

JUDGE, Akron Municipal Court

*real reason got warrant for this federal investigation on title III*

*new drugs was on way*

On June 26, 2018, investigators were monitoring the T-III intercept on BENTON. At approximately 11:12 a.m., BENTON received an incoming call from telephone number (330) 541-6143 belonging to Armando V. MERIDA. BENTON answered by saying "Hello" and MERIDA replied "Be ready at 6:30". BENTON said "Hello" and MERIDA replied "Ready at 6:30". BENTON asked "6:30" and MERIDA replied "Hmm-uhu". BENTON then said "Alright I'll be there" and MERIDA replied but it was unintelligible. BENTON said "Hello" and the call ended.

*The March 15 buy was not real truth to getting warrant on 25th real reason was 26th when new drugs was on way?*

*How is warrant signed 25th probable cause aint happen yet to Agree to warrant!*

*Why is ATTACHMENT*

*22-23 No probable cause exist to agree on warrant*

*Why believe warrant was signed after the seizure of drugs*

*Probable cause not even in city warrant?*

*Exhibit C*

*June 27 last interception*

*This The real probable cause But complaint says an informant called or provided The opposite*

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Northern District of Ohio

United States of America
v.

WILLIE R. BENTON, JR.

*Defendant(s)*

)
)
)
)
)
)
)

Case No.  5 : 18MJ 1123

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____June 26, 2018_____ in the county of _____Summit_____ in the
_____Northern_____ District of _Ohio, Eastern Division_ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21:841(a)(1) and (b)(1)(A) | possession with the intent to distribute approximately seven kilograms of cocaine, a Schedule II controlled substance; |
| 21: 846, 841(a)(1) and (b)(1)(A) | conspiracy to possess with the intent to distribute approximately seven kilograms of cocaine, a Schedule II controlled substance. |

*(handwritten: with state crimes evidence change complaint to federal codes. 26th)*

This criminal complaint is based on these facts:

Please see attached Affidavit

*(handwritten: 25th warrant for state crimes in warrant prosecution evidence.)*

☑ Continued on the attached sheet.

_____
Complainant's signature

SA Daniel D. Wehrmeyer, DEA
*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___6/27/18___

_____
Judge's signature

City and state: _____Akron, OH_____

Kathleen B. Burke, U.S. Magistrate Judge
*Printed name and title*

*(handwritten annotations in margins: "Fuck Now why Stove Courtos Central Heat", "different probable cause story?", "warrant filed 4 hours later used now for federal case and investigative and 2 different probable cause stories on same warrant", "18 JUN 27 PM 3:29", "Exhibit")*

## AFFIDAVIT

I, Daniel D. Wehrmeyer, Special Agent (SA) of the Drug Enforcement Administration (DEA), United States Department of Justice, being duly sworn, do depose and state that:

## INTRODUCTION

1.     I am an officer of employee of the United States Department of Justice, Drug Enforcement Administration (DEA) within meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.  At all times mentioned herein, I have been acting in an official capacity as a Special Agent with the DEA.

2.     This Affidavit is offered in support of a criminal complaint and warrant for the arrest of **WILLIE R. BENTON, JR.** (also referred simply to as **WILLIE R. BENTON**), and **ARMANDO V. MERIDA** (aka **ARMANDO VELASCO** and **ARMANDO MERIDA VELASCO**) alleging that on June 26, 2018, they did commit violations of:  Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A), that is, possession with intent to distribute cocaine, a Schedule II controlled substance; and Title 21, United States Code, Section 846,

that is conspiracy to possess with the intent to distribute cocaine, a Schedule II controlled substance.

## TRAINING AND EXPERIENCE

3.      I have been employed by the DEA for approximately 21 years and have been assigned to the Cleveland District Office since February 1997. I have been assigned responsibilities to investigate federal crimes involving Money Laundering and Drugs. I have conducted investigations into the unlawful importation, possession with intent to distribute, distribution of controlled substances, the money laundering of monetary instruments, monetary transactions in property derived from specified unlawful activities and the associated conspiracies, in violation of Title 21, United States Code, Sections 841(a)(1), 843(b), 846, 952(a) and 963, and Title 18, United States Code, Sections 371 and 1956.

4.      I have received specialized instruction about narcotics, narcotics trafficking, money laundering and various techniques for investigating persons and organizations engaged in this unlawful conduct. During the past 21 years, I have participated in investigations involving the organized distribution of illegal drugs and has made numerous arrests for drug-related offenses. My experience as a DEA Agent includes, but is not limited to: physical surveillance, analyzing pen

2

register and telephone toll data, interviewing witnesses, drafting and executing search warrants seeking seizure of illegal drugs and other evidence of drug violations, supervising the purchases of controlled substances by undercover agents and informants, and debriefing persons arrested and convicted of drug trafficking offenses about their illegal activity.

5.    I know that those involved in the illicit distribution of controlled substances nearly always attempt to conceal their identities, the locations at which the illicit transactions occur, and the flow of proceeds from the illicit activity into "clean" currency.

6.    Through investigation and training, I have become familiar with the types and amounts of prices charged and profits made by drug dealers, as well as the methods, language, and terms which are used to disguise their illegal activity. I have been qualified in federal court to provide expert "opinion" testimony about drug trafficking practices.

## SUBJECTS

7.    This Affidavit is regarding **WILLIE R. BENTON, JR.**, with a birth date in 1982, SSN XXX-XX-8926, and FBI No. 2958*****. **BENTON** is a black male who resides at 802 Orlando Avenue, Akron, Ohio. **BENTON** is 6'0", 285 pounds, with black hair and brown eyes; **ARMANDO V. MERIDA** (aka

3

ARMANDO VELASCO and **ARMANDO MERIDA VELASCO**) with a birth

date in 1976, No SSN, Alien Registration No. \*\*\*\*\*1023 and FBI No. 7885\*\*\*\*.

**MERIDA** is a Hispanic male who resides at 2032 Pressler Road, Akron, Ohio.

**MERIDA** is 5'6", 164 pounds, with black hair and brown eyes.

## FACTS AND CIRCUMSTANCES REGARDING PROBABLE CAUSE

8.      Except where otherwise noted, the information set forth in this

Affidavit has been provided to me directly or indirectly by Special Agents of the

DEA, Akron Police Department, Summit County Drug Unit or other law

enforcement officers.  Unless otherwise noted, wherever in this affidavit I asserted

that a statement was made, the information was provided by another law

enforcement officer (who may have either direct or hearsay knowledge of the

statement) to whom I have spoken or whose report I have read and reviewed.  Such

statements are among many statements made by others, and are stated in substance

unless otherwise indicated.

9.      In the late morning on June 26, 2018, law enforcement received

information from a confidential source which has been found to be truthful and

reliable based on investigation confirming the provided information in this

investigation.  The confidential source provided that **ARMANDO V. MERIDA**

4

*↓ deliberate falsehood*

was going to deliver a large quantity of cocaine to **WILLIE R. BENTON, JR** at

696 Carlysle Street, Akron, Ohio,      *Reckless disregard of the truth ☆*

10.   On June 26, 2018, at approximately 4:30 p.m., investigators from the

Akron-Summit County HIDTA Initiative conducted surveillance on **BENTON** as

he departed his restaurant "What's on the Menu" located at 271 S. Main Street,

Akron, Ohio.  Investigators followed **BENTON** to 696 Carlysle Street, Akron,

Ohio, and established stationary surveillance in the area.[1]

11.   At approximately 6:09 p.m., investigators observed, via the pole

camera, a vehicle arrive at 696 Carlysle Street where **MERIDA** exited the

passenger side of the vehicle carrying a box and entered into the residence with

**BENTON**.   At approximately 6:12 p.m., and via the pole camera, **MERIDA**

departed 696 Carlysle Street, Akron, Ohio, and initiated mobile surveillance.  At

approximately 6:23 p.m., Detectives from the Akron Police Department conducted

an investigative traffic stop on **MERIDA** as he traveled east on State Route 224

and Kelly Avenue.  Detectives located a large amount of U.S. currency located in a

black string bag on the floor behind the driver's seat.

---

[1] On April 11, 2018, a pole camera was installed overlooking 696 Carlysle Street which currently remains operational. In addition, investigators surmised BENTON utilized 696 Carlysle Street as a "stash house" for his drugs and/or drug related proceeds.

5

12. During this same time, **BENTON** departed the residence at 696 Carlysle Street, Akron, Ohio, and sat in his vehicle in the driveway preparing to depart. Officer's approached the residence and a City of Akron search warrant was executed at 696 Carlysle Street, Akron, Ohio. Upon entry into the residence officers conducted a protective sweep of the residence for any individuals and was found to be unoccupied. Upon searching the residence, investigators located four kilograms of cocaine in the kitchen cabinet along with the box **MERIDA** carried into the residence.[2] Additional items seized from the residence included: a handgun, and three additional kilograms of suspected cocaine secreted in a safe. Both **BENTON** and **MERIDA** were arrested pending charges.

## CONCLUSION

13. Based upon the above facts and circumstances, there is probable cause to believe that on June 26, 2018, in the Northern District of Ohio, Eastern Division, **WILLIE R. BENTON, JR.** and **ARMANDO V. MERIDA**, aka **ARMANDO VELASCO** and **ARMANDO MERIDA VELASCO**, possessed with the intent to distribute approximately seven kilograms of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1) and

---

[2] On June 27, 2018, TFO Gilbride conducted a presumptive field test which showed a positive reaction to the presence of a controlled substance.

*But city warrant dont state These crimes it State Ohio Revised Codes But How?*

*Both crimes w/ that warrant and complaint dont State same offenses!*

(b)(1)(A) and conspired to possess with the intent to distribute approximately

seven kilograms of cocaine, a Schedule II controlled substance, in violation of

Sections 846 and 841 (a)(1) and (b)(1)(A).

*Informant tip was a deliberate falsehood and Reckless disregard to The Truth!*

*Because no tip was used a wiretap text message of Beready 630 was The real probable cause in city Search warrant!*

Daniel D. Wehrmeyer, SA
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me on this 27 day of June, 2018.

Kathleen B. Burke
United States Magistrate Judge

*All DEA agents and state officers got story together at 26th June Night 27th morning got state Judges sign warrant Filed all on 27th 11:32 am 336*

*Thats Why simple and quick Change evidence to a simple source to make it Federal on state crimes Being committed*

7